FILED

1   KAREN MATTESON, Cal. Bar No. 102103
    Email: mattesonk@sec.gov
2   JASON P. LEE, Cal. Bar No. 196520
    Email: leejas@sec.gov
3
4   Attorneys for Plaintiff
    Securities and Exchange Commission
    Rosalind R. Tyson, Regional Director
5   John M. McCoy III, Associate Regional Director
    5670 Wilshire Boulevard, 11th Floor
6   Los Angeles, California 90036
    Telephone: (323) 965-3998
7   Facsimile:  (323) 965-3908

10 SEP 14 PM 3: 27

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY: _____

8

9                    UNITED STATES DISTRICT COURT

10                   CENTRAL DISTRICT OF CALIFORNIA

11  SECURITIES AND EXCHANGE            Case No. CV10 6835 RGK JCG
    COMMISSION,
12                                     MEMORANDUM OF POINTS
              Plaintiff,               AND AUTHORITIES IN
13                                     SUPPORT OF EX PARTE
                                       APPLICATION BY PLAINTIFF
14        v.                           SECURITIES AND EXCHANGE
                                       COMMISSION FOR
15  LADP ACQUISITION, INC.;            TEMPORARY RESTRAINING
    WILLIAM A. GOLDSTEIN and           ORDER AND ORDERS:
16  MARC E. BERCOON,                   (1) FREEZING ASSETS;
                                       (2) PROHIBITING THE
17            Defendants.              DESTRUCTION OF
                                       DOCUMENTS; (3) REQUIRING
18                                     ACCOUNTINGS; AND ORDER
                                       TO SHOW CAUSE RE
19                                     PRELIMINARY INJUNCTION

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

PAGE NO.

I.    INTRODUCTION ................................................................ 1

II.   STATEMENT OF FACTS ................................................... 2

   A.    The Defendants ...................................................... 2

   B.    The Fraudulent Scheme .......................................... 5

      1.    The Defendants Generally Solicit Investors Through Cold Calls ..................................................................... 5

      2.    The Defendants Make Material Misrepresentations About The Investment And Misappropriate Investor Monies ........ 6

III.  ARGUMENT .................................................................... 10

   A.    The Court Should Issue A Temporary Restraining Order Prohibiting Violations of the Antifraud Provisions of the Exchange Act .................................................... 10

      1.    Special Standards Apply to the Commission's Application 10

      2.    Defendants Violated the Securities Registration Provisions of the Securities Act ............................... 11

         a) LADP Shares Are Securities ........................... 11

         b) The Defendants Violated Sections 5(a) and 5(c) ............. 11

      3.    The Defendants Have Violated the Antifraud Provisions .. 13

         a)  The Defendants Misrepresented and Omitted Material Facts ................................................................ 13

         b) The Defendants' Misrepresentations and Omissions Were Material ......................................................... 14

         c)  The Defendants Acted with Scienter ............... 15

   B.    The Defendants Will Continue Their Fraudulent Scheme Unless Enjoined ................................................................. 16

i

1        C.     The Court Should Order An Immediate Asset Freeze To Protect

2             Investor Funds ............................................................................ 17

3        D.    Orders Prohibiting Destruction Of Documents And Requiring

4             Accountings Are Necessary And Appropriate............................. 18

5  IV.    CONCLUSION ........................................................................ 19

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CASES**

2
                                                                    PAGE NO.

3
Aaron v. SEC

4
446 U.S. 680,100 S. Ct. 1945, 64 L.Ed.2d 611 (1980)............................................. 16

5
Anderson v. Aurotek

6
774 F.2d 927(9th Cir. 1985)........................................................................ 12

7
Basic Inc. v. Levinson

8
485 U.S. 224, 108 S.Ct.978, 99 L.Ed.2d 194 (1988)............................................. 15

9
Ernst & Ernst v. Hochfelder

10
425 U.S. 185(1976)........................................................................ 16

11
FSLIC v. Sahni

12
868 F.2d 1096 (9th Cir. 1989)....................................................11,20

13
FTC v. Affordable Media, LLC

14
179 F.3d 1228(9th Cir. 1999)........................................................................ 19

15
FTC v. H.N. Singer, Inc.

16
668 F.2d 1107(9th Cir. 1982)....................................................11,20

17
Herman & MacLean v. Huddleston

18
459 U.S. 375,103 S. Ct. 683, 74 L.Ed.2d 548 (1983)............................................. 16

19
SEC v. Burns

20
816 F.2d 471(9th Cir. 1987)........................................................................ 17

21
SEC v. Calvo

22
378 F.3d 1211(11th Cir. 2004)........................................................................ 12

23
SEC v. Continental Tobacco Co. of S.C., Inc.

24
463 F.2d 137(5th Cir. 1972)........................................................................ 12

25
SEC v. Dain Rauscher, Inc.

26
254 F.3d 852(9th Cir. 2001)........................................................................ 14,15,16

27
SEC v. Fehn

28
97 F.3d 1276(9th Cir. 1996)........................................................................ 15

SEC v. Hickey
322 F.3d 1123(9th Cir. 2003)...................................................................... 19
SEC v. International Swiss Investments Corp.
895 F.2d 1272(9th Cir. 1990)................................................................. 19,21
SEC v. JT Wallenbrock & Associates
440 F.3d 1109 (9th Cir 2006)..................................................................... 17
SEC v. Koracorp Industries, Inc.
575 F.2d 692(9th Cir. 1978)........................................................................ 18
SEC v. Management Dynamics, Inc.
515 F.2d 801 (2d Cir.1975).......................................................................... 10
SEC v. Manor Nursing Centers
458 F.2d 1082 (2nd Cir 1972) ...................................................................... 19
SEC v. Murphy
626 F.2d 633(9th Cir. 1980)............................................................... 12,13,18
SEC v. Musella
578 F. Supp. 425(S.D.N.Y. 1984)............................................................... 20
SEC v. Ralston Purina Co.
346 U.S. 119(1953) ...................................................................................... 13
SEC v. Unifund SAL
910 F.2d 1028, 1041 (2d Cir. 1990);........................................................... 20
SEC v. Unique Fin. Concepts, Inc.
196 F.3d 1195 (11th Cir. 1999)..................................................................... 10
SEC v. Wencke
622 F.2d 1363, 1369 (9th Cir. 1980)...................................................... 19,21
SEC v. Phan
500 F.3d 895, 905-07 (9th Cir. 2007) ...................................................... 12,13
TSC Indus., Inc. v. Northway, Inc.
426 U.S. 438, 96 S.Ct. 2126,48 L.Ed.2d, 757 (1976)................................ 14

1

United States v. Nutri-Cology, Inc.

982 F.2d 394 (9th Cir. 1992)........................................................................ 11

United States v. Odessa Union Warehouse Coop

833 F.2d 172, 176 (9th Cir. 1987).............................................................. 18

**STATUTORY PROVISIONS**

15 U.S.C. § 77b(a)(1) ................................................................................. 11

15 U.S.C. § 77e(a) & 77e(c) .................................................................. 1,11

15 U.S.C. § 77q(a)........................................................................................ 1

15 U.S.C. § 78c(a)(10) ............................................................................... 11

15 U.S.C. § 78j(b) ........................................................................................ 1

15 U.S.C. § 78u(d) ..................................................................................... 10

**RULES AND REGULATIONS**

17 C.F.R. §240.10b-5................................................................................1,13

Reg. D, Rules 505 and 506, 17 C.F. R. §§ 230.505 & 230.506......................12

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 65(b) .................................................................................... 2

**LOCAL RULES**

L.R.7-9...........................................................................................................2

L.R.7-19.2 .....................................................................................................2

L.R. 65.1.........................................................................................................2

## I.   **INTRODUCTION**

By its Ex Parte Application, Plaintiff Securities and Exchange Commission ("Commission") seeks a temporary restraining order and other emergency relief to halt the fraudulent sale of securities by Defendants LADP Acquisition, Inc. ("LADP"), William A. Goldstein ("Goldstein"), and Marc E. Bercoon ("Bercoon").

From about mid-2009 through the present, the Defendants have raised at least $3.2 million from approximately 110 investors in the United States, in an unregistered, fraudulent securities offering.  The Defendants, through their sales agents, cold-called investors, offering and purporting to sell shares in L.A. Digital Post, Inc. ("L.A. Digital"), a television and film production company with offices in Los Angeles and New York, purportedly to grow the business of L.A. Digital. Among other representations, the Defendants and their agents tell investors that L.A. Digital will conduct an initial public offering ("IPO") of its stock within two to six months, and that its shares will soon trade on the New York Stock Exchange or the American Stock Exchange.  In fact, the defendants have been employing a "bait-and-switch" scheme whereby purchasers of the shares instead receive stock certificates stating that they own shares in Defendant LADP.  No public offering of L.A. Digital stock has occurred.  Moreover, the Defendants have not distributed any monies raised in the LADP offering to L.A. Digital.  Instead, Defendants Goldstein and Bercoon, who control LADP's bank accounts, have misappropriated for their own use at least $874,289 of the $3.2 million in investor funds raised.

By engaging in this conduct, the Defendants violated, and unless enjoined will continue to violate (1) the registration provisions of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) & (c), and (2) the antifraud provisions of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.  Accordingly,

1  the Commission seeks temporary, preliminary, and permanent injunctions
2  enjoining each of the Defendants from violating the above-described antifraud
3  provisions; a temporary restraining order and preliminary injunction freezing the
4  assets of each of the Defendants and prohibiting them from destroying documents;
5  and an order that the Defendants provide accountings.  The Commission also seeks
6  an order to show cause why a preliminary injunction should not be granted.

7  　　　The Commission requests, pursuant to Fed. R. Civ. P. 65(b) and Local Rules
8  7-19, 7-19.2 and 65-1, that the Court consider its <u>Ex</u> <u>Parte</u> Application for
9  emergency relief without prior notice to the Defendants, in order to prevent further
10  dissipation of investor funds and other assets by the Defendants before the
11  Commission's Application is considered.

12  　　　For these reasons, as explained in greater detail below, the Commission's <u>Ex</u>
13  <u>Parte</u> Application should be granted.

14  **II.**　**STATEMENT OF FACTS**
15  　　　**A.**　**The Defendants**
16  　　　<u>LADP Acquisition, Inc.</u> is a Delaware corporation located in Atlanta,
17  Georgia.  (Declaration of Jason P. Lee ("Lee Declaration") ¶ 3, Ex. 2 (LADP
18  Certificate of Incorporation).)  On January 8, 2010, the State of Pennsylvania
19  issued a cease and desist order against LADP to halt the unregistered offering of
20  LADP shares.  (Lee Declaration ¶ 6, Ex. 5 (Pennsylvania Summary Order and
21  press release).)  There is no evidence that it has any business operations.

22  　　　<u>William A. Goldstein</u> resides in Atlanta, Georgia.  He purports to be an
23  investor and entrepreneur and claims to be a founding member of WebMD.
24  (Matthews Declaration ¶ 5, Exs. 1, 2 (L.A. Digital Confidential Investor
25  Information memorandum ("LADP memo") at 3 and LADP PPM at 30,
26  respectively).)  Goldstein owns, directly or indirectly in conjunction with Bercoon,
27  a substantial interest in L.A. Digital, a television and film production company
28  with offices in Los Angeles and New York.  (Lee Declaration ¶ 4, Ex. 3 (Gary

1  Migdal[1] testimony transcript ("Migdal testimony") 22:19-25, 23, 24:1-10).)  He
2  represents that he is the Chairman of L.A. Digital and/or LADP, but he in fact is
3  not involved in the daily operations of L.A. Digital.  (See id., Ex. 3 (Migdal
4  testimony 23:20-22); Matthews Declaration ¶ 8, Ex. 4 (November 16, 2009
5  Goldstein correspondence).)  Together with Bercoon, Goldstein controls Defendant
6  LADP and has signatory authority over its bank accounts, including at least one
7  account in the name of "LADP, LLC," where investor monies are deposited.
8  (Matthews Declaration ¶ 8, Ex. 4; Declaration of Nina Yamamoto[2] ("Yamamoto
9  Declaration") ¶¶ 6, 7.)
10          In the past, Defendant Goldstein has held various positions with public
11  companies, including:

- Chairman of the Board and CEO of RCG Companies, Inc. (now
  known as OneTravel Holdings, Inc.) during the period February 1,
  2004, to June 6, 2006, and April 28, 2005, to June 6, 2006,
  respectively;
- A Director of Market Central, Inc. (now known as Scientigo, Inc)
  during the period February 2003 to November 2004; and
- The Company and Investor Relations contact for Generation Zero
  Group as of June 14, 2010.

20  Defendant Goldstein is also an officer and manager of Ibar Management Group,
21  LLC, a company located in Atlanta, Georgia.  (Yamamoto Declaration ¶ 13.)
22          Marc E.  Bercoon resides in Atlanta, Georgia, and owns, directly or
23  indirectly in conjunction with Goldstein, a substantial interest in L.A. Digital.  (Lee
24  Declaration ¶ 4, Ex. 3 (Migdal testimony 23:11-25, 24:1-10).)  Bercoon is, in fact,

---

26  [1]  Migdal is the president and CEO of L.A. Digital.

27  [2]  Ms. Yamamoto is a CPA employed by the Commission as a staff
28  accountant.

1   the Chairman of L.A. Digital, but he is not involved in its daily operations. (See

2   id., Ex. 3 (Migdal testimony 14:10-25, 15:1-5).)   Together with Goldstein,

3   Bercoon controls Defendant LADP and has signatory authority over its bank

4   accounts, including the account in the name of "LADP, LLC," where investor

5   monies are deposited. (Yamamoto Declaration ¶¶ 6, 7.)  Bercoon is an attorney

6   who was licensed to practice law in the State of Illinois until at least 2008.

7   (Matthews Declaration ¶ 5, Exs. 1, 2 (LADP memo at 3 and LADP PPM at 30,

8   respectively); Lee Declaration ¶ 5, Ex. 4 (State Bar of Illinois record of Marc E.

9   Bercoon).  Bercoon has also held himself out either as a Certified Public

10   Accountant, or as having passed the CPA examination. (Matthews Declaration ¶ 5,

11   Ex. 1 (LADP memo at 3); Lee Declaration ¶ 4, Ex. 3 (Migdal testimony 32:17-20,

12   82:23-25, 83:1-4).)  In the past, Bercoon has held various positions with public

13   companies, including:

- General Counsel and Secretary of the Broadway Stores, Inc. from February 1993 to February 1994, and Senior Vice President beginning in February 1994;
- Chief Financial Officer and President of RCG Companies, Inc. (now known as OneTravel Holdings, Inc.) from February 28, 2005, to April 28, 2005, and from April 28, 2005, to June 6, 2006, respectively;
- Assistant Secretary for Market Central, Inc. (now known as Scientigo, Inc.) as of March 25, 2005, when he signed a restated certificate of incorporation that was attached as an Exhibit to a Form S-4 registration statement filed on November 10, 2005; and
- A Director, as of March 2, 2001, of Mixson Corporation.

26   Defendant Bercoon is also a Director of Growth Capital Group, a company that

27   purportedly provides financial advisory and investment banking services; and an

28   officer and manager of Ibar Management, LLC. (Yamamoto Declaration ¶ 12(c).)

4

B. **The Fraudulent Scheme**

1. **The Defendants Generally Solicit Investors Through Cold Calls**

In approximately mid-2009, the Defendants, through the use of sales agents, began soliciting potential investors throughout the United States, including through the use of cold calling, sometimes followed up by an email. (Declaration of Henry Hubbard ("Hubbard Declaration) ¶ 3; Declaration of Gary R. Post ("Post Declaration) ¶ 3; Matthews Declaration ¶ 3.) Potential investors are told that they are being solicited to invest in L.A. Digital. (See id.) The Defendants cause potential investors to be sent, by Federal Express, email and/or United States mail, a package containing a brochure entitled "Confidential Investor Information," which also often includes a "Confidential Private Placement Memorandum," a Subscription Agreement, a "Purchaser Questionnaire" and a "Purchaser Representative Questionnaire." (Post Declaration ¶ 5, Exs. 1-4 (LADP memo, LADP Subscription Agreement, LADP Purchaser Questionnaire, LADP Purchaser Representative Questionnaire, respectively); Matthews Declaration ¶ 5, Exs.1, 2 (LADP memo; LADP PPM, respectively); Hubbard Declaration ¶ 5 (LADP memo).) Defendants Bercoon and Goldstein participated in the drafting of each of these documents. (Lee Declaration ¶¶ 8-18, Exs. 7-17 (Emails with attachments).) [3]

Once LADP has received the investor's investment, the Defendants send to the investor a cover letter purporting to be on "LA Digital Post" letterhead, but instead enclosing a "Certificate" certifying that the investor is the holder of a certain number of shares of LADP, not L.A. Digital. (Matthews Declaration ¶ 8, Ex. 4 (Goldstein letter and certificate); Declaration of Ali Siddiqui ("Siddiqui

---

[3] This fact is evidenced by drafts of the LADP offering materials being exchanged between mbercoon@nporta.com and wagatlanta@yahoo.com ("wag" are William A. Goldstein's initials).

1  Declaration") Exs. 2&3 (Goldstein letter and Certificate).)  The cover letter and

2  Certificate bear Goldstein's signature.  (See id.)

### 2.    The Defendants Make Material Misrepresentations About The Investment And Misappropriate Investor Monies

5         The Defendants, through their sales agents, orally represent to potential

6  investors that L.A. Digital is "going public" or going to be the subject of an IPO

7  within a short period of time, such as sixty or ninety days, and that its shares will

8  be traded on the American Stock Exchange ("AMEX"), or some other public

9  exchange such as the New York Stock Exchange or NASDAQ.  (Siddiqui

10 Declaration ¶¶ 4, 7; Hubbard Declaration ¶ 4, Ex. A (June 28, 2010 Kevin

11 Rodrigues email).)  The Defendants further represent through their sales agents

12 that L.A. Digital has only a limited number of shares for sale, that the potential

13 investor needs to act quickly to be included in this opportunity, and that the

14 company will be worth $160 million, and that investors who bought shares prior to

15 the IPO will make substantial profits.  (See id.; Matthews Declaration ¶ 4.)

16        In some cases, these oral representations are followed by an email from the

17 sales agent making further similar representations, including that the projected

18 return on investment ("ROI") is "in the 200-300% range conservatively," but that

19 "we feel that the market will support a 300-500% return. . . ," and that L.A. Digital

20 "is scheduled to enter the AMEX!"  These emails also include a link to the website

21 of L.A. Digital and a description of its post-production business.  (Hubbard

22 Declaration ¶ 4, Ex. A (June 28, 2010 Kevin Rodrigues email).)

23        In addition to the oral and email representations made by the Defendants'

24 sales agents, the LADP memo authored by Defendants Bercoon and Goldstein

25 makes representations about "L.A. Digital Post" that are materially misleading, in

26 that the "shares" in fact sold to investors are stock of LADP, not L.A. Digital.

27 (Hubbard Declaration ¶ 5, Ex. B (LADP memo); Post Declaration ¶5, Ex. 1 (LADP

28 memo); Lee Declaration ¶¶ 7-17, Exs. 8-18 (Emails with attachments).)  Among

1    other representations, the LADP memo:

- Prominently features the L.A. Digital logo and its website address on the first page;

- Includes a detailed description of L.A. Digital's post-production business, history and reputation, and lists prominent motion picture studios and television networks which have, in fact, been clients of L.A. Digital, as well as a "Partial Client List" setting forth highly rated television shows and a list of movies for which L.A. Digital has provided post-production services;

- Prominently features descriptions of Goldstein, described as "Chairman," and Bercoon, described as "Vice Chairman and Chief Financial Officer," of L.A. Digital, asserting that under Goldstein's leadership, a physician staffing company he founded named Nationwide Medical Services, Inc. grew "at a rate in excess of 200% per year for its first six years, achieving $18 million in sales by 1998"; and touting Bercoon's legal and accounting background, including that he graduated from UCLA School of Law, and passed the Illinois CPA and bar exams in 1982 and 1985 specifically.   In fact, neither Goldstein nor Bercoon have any current involvement in the day-to-day operations of L.A. Digital.

- Sets forth "Financial Highlights," including that "LA Digital's revenues for fiscal year end were $13.375 million," and that "There are also several acquisition targets that management has identified," notwithstanding that L.A. Digital in fact does not presently intend to acquire any companies.

(Matthews Declaration ¶ 5, Ex. 1 (LADP memo at 1, 5-7, 8); see also Post Declaration ¶ 5, Ex. 1 (LADP memo); Hubbard Declaration ¶ 5 (LADP memo).)

Additionally, although the Defendants represent that the investment will be

1  highly profitable, they fail to disclose that L.A. Digital is not in fact currently a
2  profitable company, and that it is in default with its secured lender.  (Lee
3  Declaration ¶ 4, Ex. 3 (Migdal testimony 130:15-25).)
4        In order to induce one investor, Ali Siddiqui, who had invested $50,000, to
5  invest an additional $950,000, in or about December 2009, Defendants Goldstein
6  and Bercoon executed a "Put Agreement," in which they agreed to buy back the
7  950,000 in additional shares purchased by Dr. Siddiqui at the $1 per share price at
8  which he purchased them, at any time during the period from November 4, 2010,
9  through February 2, 2011.   (Siddiqui Declaration ¶¶ 3, 4, 5, Ex. 3 (Put
10 Agreement).)
11       In fact, no public offering has been held for L.A. Digital.  (Lee Declaration
12 ¶¶ 4 & 7, Exs. 3, 6 (Migdal testimony 20:9-25, 21:1-20, 89:8-25, 90:1-7, 130:11-
13 25, Commission Attestations).)  Instead, in a "bait and switch," investors receive
14 worthless certificates representing "shares" in Defendant LADP, and Defendants
15 Goldstein and Bercoon steal their money.  (Matthews Declaration ¶ 10; Siddiqui
16 Declaration ¶10; see generally Yamamoto Declaration ¶ 9).)
17       Specifically, from July 9, 2009 to July 12, 2010, undisclosed to investors,
18 Defendants Goldstein and Bercoon have misappropriated for their own use,
19 including for the use of the companies they control, at least $874,289 of the $3.2
20 million in investor funds raised and deposited into Wachovia Bank accounts in the
21 name of LADP and "LADP LLC," which they control, and on which they are
22 signatories, as follows:
23       • Goldstein received at least $1,000 by check, received a total of
24         $22,000 in transfers to a Wachovia Bank Account in his name, and
25         withdrew $107,600 from the LADP, LLC account.  (Yamamoto
26         Declaration ¶ 9(a).)
27       • Bercoon withdrew a total of $171,589 from the LADP, LLC bank
28         account and the LADP bank account.  (Yamamoto Declaration ¶

9(c).)

- Goldstein and/or Bercoon caused at least $510,800 in transfers to be made from the LADP, LLC bank account to another Wachovia Bank account in the name of HMRZ Consulting LLC, for which account Bercoon was a signatory when these transfers occurred. (Yamamoto Declaration ¶ 9(d).)

- Goldstein and/or Bercoon caused at least $61,300 in transfers to be made from the LADP, LLC bank account to an account in the name of Ibar Management Group, an entity for which both Goldstein and Bercoon are officers and managers. (Yamamoto Declaration ¶¶ 9(e),12(c), 13(d).)

In response to repeated inquiries by investor Ali Siddiqui regarding the failure of L.A. Digital to go public, Defendant Goldstein and his sales agent, Alan Weiner, met with Dr. Siddiqui in Fort Lauderdale, Florida in or about June or July 2010. (Siddiqui Declaration ¶ 7.) At this meeting, Goldstein falsely reassured Dr. Siddiqui that he had made a sound investment, and Goldstein and Weiner described Goldstein's prior success at bringing other companies public. (See id.) In order to lull Dr. Siddiqui into believing his $1 million investment was safe, Goldstein and Weiner falsely assured Dr. Siddiqui that they were working on multiple avenues to take L.A. Digital public and that he would profit from his investment. (See id.)

Subsequently, on or about August 23, 2010, in response to further inquiries from Dr. Siddiqui as to the status of his investment, Defendants Goldstein and Bercoon falsely told Dr. Siddiqui in a telephone conversation that everything was fine, and that while two smaller investors had complained to the Commission, there was nothing to worry about. (See id. ¶ 8.)

In response to inquiries by Migdal, the president and CEO of L.A. Digital, regarding calls he was receiving from investors inquiring why a promised "public

9

1  offering" of L.A. Digital stock that Migdal knew nothing about had not taken
2  place, Bercoon falsely represented to Migdal that the situation involved "identity
3  theft," and that he was "handling" or "dealing with" it.  (Lee Declaration ¶ 4, Ex. 3
4  (Migdal testimony 30:20-25, 31:1-18, 45:8-14, 72:9-25, 73:1-16).)

5  **III.   ARGUMENT**

6       A.   **The Court Should Issue A Temporary Restraining Order**
7            **Prohibiting Violations of the Antifraud Provisions of the**
8            **Exchange Act**

9            1.   **Special Standards Apply to the Commission's Application**

10       Section 21(d) of the Exchange Act provides that the Commission may obtain
11  a permanent or temporary injunction or restraining order, without a bond, on a
12  proper showing. 15 U.S.C. § 78u(d). To obtain such relief, the Commission must
13  demonstrate (1) a prima facie case that a violation of the securities laws has
14  occurred; and (2) a reasonable likelihood that the violation will be repeated. See
15  SEC v. Unique Fin. Concepts, Inc., 196 F.3d 1195, 1199 n.2 (11th Cir. 1999); SEC
16  v. United Financial Group, Inc., 474 F.2d 354, 358-59 (9th Cir. 1973).

17       The Commission appears before this Court "not as an ordinary litigant, but
18  as a statutory guardian charged with safeguarding the public interest in enforcing
19  the securities laws." SEC v. Management Dynamics, Inc., 515 F.2d 801, 808 (2d
20  Cir. 1975). The need for temporary relief is of great importance where, as here, the
21  Commission acts to protect the public interest and the investing public. "[W]hen
22  the public interest is involved in a proceeding of this nature, [the district court's]
23  equitable powers assume an even broader and more flexible character than when
24  only a private controversy is at stake.'"  FSLIC v. Sahni, 868 F.2d 1096, 1097 (9th
25  Cir. 1989), citing FTC v. H.N. Singer, Inc., 668 F.2d 1107, 1112 (9th Cir. 1982).
26  For these reasons, the Commission faces a lower burden than a private civil litigant
27  when seeking a temporary restraining order or other pretrial relief.  Unlike private
28  litigants, the courts presume irreparable injury in Commission enforcement actions

1   in which injunctive relief is sought. <u>United States v. Nutri-Cology, Inc.</u>, 982 F.2d

2   394, 397-98 (9th Cir. 1992) ("[i]n statutory enforcement cases ... passage of the

3   statute is itself an implied finding by Congress that violations will harm the

4   public"). In fact, under established Ninth Circuit precedent, an injunction is

5   authorized "solely upon a showing of a statutory violation." <u>Id.</u> at 398. Because the

6   evidence in this case establishes that the Defendants are violating the federal

7   securities laws, and that it is reasonably likely they will continue to do so unless

8   enjoined, the Court should grant the Commission's Motion for temporary relief.

9           2.   **Defendants Violated the Securities Registration Provisions**

10               **of the Securities Act**

11          a)   **LADP Shares Are Securities**

12          The investments sold by LADP are shares of LADP and as such are

13   securities in the form of stock. <u>See</u> Section 2(a)(1) of the Securities Act, 15 U.S.C.

14   § 77b(a)(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10)

15   (defining "security" to include "stock").

16          b)   **The Defendants Violated Sections 5(a) and 5(c)**

17          Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) & 77e(c),

18   prohibit the offer and sale of securities in interstate commerce, unless a registration

19   statement has been filed with the Commission or is in effect, or the securities are

20   exempt from registration. <u>Anderson v. Aurotek</u>, 774 F.2d 927, 929 (9th Cir. 1985);

21   <u>SEC v. Murphy</u>, 626 F.2d 633, 649. (9th Cir. 1980). Section 5 operates as a strict

22   liability statute and no proof of scienter is required to establish a violation. <u>See</u>

23   <u>SEC v. Phan</u>, 500 F.3d 895, 905-07 (9th Cir. 2007). A <u>prima facie</u> violation of

24   Section 5 is established by showing that (1) no registration statement was in effect

25   or had been filed as to the securities offering, (2) the Defendants, directly or

26   indirectly, sold or offered to sell the securities, and (3) the offer or sale was made

27   through the use of interstate facilities or the mails. 15 U.S.C. §§ 77e(a) & 77e(c).

28   <u>See also</u> <u>SEC v. Continental Tobacco Co. of S.C., Inc.</u>, 463 F.2d 137, 155 (5th Cir.

1   1972).  A person violates Section 5 by engaging in the unregistered offer or sale of

2   a security.  SEC v. Calvo, 378 F.3d 1211, 1214-15 (11th Cir. 2004).  So long as

3   Defendants Goldstein's and Bercoon's role in an unregistered offering is a

4   "significant" one, i.e. they were "necessary participant[s]" and "substantial

5   factor[s]" in the offering, liability will attach.  See SEC v. Phan, 500 F.3d at 906.

6       All of the above factors are met here.  No registration statement was filed

7   with the Commission for the LADP offering.  (Lee Declaration ¶ 7, Ex. 6

8   (Commission Attestations).)  Defendants engaged in efforts to offer and sell LADP

9   securities, and they used the mail and other interstate facilities to do so.  Both

10  Goldstein and Bercoon were "necessary participants" and "substantial factors" in

11  the offering.  Goldstein spoke with prospective investors and sent letters to

12  investors confirming their investment and enclosing share certificates bearing his

13  signature.  Goldstein and Bercoon authored, edited, and/or reviewed the LADP

14  offering materials, are signatories on bank accounts into which investor funds were

15  deposited, and are featured in the LADP offering materials.  In addition, Bercoon

16  and Goldstein personally guaranteed the investment of Dr. Siddiqui, one of the

17  largest LADP investors.  These activities constitute a prima facie violation of

18  Sections 5(a) and 5(c).

19      Once the prima facie elements of a Section 5 violation have been

20  established, the Defendants bear the burden of proving an available exemption.

21  SEC v. Ralston Purina Co., 346 U.S. 119, 125 (1953).  Because Defendants

22  engaged in general solicitations through the use of sales agents that made

23  unsolicited cold calls to investors across the country and targeted the general

24  public as potential investors without regard to any level of financial sophistication,

25  no exemptions would appear to apply.  See SEC v. Murphy, 626 F.2d at 644; see

26  also Regulation D, Rules 505 and 506, 17 C.F.R. §§ 230.505 & 506.

27  *

28  *

### 3.   The Defendants Have Violated the Antifraud Provisions

    a)    **The Defendants Misrepresented and Omitted Material Facts**

Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), prohibits fraud in the offer or sale of securities, and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, prohibit fraud in connection with the purchase or sale of any security.  Rule 10b-5 provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
>
> (a)    to employ any device, scheme or artifice to defraud,
>
> (b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or
>
> (c)    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Section 17(a) is worded similarly.  The antifraud provisions of the Securities Act and the Exchange Act both prohibit fraudulent conduct or practices in connection with the offer or sale of securities.  See SEC v. Dain Rauscher, Inc., 254 F.3d 852, 855 (9th Cir. 2001).  Violations of Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder require proof of scienter but violations of Sections 17(a)(2) and (3) merely require a showing of negligence.  Id. at 856.

1   As explained below, (1) the Defendants' actions violated the antifraud

2   provisions and (2) the Defendants acted with the requisite scienter in violating

3   these provisions.

4   **b)   The Defendants' Misrepresentations and Omissions**

5   **Were Material**

6   Violations of the antifraud provisions require that the omissions and

7   misstatements concern material facts. <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 231-

8   32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). A fact is material if there is a

9   substantial likelihood that a reasonable investor would consider it important in

10  making an investment decision. <u>TSC Indus., Inc. v. Northway, Inc.</u>, 426 U.S. 438,

11  96 S. Ct. 2126, 449, 48 L.Ed.2d. 757 (1976). Liability arises not only from

12  affirmative representations but also from failures to disclose material information.

13  <u>SEC v. Dain Rauscher</u>, 254 F.3d at 855-56. The antifraud provisions impose "a

14  duty to disclose material facts that are necessary to make disclosed statements,

15  whether mandatory or volunteered, not misleading." <u>SEC v. Fehn</u>, 97 F.3d 1276,

16  1290 n.12 (9th Cir. 1996).

17  The Defendants have made material misrepresentations and omitted to state

18  material facts to investors that go to the heart of the investment. Investors

19  understood from oral and written representations that they would be investing in

20  L.A. Digital and/or that L.A. Digital would conduct an IPO or acquisition within

21  the very near future. Yet in reality, investors were not receiving ownership in L.A.

22  Digital but rather an entity that had no operations or business. Likewise, L.A.

23  Digital had no plans to conduct an IPO or acquire another entity and in fact has not

24  done so. The Defendants also omitted to disclose that they would use investor

25  funds for personal benefit and purposes unrelated to L.A. Digital. These

26  misrepresentations and omissions are material because they address the very

27  purpose of the investment and the use of investor proceeds, which reasonable

28  investors would consider important in deciding whether to invest.

### c)   **The Defendants Acted with Scienter**

Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder require a showing of scienter.  <u>Aaron v. SEC</u>, 446 U.S. 680, 701-02, 100 S. Ct. 1945, 64 L.Ed.2d 611 (1980).  Scienter is defined as a "mental state embracing intent to deceive, manipulate or defraud."  <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 n.12 (1976).  In the Ninth Circuit, scienter may be established by a showing of recklessness.  <u>SEC v. Dain Rauscher</u>, 254 F.3d at 856.  Proof of recklessness may be inferred from circumstantial evidence. <u>Herman & MacLean v. Huddleston</u>, 459 U.S. 375, 390-91, n.30, 103 S. Ct. 683, 74 L.Ed.2d 548 (1983); <u>SEC v. Burns</u>, 816 F.2d 471, 474 (9th Cir. 1987).

The Defendants acted with high scienter.[4]  As the principals of LADP, part owners of L.A. Digital, and perpetrators of the fraudulent scheme , Bercoon and Goldstein knew that contrary to oral and written representations that they disseminated, LADP would not use investor funds to provide investors an ownership stake in L.A. Digital or to grow L.A. Digital's business or finance a corporate transaction. They also were responsible for the LADP memo and LADP PPM, both of which were used to solicit investors and misstated or omitted these same material facts to these investors.  Bercoon also lied to Migdal when Migdal informed him that he was receiving investor complaints.  Instead of telling Migdal that he and Goldstein were involved in the LADP offering, he told Migdal that the situation involved "identity theft."  Additionally, in an effort to minimize the Commission's inquiry and comfort their largest investor, Dr. Siddiqui, Goldstein and Bercoon told Dr. Siddiqui the Commission's inquiry involved only a few small investors, and that he should not worry about his $1million investment with LADP.

---

[4]   As principals of LADP, Bercoon's and Goldstein's mental state are also imputed on LADP.  <u>SEC v. Manor Nursing Centers, Inc.</u>, 458 F.2d 1082, 1089 n.3 (2d Cir. 1972).

Finally, as signatories on LADP's bank accounts, Defendants Goldstein and Bercoon knowingly misappropriated at least $874,289 in investor funds for their personal benefit and undisclosed purposes unrelated to L.A. Digital, withdrawing and transferring funds to themselves and to unrelated entities they control. See SEC v. JT Wallenbrock & Associates, 440 F.3d 1109, 114 (9th Cir 2006) (defendants benefited by obtaining investor monies under false pretenses in order to fund defendants' speculative business ventures).

**B.   The Defendants Will Continue Their Fraudulent Scheme Unless Enjoined**

To obtain an injunction, the Commission must establish that there is a reasonable likelihood of future violations. See SEC v. Murphy, 626 F.2d at 655. Whether a likelihood of future violations exists depends upon the totality of the circumstances. Id. The existence of past violations may give rise to an inference that there will be future violations. See id.; see also United States v. Odessa Union Warehouse Co-op, 833 F.2d 172, 176 (9th Cir. 1987), SEC v. Koracorp Industries, Inc., 575 F.2d 692, 698 (9th Cir. 1978). Courts also consider factors such as the degree of scienter involved, the isolated or recurrent nature of the violative conduct, the defendant's recognition of the wrongful nature of the conduct, the likelihood that, because of the defendant's occupation, future violations may occur, and the sincerity of defendant's assurances (if any) against future violations. SEC v. Murphy, 626 F.2d at 655.

The Defendants' statutory violations here are egregious. They have raised approximately $3.2 million since at least mid-2009, and are all misappropriating those monies for their personal use. They continue to shamelessly lie to investors about, among other things, L.A. Digital's imminent IPO. The Defendants also continue to disseminate the false and misleading LADP offering materials they drafted. For these reasons, imposition of a temporary restraining order, together

1   with an order to show cause why a preliminary injunction should not be entered, is

2   appropriate and necessary.

3   **C.    The Court Should Order An Immediate Asset Freeze To Protect**

4   **Investor Funds**

5   Federal courts have inherent equitable authority to issue a variety of

6   ancillary relief measures in Commission injunctive actions. SEC v. Wencke, 622

7   F.2d 1363, 1369 (9th Cir. 1980). Included in these powers is the authority to freeze

8   assets, of both parties and nonparties. SEC v. Hickey, 322 F.3d 1123, 1131 (9th

9   Cir. 2003); SEC v. International Swiss Investments Corp., 895 F.2d 1272, 1276

10  (9th Cir. 1990).  Courts use freeze orders to prevent waste and dissipation of assets

11  and to ensure their availability for disgorgement for the benefit of victims of the

12  fraud. See e.g., SEC v. Hickey, 322 F.3d at 1132 (affirming imposition of asset

13  freeze over nonparty brokerage firm controlled by the defendant to effectuate

14  disgorgement order against defendant); SEC v. Manor Nursing Centers, 458 F.2d

15  at 1105-06.  Indeed, the Ninth Circuit specifically has found that "the public

16  interest in preserving the illicit proceeds [of a defendant's fraud] for restitution is

17  great." FTC v. Affordable Media, LLC, 179 F.3d 1228, 1233 (9th Cir. 1999).

18  Courts have similarly recognized that a disgorgement order will often be rendered

19  meaningless unless an asset freeze is imposed prior to the entry of final judgment.

20  See SEC v. Unifund SAL, 910 F.2d 1028, 1041 (2d Cir. 1990); SEC v. Musella,

21  578 F. Supp. 425,429 (S.D.N.Y. 1984).

22  To obtain an asset freeze, the Commission need only establish the mere

23  possibility that dissipation of assets exists. FSLIC v. Sahni, 868 F.2d at 1096-97,

24  citing FTC v. H. N. Singer, Inc., 668 F.2d at 1112. It is unnecessary for the Court

25  to find that dissipation of funds is likely. Id. [5]  Here, the Defendants lied to

26  _____

27  [5]    In a case involving a nongovernmental plaintiff, the Ninth Circuit held that
    Sahni was overruled in this respect because the Supreme Court held in Winters v.
28  Natural Resources Defense Council, Inc., 129 S. Ct. 365, 374-75 (2008), that a
    private plaintiff must establish a "likelihood of irreparable harm" to obtain a

17

1 │ investors that their money would be used to buy equipment for L.A. Digital or fund

2 │ company acquisitions by L.A. Digital.  Instead, investors monies were withdrawn

3 │ by Goldstein and Bercoon and transferred to other non-LADP accounts.  This

4 │ conduct demonstrates more than a mere possibility that dissipation of assets will

5 │ occur absent an asset freeze order.

6 │ **D.   Orders Prohibiting Destruction Of Documents And**

7 │ **Requiring Accountings Are Necessary And Appropriate**

8 │ The Court's broad equitable powers in Commission enforcement actions

9 │ include the ability to order ancillary relief to require an accounting and prohibit

10 │ document destruction. <u>SEC v. Wencke</u>, 622 F.2d at 1369. It is necessary to identify

11 │ all available assets to help ensure that funds and assets are frozen properly and

12 │ available to satisfy any future order of disgorgement or civil penalties against the

13 │ Defendants. <u>SEC v. International Swiss Investment Corp.</u>, 895 F.2d at 1276.

14 │ Accountings are appropriate here because it is unclear what happened to

15 │ several millions of dollars in investor monies. Additionally, an order prohibiting

16 │ the destruction of documents is necessary because of the possibility that the

17 │ Defendants may destroy evidence of their ongoing fraud.

18 │ *

19 │ *

20 │ *

21 │ *

22 │

---

23 │ preliminary injunction.  <u>See</u> <u>Johnson v. Couturier</u>, 572 F.3d 1067, 1085 n.11 (9th
   │ Cir. 2009).  For this reason, the Ninth Circuit held that to obtain an asset freeze, the
24 │ private plaintiff in the case before it was required to establish likelihood of
   │ dissipation of assets, rather than a mere possibility of such dissipation.  <u>Id.</u>
25 │ However, as explained above, unlike a private plaintiff, the Commission need not
   │ establish a likelihood of irreparable harm; rather, it need only establish a
26 │ reasonable likelihood of future violations.  The Commission accordingly believes
   │ the more lenient standard of establishing a possibility of dissipation continues to
27 │ apply in its actions.  However, whichever standard applies, Defendants Goldstein
   │ and Bercoon's misappropriation of investor funds clearly meets the Commission's
28 │ burden for obtaining an asset freeze.

18

1
## IV.   CONCLUSION

2       For the foregoing reasons, Plaintiff Securities and Exchange Commission

3  respectfully requests the Court to grant its Ex Parte Application.

4

5  DATED:  September 14, 2010 _____

6                                          Jason P. Lee
                                           Attorney for Plaintiff
7                                          Securities and Exchange Commission

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28