# EXHIBIT 3

UNITED STATES SECURITIES AND EXCHANGE COMMISSION


In the Matter of:            )

                            )   File No. LA-03858-A

L.A. DIGITAL POST, INC.   )


WITNESS:  Gary Migdal

PAGES:    1 through 146

PLACE:    Securities and Exchange Commission

          5670 Wilshire Boulevard, 11th Floor

          Los Angeles, California

DATE:     Friday, August 13, 2010


     The above-entitled matter came on for hearing, pursuant

to notice, at 9:59 a.m.

Diversified Reporting Services, Inc.

(202) 467-9200

**Page 2**

1   APPEARANCES:

2

3   On behalf of the Securities and Exchange Commission:

4       JASON LEE, ESQ.

5       MARSHALL S. SPRUNG, ESQ.

6       Securities and Exchange Commission

7       5670 Wilshire Boulevard, 11th Floor

8       Los Angeles, California 90036

9       (323) 965-4580

10

11  On behalf of the Witness:

12      GREGORY J. SHERWIN, ESQ.

13      Law Offices of Feilds, Fehn & Sherwin

14      11755 Wilshire Boulevard, 15th Floor

15      Los Angeles, California 90025

16      (310) 473-6338

17

18

19

20

21

22

23

24

25

**Page 3**

1           CONTENTS

2

3   WITNESS                          EXAMINATION

4   Gary Migdal                          4

5

6   EXHIBITS:    DESCRIPTION              IDENTIFIED

7       1   Form 1662                      4

8       2   Subpoena                       7

9       3   Voluntary Request for Documents    8

10      4   Document entitled "Confidential

11          Investor Information"          90

12      5   L.A. Digital Post Presentation    105

13      6   Letter to Gary Migdal          112

14      7   Letter from William Goldstein to

15          Richard Matthews              122

16      8   L.A. Digital Post Presentation    125

17      9   Request for Proposal           126

18      10  E-mail from Kevin Rodrigues to

19          HHubbard@Flash.net           129

20      11  List of Individuals and Entities   133

21

22

23

24

25

**Page 4**

1           PROCEEDINGS

2       (SEC Exhibit No. 1 was marked for

3       identification.)

4       MR. LEE:  We're on the record.

5       It is Friday, August 13th, 2010.  My name is

6   Jason Lee.  We're here at the U.S. Securities and Exchange

7   Commission's Los Angeles regional offices.  I see the witness

8   is here, Mr. Gary Migdal.

9       Mr. Migdal, if you can raise your right hand.

10  Whereupon,

11          GARY MIGDAL

12  was called as a witness and, having been first duly sworn,

13  was examined and testified as follows:

14          EXAMINATION

15  BY MR. LEE:

16      Q   Can you state and spell your full name for

17  the record.

18      A   Gary Migdal, G-a-r-y, M-i-g-d-a-l.

19      Q   Do you go by any other names?

20      A   No.

21      Q   As I stated at the beginning of the record,

22  my name is Jason Lee, L-e-e.  I'm an attorney in the

23  enforcement division of the US Securities and Exchange

24  Commission.  I'm also an officer of the Commission for

25  the purposes of this proceeding.

**Page 5**

1       We may be joined later by Marshall Sprung.

2   That's S-p-r-u-n-g.  He's an assistant regional

3   director here of this office.  He's also an officer of

4   the Commission for the purposes of this proceeding.

5       This is an investigation by the US Securities

6   and Exchange Commission to determine whether there have

7   been violations of the federal securities laws.  The

8   facts involved in this investigation may constitute

9   other violations of other federal or state civil or

10  criminal laws.

11      The title of the investigation is "In the

12  matter of L.A. Digital Post, Inc."  Our file number is

13  LA 3858.

14      Prior to the opening of the record, you were

15  provided with a copy of the formal order of

16  investigation.  This is a non-public document that has

17  been executed by the Commission per — through the

18  secretary of the Commission.  It authorizes us to

19  conduct this non-public investigation.

20      Mr. Migdal, do you have any questions

21  relating to the formal order?

22      A   I do not.

23      Q   Prior to the opening of the record, you were

24  also provided with what has been marked as SEC's Exhibit 1.

25  That exhibit is our Form 1662.  This was — a copy of this

Exhibit ___3___ Page ___7___

Page 6

1   exhibit was also provided to you in a voluntary request,
2   which you'll see in just a -- in just a few moments.
3        Mr. Migdal, do you have any questions related
4   to Exhibit No. 1?
5    A  I do not.
6        MR. LEE:  Mr. Migdal, I see that you are
7   accompanied by counsel here today.
8        If I could ask Counsel to identify himself
9   and provide his contact information for the record.
10        MR. SHERWIN:  My name is Gregory Sherwin,
11   S-h-e-r-w-i-n, of Fields, Fehn & Sherwin.  Address,
12   11755 Wilshire Boulevard, 15th floor, Los Angeles
13   90025.  Phone Number, (310) 473-6338.
14        MR. LEE:  Thank you.  And Counsel, do you represent
15   Mr. Migdal individually here today?
16        MR. SHERWIN:  I do.
17        MR. LEE:  Do you also represent the company?
18        MR. SHERWIN:  Probably, but we have not had
19   sufficient time to go through that process.
20        MR. LEE:  Understood.  And I've already done what
21   I promised not to do, which is, I failed to accurately
22   describe the company.
23        My question is:  Do you represent
24   L.A. Digital Post, Inc.?
25        MR. SHERWIN:  If -- if I will be representing the

Page 7

1   company, that will be the company that I would be
2   representing.
3        BY MR. LEE:
4    Q  Mr. Migdal, do you understand that you have
5   been sworn to tell the truth?
6    A  I do.
7    Q  Will you tell me if you do not understand a
8   question I ask you today?
9    A  Absolutely.
10    Q  Is there anything that would prevent you from
11   giving full and complete answers to my questions?
12    A  No, there's not.
13    Q  Are you taking any medication that may
14   prevent you from giving full and complete answers?
15    A  I am not.
16        MR. LEE:  I'm going to have the court reporter
17   mark what is going to be Exhibit No. 2.
18        (SEC Exhibit No. 2 was marked for
19        identification.)
20        BY MR. LEE:
21    Q  Exhibit No. 2 is a multi-page exhibit.  It
22   is -- the front page of Exhibit 2 is dated
23   August 5th, 2002.  It is addressed to Mr. Gary Migdal,
24   care of David M. Loev.
25        If you can take a look at Exhibit No. 2

Page 8

1   and tell me if you've seen this before.
2    A  Yes, I have.
3    Q  If you can turn to the third page.  The third
4   page of Exhibit No. 2 reflects a subpoena that is
5   directed to you calling for your testimony on
6   August 13th, 2010, to begin at 9:00 A.M.
7        Do you see that?
8    A  I do.
9    Q  Is this the subpoena pursuant to which you
10   are appearing here today?
11    A  Yes it is.
12        MR. LEE:  I'm handing the court reporter what's
13   going to -- enter what's going to be marked as
14   Exhibit No. 3.
15        (SEC Exhibit No. 3 was marked for
16        identification.)
17        BY MR. LEE:
18    Q  Exhibit No. 3 is also a multi-page
19   exhibit.  The front page of Exhibit 3 appears to state
20   a June 30th, 2010, date.  It looks like a letter
21   addressed to Mr. Gary Migdal at L.A. Digital Post at
22   11311 Camarillo, C-a-m-a-r-i-l-l-o, Street,
23   Toluca Lake, California.
24        Mr. Migdal, if you could tell me whether
25   you've seen Exhibit 3 before.

Page 9

1    A  I have.  I recognized it immediately.
2    Q  Is -- is Exhibit No. 3 a copy of the
3   voluntary request for documents that was sent to you by
4   me on June 30th, 2010?
5    A  Yes, it is.
6    Q  As you can see on the front page of
7   Exhibit No. 3, there are three bullet points.  The
8   three bullet points reflect the documents that were
9   requested by the staff in connection with this
10   investigation.
11        Do you see that?
12    A  I do.
13    Q  Can you tell me -- well, let me withdraw that
14   question.
15        Were you involved with the search for
16   responsive documents to this request?
17    A  I was.
18    Q  Can you tell me if anyone else was.
19    A  I do not believe so.
20    Q  Okay.  Can you describe for me the search
21   that was conducted.
22    A  The documents that I provided were documents
23   that were sent to me from potential investors in
24   LADP Acquisitions, Inc.
25        I had -- I had just recently received a

Page 10

1  couple -- meaning two -- different sets of documents,
2  which were actually, in my opinion, consistent with
3  each other.  They contained some sort of a -- a stock
4  proposal presentation, stock certificates -- copies of
5  stock certificates and actual stock certificates, and
6  wiring instructions to a specific bank in Georgia, as
7  well as a thank you letter signed by William Goldstein.
8     Q   Okay.  And did you receive that via e-mail?
9     A   I did.
10    Q   Okay.  So you searched through your e-mail to
11 look for responsive documents.
12        Did you look anywhere else outside of your
13 e-mail?
14    A   One of the sets of documents, I actually
15 received an e-mail, and then I received the same
16 documents in the mail, which I scanned and forwarded.
17    Q   Now, if my recollection is right, when we
18 called you, you described these documents to me during
19 our voluntary interview a few weeks ago.
20        Do you remember that?
21    A   Yes, I do.
22    Q   Okay.  So it sounds like you knew exactly
23 where to go to find the responsive documents.
24    A   I did.
25    Q   Did you withhold any documents that are

Page 11

1  responsive to the request that's reflected in
2  Exhibit No. 3 for any reason?
3     A   No, I did not.
4     Q   Thank you.
5         Can you state your Social Security number?
6     A   Certainly.  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.
7     Q   What is your date of birth?
8     A   4/11/1953.
9     Q   What's your home address?
10    A   19825 Greenbriar, G-r-e-e-n-b-r-i-a-r, Drive,
11 Tarzana 91356.
12    Q   Can you provide for us all your phone
13 numbers.
14    A   Certainly.  Home is (818) 343-0050.  Office
15 is (818) 487-5000.  Cell is (818) 262-2324.
16    Q   Any personal e-mail addresses?
17    A   One.  Miggy -- M-i-g-g-y -- 53@aol.com.
18    Q   What is your work e-mail address?
19    A   Gary -- G-a-r-y -- @ladigital.com.
20    Q   Have you ever been involved in any
21 proceedings relating to the federal or state securities
22 laws?
23    A   I have not.
24    Q   Have you ever been involved in any
25 proceedings related to the federal or state criminal

Page 12

1  laws?
2     A   I have not.
3     Q   Can you tell me what your current employment
4  is.
5     A   I am employed by L.A. Digital Post.  I am its
6  president/CEO.
7     Q   Can you give me a short description of what
8  your duties and responsibilities are in that role.
9     A   My duties and responsibilities are to manage
10 all of the company's locations in Los Angeles and in
11 New York City, as well as its sales, its marketing, its
12 client relationships, its purchasing of inventory and
13 any other responsibilities that are generally -- that
14 are generally tied to a president of a post-production
15 entity, which is what L.A. Digital Post is.
16    Q   Okay.  And I'm going to ask you in more
17 detail about that.
18    A   Sure.
19    Q   What is it to be a post-production company?
20    A   L.A. Digital has approximately 230
21 post-production editing systems.  They are deployed out
22 in the field, on location in this country, in other
23 countries.
24        We also have in-house facilities in three
25 locations in Los Angeles -- one in Toluca Lake, two in

Page 13

1  West LA -- and another in New York City.  Those
2  locations have editing rooms where the same compliment
3  of equipment is also housed, along with clients their
4  projects.
5         (Mr. Sprung enters the deposition room.)
6         MR. LEE:  Let the record reflect that
7  Marshall Sprung has joined us.  As I stated earlier,
8  Mr. Sprung is an assistant regional director here in
9  this office and also an officer of the Commission for
10 the purposes of this proceeding.
11        BY MR. LEE:
12    Q   Who are your typical clients?
13    A   Like, our top clients, or does it --
14    Q   Just general.
15    A   Generally, it could be studios, networks,
16 production companies.  That would pretty much sum up
17 the majority of who we work with.  We work on
18 everything on a per-project basis, generally speaking.
19    Q   And how long have you been with
20 L.A. Digital Post?
21    A   Approximately 15 years.
22    Q   Have you always been the CEO/president?
23    A   No, I have not.
24    Q   Can you briefly describe the titles you've
25 held in that time period.

4  (Pages 10 to 13)

Exhibit ___3___ Page ___9___

## Page 14

1    A   Sure.  I joined L.A. Digital Post as a
2  consultant 15 years ago.  I was -- shortly thereafter,
3  I would say within a year approximately, maybe a little
4  bit longer, I was brought on staff as the VP of sales,
5  and approximately eight years ago, became the
6  president.
7      At that time, the company was owned by
8  different parties than own it today.  And I have been
9  the president ever since.
10    Q   Who do you report to as president?
11    A   I report to Mark Bercoon, who is the acting
12  chairman of -- well, of L.A. Digital.  But L.A. Digital
13  does have a parent company that owns LADP New York and
14  that owns L.A. Digital Post in Los Angeles.  And the
15  parent company, the holding company, I believe -- I
16  just want to get this straight -- is LADP -- is
17  LADP, LLC, out of Delaware.  They own both entities,
18  New York and LA.
19    Q   Okay.  And Mark Bercoon, that is
20  B-e-r-c-o-o-n; is that right?
21    A   Yes, that's correct.
22    Q   He is the chairman of LADP, LLC?
23    A   (Nonverbal response.)
24    Q   Is that a "yes"?
25    A   Yes, yes.

## Page 15

1    Q   Does he have any position at
2  L.A. Digital Post?
3    A   He does not have any sort of an operating
4  position, nor does he get involved with the day-to-day
5  activities of the company and its operation.
6    Q   Okay.  So he just owns a percentage interest
7  in L.A. Digital Post?
8    A   Yes.
9    Q   Does Mr. Bercoon have any position or title
10  at LADP New York?
11    A   No, he does not.
12    Q   Other than Mr. Bercoon, do you report to
13  anyone else?
14    A   No.
15    Q   I assume that there's a board of directors --
16  let me finish.  I know you're about to answer my
17  question.
18      Is there a board of directors at
19  L.A. Digital Post?
20    A   There is.
21    Q   Do you report to them?
22    A   Well, I'm confused about the question,
23  because the answer is not going to be clear.  And so
24  I'll just speak.
25    Q   Sure.

## Page 16

1    A   The board of directors originally consisted
2  of Gary Migdal, Rob Rissinen, R-i-s-s-i-n-e-n,
3  William Goldstein, and Mark Bercoon.  Over the course
4  of the last seven years, which is approximately how
5  long they have owned the company, there's been what I
6  would call administrative changes in partners buying
7  out other partners.
8      Today, the board of directors -- it's unclear
9  to me who is on the board, exactly.  I would say that
10  Mark Bercoon is absolutely on the board, that I am
11  absolutely on the board.  Salem Halifax, who is the
12  first secured lender to L.A. Digital, has the ability
13  to sit on the board.  But beyond that, I could not tell
14  you.  This would be a question to be answered by
15  Mark Bercoon.
16    Q   So sitting here today, you know for sure that
17  you, Salem Halifax and Mark Bercoon are on the board?
18    A   Yes.  And I should rephrase Salem Halifax.
19  They have the ability to be present at board meetings.
20  I am not certain whether they actually hold a board
21  seat or not.
22    Q   Okay.  And how long has this uncertainty
23  been, in terms of who is on the board, for you?
24    A   I would speculate and say it's at least three
25  years.

## Page 17

1    Q   Is there a board of directors associated with
2  LADP, LLC?
3    A   I believe it to be one and the same.
4    Q   Okay.  So the board that you've been
5  describing is the board that essentially controls
6  LADP, LLC, and through that, L.A. Digital Post and
7  LADP New York?
8    A   Yes.
9    Q   How many employees does L.A. Digital Post
10  have?
11    A   It fluctuates between 45 to 50.
12    Q   What's your company's -- what is
13  L.A. Digital Post's revenue, roughly, for 2009?
14    A   Approximately $12 million.
15    Q   Is L.A. Digital Post a profitable company?
16    A   Not currently.
17    Q   Well, you're here today to talk about sort of
18  the first time you've heard about any offerings related
19  to or associated with L.A. Digital Post or
20  LADP Acquisitions, Inc.
21      So I'm going to ask you first:  Have you
22  heard of the entity LADP Acquisitions, Inc.?
23    A   I have.
24    Q   Okay.  And can you tell me how you first came
25  to know the name LADP Acquisitions, Inc.

Page 18

1    A   The very first time I became aware of
2  LADP Acquisitions, Inc., was from a cease and desist
3  order that I received by mail from the State of
4  Pennsylvania.
5    Q   When was this?
6    A   A little over a year ago.
7    Q   Do you recall what the cease and desist order
8  said?
9    A   The cease and desist order referred to
10 LADP Acquisitions, Inc., and requested that
11 LADP Acquisitions, Inc., and a company by the name of
12 Paramount Capital and an individual by the name of
13 Joseph Vitale cease and desist selling shares of
14 LADP Acquisitions, Inc., in that state.
15   Q   Now, in terms of -- you think it was last
16 year when you received this cease and desist order.  Do
17 you remember what month?
18   A   I do not, but I will say that I forwarded all
19 of that information on to Mark Bercoon immediately.
20 And more recently, it should be -- should have been in
21 the possession of David Loev.
22   Q   Is there anything else that you can recall
23 about this cease and desist order?
24   A   Not in particular.  But I do recall asking
25 Mark Bercoon what this is, so -- meaning, I understand

Page 19

1  it's a cease and desist order, but I was questioning,
2  why am I receiving this and what is seemingly going on.
3    Q   Is there any relationship that you know of
4  between L.A. Digital Post and LADP Acquisitions?
5    A   No, none whatsoever.
6    Q   In this cease and desist order, was there any
7  reference to L.A. Digital Post?
8    A   Yes.
9    Q   Okay.  And what was that reference?
10   A   As I recall -- and I'm doing this from
11 memory -- L.A. Digital Post seemed like it was being
12 used as the -- the vehicle that was going to be
13 publicly offered for some sort of a merger or
14 stock sale/acquisition.
15   And I believe that's why I received it at
16 L.A. Digital Post, because that was the company that
17 was referenced by LADP Acquisitions, Inc.
18   Q   Was your name on this cease and desist order?
19   A   I do not believe so.  I think it was sent to
20 me, but I was not referenced in any way as an
21 individual who should cease and desist.
22   I think it was sent to me because, if you go
23 on to our website, it lists some of the officers of the
24 company, and the address and so on.
25   And I am also of the understanding that the

Page 20

1  persons that they tried to contact who they were really
2  telling to cease and desist could not be found.  So
3  they went to the company that was referenced, because
4  they could not find the individuals -- meaning, Joseph
5  Vitale seems to be a name that comes up, and no one can
6  find him.
7    Q   Okay.  So it was your understanding that --
8  let me withdraw the question.
9    At the time you received this cease and
10 desist order sometime in 2009 -- about a year ago, I
11 think you said -- was L.A. Digital Post contemplating
12 any public offering of securities?
13   A   No, they were not.
14   Q   Was L.A. Digital Post contemplating any
15 transaction that would allow its shares, stock, to be
16 traded on a public exchange?
17   A   Not to my knowledge.
18   Q   Was L.A. Digital Post contemplating any
19 merger with any company in which that company's shares
20 were trading on a public exchange?
21   A   No.
22   Q   At that time, about a year ago, was
23 L.A. Digital Post contemplating any corporate
24 transaction, acquisition, fundraising, loan?
25   A   Yes.

Page 21

1    Q   What was that?
2    A   There were a multitude of failed mergers and
3  transactions with several different competitors within
4  our space, within our business.  There was some
5  consistent ongoing fundraising efforts with various
6  groups that also did not come to fruition.
7    This was spearheaded by Mark Bercoon and by
8  William Goldstein, most of which happened completely
9  without the knowledge of L.A. Digital Post and their
10 management.
11   Q   In the -- I think you had described the
12 multiple failed merges or transactions with
13 competitors.  Would any of those transactions resulted
14 in L.A. Digital Post shares being offered to the
15 public?
16   A   Extremely doubtful.
17   Q   Was there anything that you can recall that
18 would have resulted in a public offering of
19 L.A. Digital Post shares?
20   A   No, there's not.
21   Q   The -- I think you termed it consistent
22 fundraising efforts with various groups during this
23 time period when you received the cease and desist
24 order.  Was there anything related to those efforts, to
25 your knowledge, that would have resulted in

Page 22

1   L.A. Digital Post offering securities to the public?
2     A.  Not to my knowledge.
3     Q.  Who is Will Goldstein?
4     A.  William Goldstein was the original owner,
5   slash, purchaser of L.A. Digital going back seven years
6   ago, going back to 2003. William Goldstein came out
7   and met with me, and later on, offered a letter of
8   intent to purchase the company.
9       He brought in an individual by the name of
10  Robert Rissinen, who I mentioned a few moments ago.
11  And together, they bought the company from the previous
12  owners.
13      At that time, there was no LADP New York.
14  The New York entity did not exist at that point. That
15  happened about a year later, after they had purchased
16  the company. They had purchased the company with very
17  little cash and a very large note from the
18  Bank of America out of Georgia.
19     Q.  And I think in your discussions about who
20  currently sits on the board, Will Goldstein, to your
21  understanding, does not; is that right?
22     A.  He does not. My -- my understanding of
23  William Goldstein is that -- and this is speculation --
24  may I say that?
25     Q.  Of course.

Page 23

1     A.  -- is that Mark Bercoon basically is the --
2   on paper, is what I would refer to, the front man for
3   Will Goldstein, and William Goldstein has somewhat of
4   what I can see to be a problematic financial history.
5      And at some point, a little bit over a year
6   ago, after the fundraising efforts with a company by
7   the name of Chatham, C-h-a-t-h-a-m -- I can't recall
8   any more information than that about Chatham. That was
9   part of a fundraising effort and a potential merger
10  that failed.
11      So subsequent to that failure, Mark Bercoon
12  very quickly changed a lot of the -- what I would call
13  the administrative structure on paper to reflect
14  Mark Bercoon is the hundred percent owner of
15  L.A. Digital, and William Goldstein's name does not
16  really appear on the surface in reference to
17  L.A. Digital.
18      However, he is still one of the guarantors on
19  the note with B of A.
20     Q.  Does William Goldstein have any current
21  involvement with L.A. Digital Post operations?
22     A.  He does not.
23     Q.  When you use the term "front man," what do
24  you mean by that?
25     A.  Well, Mark Bercoon is the chairman of record

Page 24

1   of L.A. Digital. But I believe that he and
2   William Goldstein are partners, and I would speculate
3   to say that they have some sort of an operating
4   agreement behind them.
5      Many times when I am on the phone with
6   Mark Bercoon, I do hear Will Goldstein in the
7   background. So I know that they are always working
8   together, and I know this by Mark's own admission, that
9   he and Will are partners, and as he phrased it, "joined
10  at the hip."
11     Q.  You've mentioned that a couple attempts that
12  failed with mergers and transactions.
13      Is it your understanding that those attempts
14  failed in part because of Will Goldstein's checkered
15  financial past?
16     A.  I think that William Goldstein lacks
17  credibility, does not have a good reputation. I can
18  only speak about our industry. I don't want to
19  speculate about the other businesses that they've been
20  involved in, because I really don't operate in that
21  world.
22      But anything that -- that they have tried to
23  facilitate in the way of L.A. Digital merging with
24  other companies, fundraising efforts related to those
25  such opportunities, have failed.

Page 25

1      In talking to competitors, a lot of our
2   competitors who they intended to try to do business
3   with also did not have good feelings or a lot of trust
4   in regard to William Goldstein. And I think that
5   probably is -- well, I think it's fair to say that, in
6   part, that was one of the reasons why these
7   acquisitions never -- and mergers never came to
8   fruition.
9     Q.  Can you provide more detail about what
10  Mr. Goldstein's financial background or reputation --
11     A.  Well, to my best recollection, initially, one
12  of the mergers that they -- that they tried to do with
13  L.A. Digital and another company called
14  Electric Pictures Solutions, after a lengthy and costly
15  due diligence period, resulted in William Goldstein and
16  both Mark Bercoon trying to do nothing more than a
17  stock swap.
18      And the -- we're all small companies,
19  relatively small companies, privately owned. The word
20  "mom and pop shops" kind of comes up in our -- in our
21  competitive market more than not, because there are not
22  very many large, well-financed players in our space,
23  other than -- Ascent Media is the only one that really
24  comes to mind, and companies like Deluxe that are a
25  hundred years old and very cash rich.

Page 26

1    So anyway, anyone who's looking to do a
2  merger or an acquisition is looking to take cash off
3  the table for building their business. It seemed that
4  these folks were somewhat misled, and when it came down
5  to just doing a stock swap and no money really changing
6  hands, they walked away from the deal.
7    But oddly enough, the same folks walked back
8  into another potential merger about a year and a half
9  ago, which also didn't work out. At that time, they
10  were working with the company, Chatham, that I just
11  mentioned, and that deal failed for, I believe, a
12  multitude of reasons.
13    And it wasn't because there wasn't going to
14  be a cash buyout to some extent to the owners of
15  Electric Pictures Solutions; it really had more to do
16  with Chatham not wanting to do business with
17  William Goldstein.
18    That is what I heard from Mark Bercoon after
19  -- I'm speculating now -- $400,000 worth of expenses in
20  legal fees, and in due diligence, and audits and so on,
21  and for the fact that there was some volatile
22  personalities in the ownership of the entity they were
23  trying to merge in. And those volatile personalities
24  surfaced at two meetings that I witnessed, and the deal
25  consequently fell apart.

Page 27

1    Q   So I'm getting -- your understanding is that
2  Will Goldstein may have misled Electric to the terms of
3  the deal, and that may have affected his reputation in
4  that community?
5    A   As it relates to that deal. But there have
6  been other instances in -- in our seven years together,
7  having them as the owners, where they have met with
8  other companies, competitors in the business, who we
9  compete with.
10    There have been suppliers that they have
11  somewhat interfered with in regards to payments being
12  timely and so on. There's been some, I would say,
13  deception on their part in seeing that our suppliers
14  get paid timely, and it has upset some of the companies
15  I have been dealing with for the last 20 years. I've
16  had to do a lot of cleanup after allowing them to deal
17  with particular vendors.
18    Q   So you had said following your receipt of the
19  cease and desist order from Pennsylvania about a year
20  ago, you forwarded that cease and desist order to
21  Mark Bercoon.
22    Do you remember that?
23    A   Yes, I do.
24    Q   Okay. When was that?
25    A   Immediately. If you would like an actual

Page 28

1  date, I'd have to refer to the document. And also,
2  when I'm saying a year ago, I'm approximating. It
3  could be a little less, it could be a little bit more.
4  But I would -- I would provide you the document so you
5  could have an exact point of reference for time.
6    MR. LEE: Okay.
7    MR. SPRUNG: Can I just add:  You said you
8  mentioned that the C and D referenced a guy named
9  Vitale.
10    THE WITNESS: Yes.
11    MR. SPRUNG: Are you aware of that -- of who that
12  person is?
13    THE WITNESS: No, I do not. I had never heard
14  his name prior to that -- receiving that document.
15    MR. SPRUNG: And you said also that the C and D
16  mentioned Paramount Capital.
17    Was that name familiar to you?
18    THE WITNESS: Not at all. Not until I saw that
19  document.
20    MR. SPRUNG: Okay.
21    THE WITNESS: And it seemed to be that
22  Joseph Vitale was the representative of Paramount
23  Capital.
24    MR. SPRUNG: And lastly, it sounds like you got
25  the C and D directly from the State of Pennsylvania?

Page 29

1    THE WITNESS: Yes.
2    MR. SPRUNG: So the State sent it to you?
3    THE WITNESS: Yes.
4    MR. SPRUNG: That's how you received it?
5    THE WITNESS: Yes. Yes, it is.
6    MR. SPRUNG: Thank you.
7    BY MR. LEE:
8    Q   How did you forward the C and D to
9  Mark Bercoon?
10    A   I scanned it and I sent it to him via e-mail.
11    Q   And did you receive a response from him?
12    A   Yes, I did.
13    Q   And what was that response?
14    A   The responses that I receive from
15  Mark Bercoon are generally verbal.
16    Q   So he called you --
17    A   He called me --
18    Q   What did he say?
19    A   -- and I had asked him about it. I mean, I
20  was shocked, to say the least. First of all, I had no
21  idea that they were selling what seemed to be stock of
22  L.A. Digital.
23    Secondly, to receive a cease and desist order
24  is something I had no knowledge of, regarding a company
25  that I have built, more or less, from the ground up,

## Page 30

1  was extremely disturbing. So I asked Mark what this is
2  all about, meaning this cease and desist order.
3      And he went on to tell me a very interesting
4  story. And the story goes as follows: They were
5  trying to raise money for the company, which was always
6  the case, because the company was extremely leveraged.
7      And I have to sort of regress for a moment to
8  say that when they bought the company, they never
9  represented how they were going to support a
10 capital-intensive business like L.A. Digital, other
11 than they were going to bring the resources, and those
12 resources were supposedly coming from their personal
13 accounts.
14     They had told me that Rob Rissinen had no
15 less than $50 million in assets and so on and so forth,
16 and it was going to be a new day at L.A. Digital.
17     Very shortly after, we realized that that was
18 not the case, and they began to leverage up the company
19 beyond our wildest dreams. So --
20     MR. SPRUNG: If I can just stop you. When you
21 say "they," are you speaking about --
22     THE WITNESS: I'm speaking about Mark Bercoon.
23 I'm speaking about William Goldstein. I'm never really
24 speaking about Robert Rissinen, because he was a
25 passive investor, and in my opinion, he was -- he is a

## Page 31

1  trust-fund child who was somewhat victimized by their
2  efforts.
3      So I called Mark Bercoon, and he began to
4  tell me that in their efforts of raising money, they
5  found a group down in Florida who was connected to some
6  very wealthy people privately. And the reason
7  Florida -- is because I believe they own a club in
8  Florida, in south Florida somewhere. I couldn't tell
9  you the name of it. I really do not know.
10     But in their dealings in Florida, they ran
11 across a group that was going to bring in private money
12 to the company. And they went down the road of
13 investigation, and it didn't work out.
14     And what Mark Bercoon went on to tell me is
15 that this is directly related to nothing more than an
16 identity theft situation, which they are handling.
17 Being that this company down in Florida -- and I will
18 assume they were referring to Paramount Capital --
19 //
20 BY MR. LEE:
21 Q  Did they say Paramount Capital?
22 A  Well, in this conversation, I had asked them,
23 "Do you mean Paramount Capital and Joseph Vitale?"
24     And Mark Bercoon said yes. He also went on
25 to say that Joseph Vitale really isn't a bad guy, it's

## Page 32

1  just the people he works for, whomever those people
2  are.
3      And he believes that they have stolen the
4  identity of L.A. Digital Post, which they got off our
5  website -- and there is a lot of information on our
6  website; photos, clients, projects, company overview,
7  some very brief bios on some of the executives.
8      And I said, Mark, well, you know, this is
9  fairly serious. I mean, to receive a document like
10 this, I mean, this is a very sort of serious order from
11 a state. I really hope that, you know, you resolve
12 this situation quickly, because, you know, this can't
13 be problematic for L.A. Digital. I mean, we don't know
14 anything about this.
15     Again, he said, it's a case of identity theft
16 and he's dealing with it.
17     Now, when I say that he's dealing with it,
18 Mark Bercoon is an attorney, and he, I believe, is
19 licensed in the State of Illinois, and he also holds a
20 CPA license. They have other businesses,
21 travel-related businesses, as well as -- they have, or
22 had, a homeland security business as well. And --
23 which I, again, don't know that much about, other than
24 what they've told me, that these are companies that
25 they own.

## Page 33

1      And I was hoping that because of his
2  credentials, being an attorney, that he would take it
3  seriously, and that, if it was a case of identity
4  theft, which I know does happen, that he would get this
5  resolved immediately.
6      And that was the last conversation we had
7  about the cease and desist order that I received.
8  Q  Okay. Now, your testimony here, is that a
9  summary of multiple phone calls you had with him or is
10 this just one phone call upon -- in receiving the cease
11 and desist order you sent to him?
12 A  I believe it was only one phone call, because
13 that was the only time I received anything from the
14 State of Pennsylvania.
15     He made it clear that it -- it wasn't real,
16 as far as he was concerned, and that there was
17 absolutely nothing for me or L.A. Digital management to
18 be concerned about. So I dropped the issue.
19 Q  So at the time you received this cease and
20 desist order, and forwarding it to Mark Bercoon, and
21 your conversation with Mark Bercoon, was it your
22 understanding that the offering -- the allegations of
23 the offering was being conducted by L.A. Digital Post
24 or LADP Acquisitions?
25 A  My understanding was that there was a

Page 34

1  gentleman by the name of Joseph Vitale and
2  Paramount Capital that was illegally trying to sell
3  stock, or was selling stock, of L.A. Digital/LADP
4  Acquisitions, who I had never heard of.
5       And I think because I had never heard of
6  LADP Acquisitions, Inc., it all sounded very fabricated
7  to me. I didn't know there was an entity called
8  LADP Acquisitions, Inc. I had never heard of them.
9       Q   Did you ask Mark Bercoon about
10  LADP Acquisitions?
11      A   I did.
12      Q   What did he say?
13      A   Again, he said this was all a case of stolen
14  identity and he doesn't know anything about
15  LADP Acquisitions, Inc.
16      Q   Was Will Goldstein on this call that you had
17  with Mark Bercoon?
18      A   Absolutely not.
19      Q   Have you ever spoken with Will Goldstein
20  about the cease and desist order?
21      A   No, I haven't.
22      Q   So you testified that following this one
23  phone call with Mark Bercoon, you assumed that Mark
24  would take care of the situation, and that you didn't
25  do anything else related to the cease and desist order

Page 35

1  or the LADP Acquisitions or L.A. Digital Post offering?
2       A   I didn't only assume, I was assured by
3  Mark Bercoon that this would be taken care of.
4       Q   Okay. So when was the next time that you
5  encountered or heard of offering activities by
6  LADP Acquisitions or L.A. Digital Post?
7       A   Now, the timing I'm going to reference right
8  now could being a little skewed, so I don't know if the
9  phone call that I had received was before or after
10  that. But I know it was in close proximity, and I'll
11  explain.
12       I was called one morning by an investment
13  broker. It was a random solicitation, and the
14  investment broker -- I took his call. I generally take
15  everyone's calls, as I think you're aware of when I --
16  when you called me. He called me to congratulate me on
17  the acquisition, slash, sale of L.A. Digital.
18       And I said to him, "I have no idea what
19  you're talking about."
20       He goes, "You're the president, aren't you?"
21       I go -- I answered, "Yes, I am. I still have
22  no idea what you're talking about, but I would -- I'm
23  really curious to find out."
24       He was kind enough to send me a link to one
25  of the financial websites, and I do not recall which

Page 36

1  one. I clicked on the link, and there was an
2  announcement -- an announcement by the
3  Acies Corporation, whom I've had -- whom I have never
4  heard of, referencing William Goldstein,
5  L.A. Digital Post, a gentleman by the name of
6  Oleg Firer -- and I believe it's spelled F-i-r-e-r --
7  and this article about the sale of L.A. Digital Post
8  and some potential public offering by the
9  Acies Corporation, and that William Goldstein would be
10  escalated to chairman of the new company and so on and
11  so forth.
12       I immediately got in touch with Mark Bercoon
13  and asked him what this is about. And I was furious,
14  to say the least. And as I recall, I sent him a
15  somewhat disparaging e-mail, and then I wouldn't answer
16  his phone calls for a few hours.
17       I finally got on the phone with him, and he
18  went on to tell me that this is a favor that they did
19  for their buddy Oleg, because Oleg is someone that they
20  do business with down in Florida, and that he has a
21  public shell, and that he was going to lose his public
22  shell unless he could put something into it.
23       And they allowed him, because they were doing
24  business together of another nature, which they never
25  disclosed to me, in relation to their club in Florida.

Page 37

1  They allowed him to do this so he would not lose his
2  shell, and it's nothing to worry about. There's no
3  sale. There's no acquisition. There's just, you know
4  -- they weren't -- they didn't know he was going to
5  make a public announcement.
6       But again, Mark Bercoon said, "Don't worry.
7  It's really nothing. It's meaningless, I'll handle
8  it."
9       He did not say this was a case of identity
10  theft. He did basically refer to it as a -- friendly
11  accommodation.
12       Q   Did he use that word?
13      A   He did not. I don't recall exactly his --
14  his phrasing. But he did say "favor." "Favor" was
15  definitely something that he said. Friendly
16  accommodation is -- is my own interpretation of what he
17  told me.
18      Q   The phone call that you received from the
19  investment broker, do you know who that was?
20      A   No. It was completely random. It was no one
21  that I knew. It was no one I ever heard of. But I do
22  get random calls from investment bankers fairly
23  regularly, and e-mails as well, regarding capital
24  availability for equipment, for mergers, for
25  acquisitions. So it wasn't unnatural for me to receive

10 (Pages 34 to 37)

Exhibit 3  Page 15

## Page 38

1  a call from a random broker.

2      However, the context of the information, it

3  was a little bit more than just a general solicitation.

4  It was a congratulatory -- that was sort of a pitch,

5  "Congratulations on the sale; we'd love to work with

6  you."

7      And I responded with, "I don't know what

8  you're talking about."

9    Q   Do you remember his name?

10    A   I have no idea.

11    Q   You mentioned a company called Acies.

12     How do you spell that?

13    A   A-c-i-e-s.

14    MR. SPRUNG:  And do you happen to remember when

15  this call came in, approximately, what month?

16    THE WITNESS:  I don't.  But I could backtrack,

17  because I did save the article.

18    MR. SPRUNG:  Okay.

19    THE WITNESS:  So it's consistent -- if the

20  article came out on a Thursday, this was probably that

21  Friday or that Thursday afternoon.  So I could -- I

22  could give you a specific point of reference when I go

23  back to my office.

24    MR. SPRUNG:  So how long -- was this several

25  weeks or months after you got the C and D from

## Page 39

1  Pennsylvania?

2    THE WITNESS:  I'm unsure of the timeline, but in

3  close proximity.

4    MR. SPRUNG:  Okay.  And I'm confused.  When

5  Mr. Bercoon told you that the announcement was actually

6  not true, in the sense that the public shell had not

7  acquired LADP, or did it, in fact, happen such that now

8  the public shell did --

9    THE WITNESS:  No, it never happened.  And there

10  was no truth to it whatsoever.

11    MR. SPRUNG:  Really?  Okay.

12    THE WITNESS:  From my perspective and by

13  Mark Bercoon's own admission.

14    BY MR. LEE:

15    Q   What did Mark Bercoon say specifically about

16  that?

17    A   He said that he had told Oleg -- you know, he

18  had told Oleg that he could, you know, use

19  L.A. Digital, so to speak, to help him out.  But he had

20  no idea that he was going to put an article on the

21  Internet, or an announcement on the Internet, for all

22  to see.

23    I think -- you know, so my interpretation was

24  that this was a -- you know, a conversation that

25  happened behind closed doors.  And sure, you could say

## Page 40

1  that, you know -- and you're looking into merging in

2  L.A. Digital.  And he told me that he did that as a

3  favor.  And that was the extent of his response.

4    Q   Is this Acies company the shell company we're

5  talking about?

6    A   Yes.

7    Q   Did Mr. Bercoon explain or otherwise describe

8  for you why Oleg would be losing his shell company if

9  not for the use of L.A. Digital's name?

10    A   He went on to basically say that -- he said

11  that the laws had changed.  And not being a lawyer, and

12  he being a lawyer, I trusted him.  And that you can't

13  just own a public -- an empty shell for X amount of

14  time, you have to actually do something with it.  And

15  that, you know, maybe this would be something for

16  L.A. Digital theoretically, but there was no intention

17  of a merger.

18    I had no idea who Oleg Firer is.  I was told

19  he did this as a favor to Oleg because Oleg works with

20  them in connection with their club in Miami, and that

21  they have borrowed X amount of dollars from him over

22  time to help the club with its cash issues, for lack of

23  better explanation.  That's what he had told me.

24    Q   Are you a -- do you have an ownership

25  interest in L.A. Digital Post?

## Page 41

1    A   I do not.

2    Q   Do you have any ownership interest in

3  LADP, LLC; L.A. Digital Post; or LADP New York?

4    A   No, I do not.  But I would like to clarify my

5  response --

6    Q   Sure.

7    A   -- a little bit further if that's okay.

8    When L.A. Digital was sold to

9  William Goldstein and Rob Rissinen, and I entered into

10  a new employment agreement with them, which was a

11  four-year -- I believe it was a four-year -- had a

12  four-year term, the notion was to give me ownership in

13  the company.

14    The way that the contract eventually worked

15  is that the amount of ownership they promised to give

16  me in the company was scaled way down at the end.  The

17  document stated that I had 10 percent equity in

18  L.A. Digital and another 10 percent in stock options,

19  and that my employment with L.A. Digital was contingent

20  upon my ownership.  So if I were to no longer work at

21  L.A. Digital, there was no buy/sell agreement or

22  anything else.

23    I was very disappointed with that.  I had

24  never been treated like an owner, but I was in an

25  awkward situation.  And the old owners had left.  They

## Page 42

1   were bought out. I had built the company from the time
2   it was a year old to where it was at that point, and it
3   was profitable. I certainly didn't want to leave. I
4   was disappointed, to say the very least.
5       I had it reviewed by yet another attorney,
6   and what my ownership percentage in the company really
7   was, more or less, was a sales bonus in the event that
8   the company was actually sold. There were no
9   distributions. There was no value to it. If I were to
10  leave, which I had wanted to on many occasions, there
11  was no ability to be bought out.
12      The four-year term of that contract expired
13  four -- three years ago. I have been working at
14  L.A. Digital without a contract, without an employment
15  agreement.
16      I have never seen a stock certificate or
17  anything else. There are -- for the last -- well, I've
18  never seen a stock certificate, period. But I have
19  been working without any sort of documentation for over
20  three years.
21      And to my knowledge, and to the knowledge of
22  L.A. Digital's general counsel, who is not
23  present because this is a separate matter, I have no
24  ownership in the company at all.
25    Q  But you sit on the board?

## Page 43

1    A  I sit on the board -- I sit on the board of
2  directors as the president of the company, not as an
3  owner of the company.
4    Q  If L.A. Digital Post was in negotiation
5  contemplating doing a public offering, would you be
6  involved in those discussions?
7    A  No, I wouldn't.
8    Q  You would have no authority to bind the
9  company in a transaction relating to the public
10  offering?
11    A  I -- I believe that eventually, I would be
12  required to do so, but I have never been part of any
13  such conversations with them, nor have there been very
14  many board meetings in general.
15    Q  So if L.A. Digital Post wanted to do a public
16  offering, would your signoff be required?
17    A  Only what -- I can only state my signoff
18  would be required if that's what the law requires.
19  Otherwise, I am sure that Mark Bercoon and
20  William Goldstein would do it completely without my
21  knowledge and tell me after the fact.
22    Q  So in the time period where Mark Bercoon was
23  responding to your e-mail about the Acies shell
24  transaction merger with L.A. Digital Post, were you
25  aware of any discussions that LADP was having with

## Page 44

1   anyone about a potential IPO?
2    A  Absolutely not.
3    Q  About a potential shell merger involving the
4  eventual distribution of L.A. Digital Post shares on
5  the public exchange?
6    A  No. Absolutely no knowledge of that
7  whatsoever.
8      MR. SPRUNG:  Do you have any reason to believe
9  that either of those things is actually happening?
10     THE WITNESS:  I'm sure -- well, I can't say I'm
11  sure, because I don't know.  To my knowledge, none of
12  those things have ever happened.
13    BY MR. LEE:
14    Q  Okay.  So following your conversation with
15  Mark Bercoon, which he was telling you about Acies and
16  the shell transaction, what was the next thing that you
17  recall happening with L.A. Digital Post or
18  LADP Acquisitions offering securities?
19    A  We started to receive random calls.  And when
20  I say "random calls," there would be a message left
21  with the front desk, the receptionist, or the
22  accounting department by random people whose names I
23  have never heard of in regard to their investment.  And
24  they were calling L.A. Digital Post because
25  L.A. Digital Post was referenced in whatever investment

## Page 45

1   they apparently had made.
2      There were a few calls.  It was nothing --
3  there were a few calls, and the distance between the
4  calls was fairly significant.  It wasn't a situation
5  where every week, there was a call from some potential
6  investor who was wanting to know about the IPO -- or
7  the alleged IPO.
8      Every once in a while, there was a call, and
9  I would speak to those people, try to get whatever
10  basic information I could.  I had told them initially
11  that I believed that there was some sort of an identity
12  theft, I think, situation, and that Mark Bercoon was
13  handling this matter, who is the principal owner of the
14  company, out of Atlanta, Georgia.
15      I would then take their name, their number,
16  which was generally all the information, unless, of
17  course, they said, well, I invested X amount of
18  dollars.  And I would forward all of that information
19  on to Mark Bercoon to basically deal with it, as that's
20  what he requested.
21      I report to Mark Bercoon.  He is the --
22  technically the owner of the company.  I forwarded all
23  of the information on to him under the notion that this
24  was related to this case of identity theft that he had
25  claimed went on with Joe Vitale and Paramount Capital

## Page 46

1  I'll also say this: The name Joseph,
2  Joe Vitale, did come up. So it seemed consistent with
3  the story that he told me.
4  MR. SPRUNG: When you say "did come up," you mean
5  in the calls you were receiving?
6  THE WITNESS: Yes.
7  MR. SPRUNG: Okay.
8  THE WITNESS: The folks that called me -- and
9  they called from various locations around the
10  country -- it was the same dialog each time.
11  I had made an investment, I was waiting for
12  the merger to happen. We can't seem to get in touch
13  with Paramount Capital or Joseph Vitale.
14  And then I began to hear another name. There
15  was a woman's name, who I honestly don't recall for the
16  moment.
17  No one seems to be there. The numbers were
18  either disconnected or they -- they never get a call
19  back.
20  I said, "Well, there's someone in Atlanta
21  who's handling this matter, and I will refer all of
22  your information to them, and I'm sure they will call
23  you."
24  I would then get on the phone with
25  Mark Bercoon. I would give him all the information.

## Page 47

1  He would generally get back to me by the next day after
2  I gave him the information and tell me that they spoke
3  to so-and-so, meaning whoever the person was that
4  called, and that, you know, the matter was being
5  handled.
6  BY MR. LEE:
7  Q  Anything else that you can think of that
8  these investors told you during these calls, other than
9  what you've already testified?
10  A  Not initially.
11  Q  I'm sorry
12  A  Well, not initially, meaning in the beginning
13  of receiving these calls, which were spread fairly far
14  apart, the information that I received was exactly what
15  I had just stated.
16  As time went on, in more recent months,
17  meaning the last -- I want to say four months --
18  Q  I'm going to stop you, just because I want to
19  get some more details --
20  A  Okay.
21  Q  -- on the first phase of your discussions
22  with what looks like -- to be investors or individuals
23  relating to securities offerings.
24  When you said waiting for -- that these
25  investors or individuals told you that they were

## Page 48

1  waiting for a merger, did they provide any other
2  details?
3  A  No, they did not. They just asked about the
4  merger. "Did it happen?" They were asking me if the
5  merger happened.
6  And my response would be, "I'm unaware of any
7  such merger or public offering, but I would like to
8  refer you to Mark Bercoon in Atlanta, who is handling
9  this matter."
10  Q  Did any of these individuals mention Acies,
11  the shell company?
12  A  No, they did not.
13  Q  Did they mention any company related to
14  the -- to this merger?
15  A  They mentioned Paramount Capital out of
16  Florida. And at some -- no, I retract that.
17  They mentioned Paramount Capital out of
18  Florida, for the most part. I would also state for the
19  record that initially I didn't think that much of it,
20  because it was consistent with the information
21  Mark Bercoon had told me, and I did not really probe
22  with -- on any of these phone calls at all.
23  I assumed that what he was telling me was the
24  truth, and that it was potentially a case of identity
25  theft. And I didn't really probe into these

## Page 49

1  conversations to acquire any more information than they
2  were willing to -- to give me in this phone call.
3  Q  Was it your understanding, based on this sort
4  of listening to these collective individuals' calls,
5  that the merger would result in some kind of public
6  offering related to L.A. Digital shares?
7  A  Based on what they were stating, it seemed
8  that somehow, yes, L.A. Digital was involved in some
9  sort of an apparent scam which was unbeknownst to me,
10  which Mark Bercoon seemed to know about to some extent
11  or to whatever extent he would -- he would state to me,
12  and that he was somehow -- and I should use quotes,
13  "making good" on what whatever this problem was by
14  either -- and now I'm speculating.
15  I don't know if he was turning around and
16  cutting checks to these people for their investments,
17  or that he had a direct line with the folks that stole
18  the identity for this apparent merger or scam.
19  But somehow, I got the impression from him
20  that he was handling this in some way. I don't know
21  exactly what that meant, but I can tell you that I
22  never received a subsequent call or contact from those
23  individuals. So I did assume that whatever he was
24  doing, it was -- he was clearing up the situation to
25  their satisfaction.

Exhibit   3       Page   18

Page 50

1   Q.  In this initial wave of calls from these
2   individuals, did any of them mention LADP Acquisitions?
3       A.  I really don't recall.  They may have.  They
4   may have not.  I did not focus on LADP Acquisitions
5   until much later on.
6       MR. SPRUNG:  Was there ever an instance where
7   someone called you, you referred them to Mr. Bercoon,
8   and then you spoke to that individual again after he or
9   she had spoken with Mr. Bercoon?
10      THE WITNESS:  No, there is not.  I assumed,
11  because they never phoned again, that the matter was
12  resolved.  And I kind of left it as such on the phone,
13  even to this day.
14      I would state that if Mark Bercoon does not
15  get in touch with you, if you still have ongoing
16  concerns, whatever they may be, contact me again and
17  I'll do whatever I can to help you in this situation,
18  getting in touch with the right people.  No one ever
19  called back.
20      BY MR. LEE:
21      Q.  So what was the next thing that happened that
22  you can remember about L.A. Digital or
23  LADP Acquisitions' offering of securities?
24      A.  Again, I'm not, like, totally -- I don't
25  believe that I am -- I may be a little inaccurate on

Page 51

1   the timeline in the chain of events, but I'm clear on
2   the events.
3       Q.  Okay.
4       A.  If that -- I just want to state that for the
5   record, should it -- should my documentation prove one
6   month versus another in terms of the order, I just want
7   to be clear about that.  Without having it in front of
8   me, I am unsure of the exact timeline.  But I am sure,
9   again, of the calls that I received or any
10  communication that I received.
11      The next thing that I recall happening is
12  that I received a call -- well, a voice message that my
13  assistant made me aware of by a gentleman by the name
14  of Dimitri Burnadon.  And I'm struggling for the
15  spelling of the second name, but I do have it written
16  down.
17      He described himself as an investigator, a --
18  I believe he stated that he was from the Fraud
19  Investigations Department from the State of Florida.
20  And he was looking into Paramount Capital,
21  L.A. Digital Post, LADP Acquisitions, Inc. -- I had --
22  I clearly remember that in that conversation -- and
23  apparent stock sales that went on.  And what do I know
24  about that.
25      And I had told him that I had taken a couple

Page 52

1   of calls over the course of time from people who
2   claimed that they were investors who were asking about
3   the IPO, about the sale, about the merger.
4       I had told him I had also received the cease
5   and desist from the State of Pennsylvania, all of which
6   I forwarded on to Mark Bercoon, at the following
7   telephone number and address in Atlanta.
8       It took a couple times for me to actually
9   connect with him.  We kept missing each other because
10  they're three hours ahead or we're three hours behind.
11  And eventually, when I spoke with him, I gave him all
12  of that information I just stated.
13      I then called Mark Bercoon and told him about
14  the call.  And he told me that he would handle it, it's
15  all connected, again, to the same thing, meaning, to
16  this identity theft situation that -- and referenced
17  the name Joseph Vitale and Paramount Capital.
18      And that was the only time that I had ever
19  spoken to Dimitri Burnadon.  He had never called again.
20  I had said the same thing to him:  If Mark Bercoon does
21  not contact you, if you are not satisfied with the
22  information that you're getting, please contact me and
23  I will see if there's someone else that I can put you
24  in contact with.  And he never called again.
25      Q.  So Dimitri said something about -- you just

Page 53

1   said something about stock sales?
2       A.  Well, he was asking about -- about stock
3   sales, and he was asking about, what do I know about
4   the sale -- the public offering of L.A. Digital, do I
5   know anything about LADP Acquisitions.
6       I said, I have no idea who they are.  And I
7   probably told him -- I say probably -- that I have --
8   you know, I have had a discussion similar to this with
9   Mark Bercoon regarding some -- a handful -- and when I
10  say "a handful," probably three potential investors who
11  called asking the same questions that you are actually
12  asking me, although I have never heard of
13  LADP Acquisitions, Inc.  I don't know who they are.
14      MR. SPRUNG:  Did you happen to keep any contact
15  information for the people who called you questioning
16  you about their investment?
17      THE WITNESS:  To some degree.  I -- more
18  recently -- and this is prior to being contacted by
19  Jason Lee -- I started to really keep records, because
20  it was -- it was starting to happen more frequently,
21  the calls.  They went from being random to more
22  recently.
23      And I -- but I would assume that if I went
24  back, because I do keep notebooks and messages, to some
25  degree, I -- we certainly keep all the message --

14 (Pages 50 to 53)

Page 54

1    copies of all the message books, that I could go back
2    through the last year and probably find that
3    information for you.
4           MR. SPRUNG:  Okay.  Thanks.
5           THE WITNESS:  If I don't have it, you know, in my
6    own records, I'm sure it's in one of the message books
7    that we keep on file.
8           MR. SPRUNG:  Okay.
9    BY MR. LEE:
10       Q    So what's the next thing that you can
11   remember about L.A. Digital Post or LADP Acquisitions'
12   securities offerings?
13       A    I think the very next thing that happened is
14   I received a call from a gentleman in San Diego, and I
15   forget his name.  I don't want to seem racist, but I do
16   recall that he was Indian, as far as his ethnicity.
17   His name was Indian, and I don't recall it.
18          He described a substantial investment.  I
19   believe he said it was $60,000.  I called Mark Bercoon
20   immediately.
21          In most cases -- I should also state again --
22   the calls didn't always go directly to me, because what
23   would happen is, someone would call.  They weren't
24   necessarily looking for me.  I directed the front desk
25   for me to take these calls.  I didn't want to alarm the

Page 55

1    staff by taking these calls if there was something, you
2    know, allegedly wrong here.
3           But in more times than not, when the calls
4    came in, they would go to anyone from the receptionist
5    to the accounting department to my assistant.
6           And the folks that were on the phone were
7    duly upset, and they would, more or less, regurgitate
8    this information to whomever they could get on the
9    phone, because the -- my impression was some of the
10   folks who invested were retirees, people that may have
11   had disabilities that were investing their life --
12          Sorry.  I find this despicable, and I'm going
13   to state that this situation is absolutely despicable.
14   I find that these people were taken advantage of by
15   someone, and it was very heartfelt.
16          So you got this over the phone from some of
17   these people, because they would talk to anybody just
18   to hear a voice, because I believe that they couldn't
19   get in touch with anyone.
20          Here it was, they sent checks, they wired
21   money, whatever the case was.  And all of a sudden,
22   X amount of months went by, and whatever the promise
23   was that was made didn't happen, and the individuals
24   who got them to invest had, more or less, disappeared.
25          Anyway, this gentleman, whose name I don't

Page 56

1    recall -- I called Mark Bercoon immediately, told him
2    about the situation.  He seemed to know exactly who he
3    was and what it was all about.
4           And he said, "Don't worry, I'll handle it."
5    And that was the end of that, really, conversation.
6    The guy from San Diego never called back.  Mark Bercoon
7    never mentioned it again.  And somehow, it seems that
8    it all just went away.
9           If you're going to ask me what is -- what I
10   remember next, I believe it's your call.
11          MR. SPRUNG:  Sir, did you ever have any
12   discussions with Mr. Bercoon about these calls you were
13   receiving?
14          THE WITNESS:  Absolutely.
15          MR. SPRUNG:  I know you called -- after the
16   gentleman from San Diego called you, you called
17   Mr. Bercoon.
18          But more generally, did you say to him, "I'm
19   receiving these calls from people who appear to have
20   invested or bought stock in this company.  What's going
21   on?"
22          THE WITNESS:  Repeatedly.  I repeatedly, I would
23   say, got in his face.  And I would even say that I was
24   somewhat accusatory.  "What's going on?  What are you
25   guys doing?"

Page 57

1           MR. SPRUNG:  What was his response?
2           THE WITNESS:  This was a case of identity theft.
3    "We're not doing anything.  We didn't do anything
4    wrong."
5           "Well, what is happening?  Do you know who
6    these folks are?  You apparently know who they are.
7    How do you get in touch with them and have them stop
8    doing this?  I believe this is putting L.A. Digital in
9    a very volatile situation.  It's not healthy for this
10   company.  The company is not healthy as it is.  This
11   just adds to all of the stress of trying to run this
12   day-to-day operation, and I'm sick and tired of taking
13   calls about these alleged stock sales from -- from
14   investors when you're telling me there's nothing going
15   on, and there's identity theft."
16          I pressed him and pressed him and pressed
17   him, and he never changed his story.  Never.
18          BY MR. LEE:
19       Q    You had mentioned that you had heard various
20   promises that were made to these individuals that were
21   calling you.
22          Is there any additional promise that you can
23   remember that's different than what you've already
24   testified about?
25       A    No, there's not.

## Page 58

1   Q   So centered around an IPO by L.A. Digital, a
2   merger or an acquisition that would result, in some
3   way, to L.A. Digital shares trading on some public
4   exchange?
5   A   Yes.
6   Q   Any promises relating to any guarantees of
7   return?
8   A   No. There -- I never received any verbal
9   information about guarantees of returns or anything
10  along those lines.
11  Q   Any promises relating to dividends?
12  A   No.
13  Q   Now, specific to promises relating to an IPO
14  or other public offering by L.A. Digital Post, was an
15  exchange ever identified?
16  A   No, it wasn't.
17  Q   Was a time frame ever identified in when
18  L.A. Digital Post would actually be conducting this
19  alleged IPO?
20  A   Yes. Many of the folks that I spoke with,
21  they were reacting to a time frame specifically. And I
22  can't tell you the time frame from memory, but I can
23  tell you that each call was related to a time frame
24  that had passed.
25      And I believe that's why they were calling.

## Page 59

1   The time frame of the IPO had passed, they couldn't get
2   in contact with whomever it was that sold them the
3   stock, and they were beginning to become nervous. That
4   was clear in every phone call that I took up until two
5   weeks ago.
6   Q   Any promises relating to the percentage
7   return or -- well, let me stop there -- promises
8   related to the percentage return these individuals
9   would be receiving?
10  A   No.
11  Q   So the next thing that you remember was my
12  call to you?
13  A   Yes.
14  Q   Okay. And then, prior to that call, have you
15  had any communications with Will Goldstein about these
16  calls that you had with these individuals or anything
17  that you've testified about what you can remember
18  relating to this alleged LADP or L.A. Digital Post
19  offering?
20  A   No, I have not. I do not actually speak with
21  Will Goldstein. We do not speak with each other, and
22  haven't for some time.
23  Q   Because of some falling out?
24  A   It's a general falling out. I disapprove of
25  Will Goldstein.

## Page 60

1   Q   So --
2   A   And he is very aware of my feelings of how I
3   feel about him and how he has impacted the company
4   negatively by whatever it is that he seems to be doing.
5   Q   So you don't get on the phone with him, you
6   don't e-mail him?
7   A   I do not.
8   Q   Does he ever try to reach out to you?
9   A   He doesn't. He talks to me through
10  Mark Bercoon.
11  Q   And I guess vice versa, you talk to him
12  through Mark Bercoon?
13  A   No. I don't really talk to him. I talk
14  about him, but I don't -- I would never say to Mark,
15  "Give Will this message." I would just as soon have
16  nothing to do with him.
17  Q   So following my call to you, was there
18  anything else that you can recall happening with an
19  alleged L.A. Digital Post offering?
20  A   Yes. Prior to your call -- and again, I'm a
21  little foggy on timeline. I don't know if it was a
22  week or a day. But shortly before you called, I had
23  received a call from -- and I want to -- I believe it
24  was David Scheibel is the name. Again, I need -- I
25  didn't bring files with me. David Scheibel.

## Page 61

1       And I don't know if it was, again, a day
2   before, a week before. I almost felt as if your call
3   was in reaction or response to my conversation with
4   David Scheibel.
5       And David Scheibel was the first person that
6   I spoke to in greater detail, because I was no longer
7   satisfied with "we're handling it," "I'll take care of
8   it," "identity theft."
9       He seemed to be very talkative. He seemed to
10  want to talk. I certainly wanted to understand what it
11  is that we were really dealing with, or trying to. And
12  David Scheibel was the first person who had actually
13  sent me copies of what he physically had.
14      Up until that point, I had never seen
15  anything. They were just random conversations with a
16  certain amount of distance and time between each
17  conversation.
18      David, I believe, was the very first person
19  who actually sent me scans, copies of the presentation
20  proposal, the stock certificate, the welcome letter,
21  and all of the wiring instructions, shipping receipts,
22  et cetera. Anything that he had in relation to this
23  alleged stock sale, he copied me on it and sent it to
24  me. And that, I will say, is the very first time I
25  actually saw this material.

16 (Pages 58 to 61)

Page 62

1    Q   In your conversation with David, can you
2  remember the details of what was discussed?
3    A   He -- the details of what was discussed
4  initially was the same conversation that I had with
5  everyone.  It talked about an investment.  It talked
6  about -- he talked about an IPO.  He talked about the
7  fact that he couldn't get in touch with the folks who
8  had sold him the stock or the company.
9        He mentioned a few names.  He mentioned the
10  name -- I believe he mentioned William Goldstein.  He
11  mentioned Joseph Vitale.  He talked about, again, a
12  young woman I believe was also associated with
13  Paramount Capital, whose name I don't recall.  And he
14  talked about Alan Weiner, W-e-i-n-e-r.
15        Other than William Goldstein, and the fact
16  that Joseph Vitale was a name that I had known from
17  previous conversations with other potential investors,
18  I recognized the name of Alan Weiner.
19    Q   Who is he?
20    A   He is a friend of Will Goldstein's, or he's a
21  gentleman that worked with Will Goldstein.
22    Q   Is he connected in any way to any of the
23  L.A. Digital Post entities?
24    A   He is not.
25    Q   And what is your understanding of

Page 63

1  Mr. Weiner's relationship with Will Goldstein?
2    A   I knew the name Alan Weiner because he was a
3  business -- he was described to me as a business
4  associate of William Goldstein's.
5        And at different points in time, in an effort
6  to help L.A. Digital, Will would reach out to me
7  through Mark Bercoon and say, you know, "Our friend
8  Alan Weiner knows so-and-so at this company or that
9  company.  You should call them.  They do a lot of the
10  same business that you guys solicit.  Give him a call,
11  try to get a meeting."  You know, "He's trying to help
12  the company."
13        So I knew his name in that context.  I
14  followed up on some of the leads that -- well, on all
15  of the leads that I had received, and there was really
16  nothing there.
17        But I recognized his name from those
18  conversations, as well as -- he toured L.A. Digital in
19  New York City with William Goldstein on a couple of
20  different occasions.
21    Q   So how did Alan Weiner's name come up in your
22  conversation with David Scheibel?
23    A   He just mentioned the name.  And then when
24  David Scheibel sent me the -- the e-mail scans, his
25  name was printed on the shipping receipts.  It

Page 64

1  seemingly looked as if Alan Weiner was acting as some
2  sort of a representative in this -- what I would refer
3  to as a scam.
4    Q   Did Mr. Scheibel attribute any statements
5  by -- strike that.
6        Did Mr. Scheibel tell you anything that
7  Mr. Weiner said relating to L.A. Digital Post's
8  offering?
9    A   No, he did not.  He was fairly generic, just
10  about the story of what his -- what he was sold and
11  what the expectation was.  He didn't get too specific
12  into the details of who said what.
13        But when I looked at all the paperwork --
14  which I believe you were copied on -- it sort of
15  illustrated somewhat of a game plan there, that Alan
16  Weiner apparently was part of whatever this alleged
17  stock sale was.
18        And that made me more concerned than ever,
19  because it was clear from -- it was clear to me from
20  looking at all the paperwork that I received that there
21  was a lot more to this than identity theft.
22        May I elaborate?
23        MR. SPRUNG:  Please.
24        THE WITNESS:  Well, first of all, I can
25  understand that someone could go to our website and

Page 65

1  download information.  And some of the information that
2  I saw on the presentation could have easily come off
3  the website.
4        However, there were bios in there, and there
5  were -- there was my bio; there was the bio of our
6  controller; there was the bio of Mark Bercoon; there
7  was the bio of William Goldstein.  That isn't on the
8  website.  My bio is, but no one else that I mentioned
9  has a bio on the website.  It couldn't have been
10  downloaded from the website.  It's impossible.
11        Also, in looking at the name Alan Weiner, I
12  knew Alan Weiner as an associate of Will Goldstein's.
13  And if this was identity -- a case of identity theft,
14  then Alan Weiner must have been one of the perpetrators
15  in this theft.
16        I also saw stock certificates from the very
17  first time they bought the company, LADP
18  LADP Acquisitions, Inc. stock certificates, and that
19  was equally as disturbing.
20        The welcome letter signed by Will Goldstein
21  was even more disturbing because I know it to be his
22  signature, clearly.  And I compared it to other
23  documents that I do have that have his signature on it.
24  I looked at the bank information.  I looked
25  at the routing number of the bank.  It's the

17  (Pages 62 to 65)

Exhibit   3    Page   22

Page 66

1   Wachovia Bank in Georgia. It seems to be the same bank
2   that they bank at.
3       So at this point, the combination of
4   receiving this information and your call kind of forced
5   my hand to sort of -- to come up with a terminology.
6       And when I say "forced my hand," I insisted
7   that the company get legal representation immediately
8   to deal with this matter and to sort this matter out,
9   whatever it may be. My statement to Mark Bercoon was
10  that L.A. Digital has enough problems without this.
11  This seemingly trails back to Will Goldstein.
12      And Mark Bercoon went on to tell me that
13  Alan Weiner is a bad seed, and that -- he told me some,
14  I don't know, wild story about Alan Weiner and his
15  brother, whose name I don't recall, and that his
16  brother doesn't even talk to him, and Alan Weiner has
17  disappeared and when he --
18      And I said, "Well, how do you explain Will's
19  signature on this welcome letter that I have?"
20      He said, "Well, it's easy enough to steal a
21  stamp."
22      I said, "Are you saying that there's a
23  signature stamp that you guys use?"
24      He didn't really answer. Mark Bercoon is
25  very careful in how he answers everything, unless he is

Page 67

1   having a weak moment where he feels like talking, and
2   he has those occasionally. But everything -- anything
3   that he has ever admitted to me in any way, shape or
4   form in relating to this matter was never in writing.
5       The next thing that happened was that he put
6   me in touch with David Loev, who is an attorney that he
7   knew who --
8       MR. SHERWIN: Gary, I want to caution you not to
9   disclose any conversation you had with the attorney.
10      THE WITNESS: Okay. Understood. I was put in
11  contact with David Loev, and I was asked to forward any
12  information that I have relating to this matter to
13  David Loev to handle, as he is an SEC attorney and this
14  is what he specializes in.
15      And I was told by Mark Bercoon that he, in
16  fact, was the attorney of record who dealt with Dimitri
17  Burnadon in this matter in the State of Florida. I
18  don't actually know if that's true or not, but that is
19  what Mark Bercoon stated to me.
20      I gave David Loev all of the information that
21  I had at the time, including David Scheibel or anyone
22  else subsequent to that who sent me information,
23  because I -- I became more in the -- I became more
24  inclined to ask more details and to ask more
25  information in every subsequent call that I received

Page 68

1   after the one I received from David Scheibel. At that
2   point, anyone who contacted me, I probed and I asked
3   for more information.
4       So to backtrack, I gave everything to
5   David Loev. David Loev --
6       MR. SHERWIN: Again, I want to caution you not to
7   disclose attorney/client conversations with Mr. Loev.
8       THE WITNESS: David Loev forwarded that
9   information on to your office as he copied me on -- on
10  those e-mails that went to you. I did not have very
11  many conversations with David Loev at all, to be
12  honest. My conversations were mostly all with --
13      MR. SHERWIN: Again -- okay.
14      THE WITNESS: No, I understand.
15      I spoke to Mark Bercoon directly regarding my
16  concerns.
17      I do need to ask you a question, though.
18      MR. SHERWIN: Me?
19      THE WITNESS: Yes. So I need to go off the
20  record for a sec.
21      MR. LEE: Sure.
22      Let's go off the record. It's 11:45.
23      (A brief recess was taken.)
24      MR. LEE: We're back on the record. It is 11:54.
25      BY MR. LEE:

Page 69

1       Q   For the record, there was no substantive
2   discussions between the staff and the witness; is that
3   right, Mr. Migdal?
4       A   That's correct.
5       Q   Okay. We were discussing the time frame
6   where L.A. Digital Post had retained David Loev.
7   David Loev is actually spelled L-o-e-v.
8       My question is, did you continue receiving
9   investor calls following -- you know, as we're
10  developing this chronology -- following the company's
11  engagement of Mr. Loev?
12      A   Yes, I did.
13      Q   Okay. And were these calls of the same
14  nature?
15      A   Yes, they were.
16      Q   Were there any additional purported promises
17  made to these investors outside of what we've discussed
18  here today?
19      A   No. It was consistent with all the other
20  information that I have given you.
21      Q   Okay. How about conversations with
22  Mr. Bercoon about L.A. Digital Post's purported public
23  offering or merger with a shell company or any other
24  transaction that would result in L.A. Digital Post
25  offering securities to the public?

Page 70

1      A   There was none, to my knowledge.
2      Q   When was the last time you spoke with
3  Mr. Bercoon?
4      A   Let's see.  I was in New York all week.  I
5  have to think for a second.  I spoke to Mr. Bercoon
6  last Friday.
7      Q   Okay.  Was there discussion of anything
8  related to L.A. Digital Post's purported public
9  offering?
10     A   It was specifically related to another couple
11 of calls that I had received earlier that week.
12     Q   From investors?
13     A   Yes.
14     Q   And the same tone and tenor of those calls?
15     A   Yes, to some degree.  One particular investor
16 was extremely -- he seemed to be extremely upset and
17 actually threatening.
18     Q   What did he say?
19     A   He said he had made a sizeable investment.
20 He indicated the investment was $15,000.  He had said
21 that -- the same basic story about the promise of a
22 public offering and a return on his investment over
23 X amount of time.  Didn't really say what that was.
24 Said that time has passed.  He can't reach anyone.
25 He's looking for William Goldstein.

Page 71

1          I told him, "I am really not sure where
2  William Goldstein is, but this matter is -- has been
3  somewhat escalated more recently.  It's being handled
4  by Mark Bercoon, who is the chairman out of Atlanta.
5  And it's being handled by an attorney.  His name is
6  David Loev.  And that I will get all of your
7  information to them ASAP."
8          Before the end of the call, he went on to say
9  that this is something -- you know, if he doesn't get a
10 response from someone quickly, he's going to notify the
11 Attorney General, and/or he's going to the Securities
12 and Exchange Commission.
13     Q   Do you remember this investor's name?
14     A   I am guessing, because I have a bunch of
15 names in my head.  I believe his name was
16 Rick Matthews.  And I believe also that he, actually,
17 is in San Diego.  I do have his information at my
18 office.
19     Q   Okay.  In all the calls that you received
20 from investors, did they indicate to you when they
21 purchased shares in either L.A. Digital Post or
22 LADP Acquisitions?
23     A   All of the people that I spoke to indicated,
24 more or less, that the time has passed, that they have
25 had the investment for some time.  I can't recall if

Page 72

1  the promise was within six months or within a year, but
2  I did note that they were calling me because the time
3  for their money, their investment, to be worth
4  something and for something to happen with the company
5  had passed.
6          I don't really recall what the time frame was
7  from memory when they actually did make this
8  investment.  But I do recall the most recent calls.
9      Q   Okay.
10     A   May I speak to that?
11     Q   Sure.
12     A   The most recent calls that I received, two in
13 particular, one, the gentleman I just mentioned, whose
14 name I believe was Rick Matthews, he claimed that he
15 had made this investment in March of this year.
16 So 3/2010.
17         The next call that I received, which was a
18 day later -- and I don't recall the gentleman's name,
19 except his first name was Paul, and I do recall that
20 he's a pastor -- he had made his investment two weeks
21 earlier, which basically said to me that whatever it is
22 that is going on is continuing to go on.
23         And he went on to say that -- that he had
24 continued to get calls to invest more in -- from that
25 -- in that two-week period.  So he made an investment

Page 73

1  of $5,000, and that over the course of the subsequent
2  two weeks, he was solicited again and again, and he was
3  calling to see if this was a viable investment.  And he
4  called L.A. Digital because L.A. Digital was the
5  company that was being, I guess, used as a pawn of what
6  he is investing in.
7          And I took his call, and I spoke to him, and
8  I asked him to send me whatever information he had.
9  And I cautioned him not to make any further
10 investments.  And I told him that I would not -- I
11 wouldn't put another dime into this, because there is
12 some sort of an apparent scam that's going on, and I'm
13 going to put you in touch with an attorney who is
14 handling this.
15         And I notified Mark Bercoon.  And I e-mailed
16 David Loev and sent the information to them.
17     MR. SPRUNG:  What did you say to Mr. Bercoon?
18     THE WITNESS:  I said, "What the eff is going on?
19 What is happening?"
20         And the impression that I get from
21 Mark Bercoon -- and this is an impression -- is that
22 he's overwhelmed with cleaning up the messes of
23 Will Goldstein, whatever they may be.
24         And I'm speculating that Will Goldstein is
25 the one responsible for this.  I cannot state that for

Exhibit ___3___   Page ___24___

## Page 74

1  the record because I don't know. I don't speak to him.
2  I have, really, no communication with him whatsoever
3  via e-mail, via voicemail, via anything.
4      My communication is only with Mark Bercoon,
5  but Mark Bercoon does seem to be extremely overwhelmed
6  by all of this -- "this" meaning what we're discussing
7  today -- as well as other matters with Will and his
8  businesses that I really don't know anything about.
9      MR. SPRUNG: But back to the conversation with
10  Mr. Bercoon, when you say, "What the eff is going on,"
11  what is his response -- what was his response?
12      THE WITNESS: He, you know, kind of sticks to his
13  story. I don't -- I don't know -- you know, I don't
14  know what -- I don't know what Will does, one way or
15  the other. Not saying that he's admitting that Will is
16  guilty of anything or denying that he's guilty of
17  anything. And I can't speculate because I don't know.
18      And I still have responsibilities to the
19  company and don't want to be accused of pointing the
20  finger at someone and talking beyond what my exact
21  knowledge is. I also don't have the best feelings for
22  Will Goldstein, and I don't want that to interfere with
23  the truth.
24      But I get the distinct impression that
25  Mark Bercoon is fed up and has had it with dealing with

## Page 75

1  Will Goldstein and his business dealings.
2      And whether this is a case of identity theft
3  that was somehow done to Will Goldstein for trusting
4  the wrong people or whether this is a case of Will
5  Goldstein actually being behind this, I don't know.
6      But I do know that Mark Bercoon is -- is fed
7  up with dealing with these matters, and he is extremely
8  concerned about me being here today.
9      MR. SPRUNG: Why do you say that?
10      THE WITNESS: Because I believe that it's very
11  clear that I -- I have been very clear that I am
12  suspect of wrongdoing.
13      MR. SPRUNG: Did you have discussions with
14  Mr. Bercoon about your appearance today before the
15  Commission?
16      THE WITNESS: I did. I told him I was coming
17  here.
18      MR. SPRUNG: When did you have that conversation
19  with Mr. Bercoon?
20      THE WITNESS: I had that conversation with
21  Mr. Bercoon as soon as David Loev received the subpoena
22  for my appearance, which I think was last Thursday; is
23  that correct?
24      MR. SPRUNG: I don't know, but we can find out.
25      THE WITNESS: I'd have to look at the date.

## Page 76

1      MR. SPRUNG: But --
2      THE WITNESS: And this was on the tail end of a
3  conversation about -- that, you know, I told him, "I'm
4  very concerned about this because I'm continuing to get
5  these phone calls. I continue to collect more
6  information from these so-called 'investors.' The
7  situation isn't ancient history; it's continuing. One
8  of the calls that I took was from a guy who invested
9  two weeks ago. The other one was in March, not that
10  many months ago.
11      "Whatever is happening is continuing to
12  happen, and you stating that you have it under control
13  is clearly not the case. There is something very much
14  out of control that seems to be ongoing, and it seems
15  that the calls are coming in more frequently than ever
16  before."
17      And he feels that I feel that they somehow
18  have something to do with this, and this is not a case
19  of identity theft.
20      MR. SPRUNG: Did Mr. Bercoon specifically address
21  your testimony and what kinds of things you might be
22  asked or what you should say in response to questions
23  before us today?
24      THE WITNESS: He did make a statement.
25      MR. SPRUNG: And what was the statement?

## Page 77

1      THE WITNESS: He told me to tell the truth.
2      MR. SPRUNG: Anything else?
3      THE WITNESS: Yes.
4      MR. SPRUNG: What else?
5      THE WITNESS: He told me to remember that he and
6  Will have families.
7      MR. SPRUNG: Anything else?
8      THE WITNESS: No.
9  BY MR. LEE:
10    Q  You had said something that -- in your
11  conversation with Mr. Bercoon following your
12  conversation with Paul the pastor, that you thought he
13  was overwhelmed with the things that Will Goldstein was
14  doing.
15      What did he say specifically that caused you
16  to think that he was overwhelmed?
17    A  Mark Bercoon, well, has described
18  Will Goldstein to me as someone who he admires, someone
19  who he is, as I phrased before, joined at the hip with
20  in whatever businesses they're involved in beyond
21  L.A. Digital, and that -- he describes Will Goldstein
22  as a person who is very much out of control and does
23  what he wants, regardless of what people think or say
24  or do, personally and professionally.
25    Q  And is that what he told you during that call

Page 78

1 with him?

2 A   Not in that -- at that particular call.  But

3 there have been calls in the past where he has

4 described Will as such.

5 And notably in that call, you know, he -- he

6 seemed, as I said, to be overwhelmed with Will's

7 business, whatever that means, and that, you know, he

8 doesn't know where Will is necessarily, or what he's

9 doing.  It was almost like he was kind of trying to

10 distance himself from Will in that conversation.

11 And I really can't say more, because I'm

12 really just speculating.

13 Q   Has Mr. Bercoon's story about identity theft

14 been consistent with -- let me strike that.

15 Has Mr. Bercoon been telling you that this

16 entire situation is a result of identity theft this

17 entire time?

18 A   His story has remained pretty much consistent

19 the entire time.  So he --

20 MR. SPRUNG:  Meaning -- sorry.  Meaning that he

21 has no involvement in this?

22 THE WITNESS:  He never claimed to have any

23 involvement in this whatsoever.  He never made one

24 comment that would -- for the record -- lead me to

25 believe that he is involved in this.

Page 79

1 MR. SPRUNG:  Has Mr. Bercoon ever acknowledged or

2 told you that Mr. Goldstein was involved in this

3 offering of securities?

4 THE WITNESS:  No, not in so many words.  He said

5 that although he felt that Will was brilliant, that he

6 tends to make bad judgment calls.

7 I didn't want to try to read into that, but I

8 think it was in reference to the people that he was

9 supposedly working with down in Florida who were going

10 to raise money for the company, and then those meetings

11 resulted in this matter.  Mark is extremely careful in

12 what he states and how he states it.

13 MR. SPRUNG:  One other question I had that I want

14 to remember to ask is, in these conversations you had

15 with the individuals who called you to ask after their

16 investment, did anyone tell you who solicited them, who

17 actually contacted them, about buying or making an

18 investment in L.A. Digital?

19 THE WITNESS:  Besides Joseph Vitale, whose name,

20 you know, came up several times, there were names I

21 didn't recognize at all.

22 And I'll go back in time to say that when

23 Jason Lee had phoned me initially and interviewed me on

24 the phone, he went through a list of names also.  I

25 didn't recognize any of them.

Page 80

1 That was kind of the same case with a lot of

2 the calls.  They were names that I had never heard of.

3 I don't know if they're real names or aliases.  I have

4 no idea.

5 MR. SPRUNG:  So somebody would call you and say,

6 I got a call or I was contacted by Jane Doe about

7 L.A. Digital --

8 THE WITNESS:  It went in and out.

9 MR. SPRUNG:  -- and you didn't recognize

10 Jane Doe's name or any name that they gave you like

11 that, other than Mr. Vitale, and that's because of the

12 C and D; is that correct?

13 THE WITNESS:  Well, that's because of the

14 C and D, and it's also because that name came up a few

15 times.

16 MR. SPRUNG:  When you got these calls from

17 investors?

18 THE WITNESS:  Yes.

19 MR. SPRUNG:  And when they talked about

20 Mr. Vitale, did they say that it was Mr. Vitale who

21 contacted them about the investments or -- how did his

22 name come up in those conversations?

23 THE WITNESS:  Well, it came up in context, that

24 they were looking for him and couldn't get in contact

25 with him, and thought they would call the company

Page 81

1 directly.  And they got the company's information from

2 the website.

3 MR. SPRUNG:  Okay.

4 THE WITNESS:  And that's generally how -- I would

5 say that's how all the calls pretty much were, except

6 from the pastor.  He was -- he smelled something funny

7 and called.  And maybe it's because he was being

8 solicited so heavily right after making an investment,

9 like, a week earlier.  So --

10 MR. SPRUNG:  And again, the pastor, this guy,

11 Paul, didn't tell you who was heavily soliciting him,

12 did he?

13 THE WITNESS:  No, I don't think he did.  He -- I

14 just stopped him, and I said, "Look, don't.  Don't do

15 it.  Don't invest anything more.  Let me get this

16 attorney in touch with you.  I will do that

17 immediately.  Send me whatever information you have,

18 let me forward that to him so, you know, the proper

19 people can deal with this and you could, you know, be

20 made whole somehow."

21 And, you know, everyone that I spoke to, at

22 least on the surface, seemed to be extremely

23 appreciative that I was trying to help them out.

24 I don't know what happened past the phone

25 call, though, and past forwarding the information to

Page 82

1  Mark Bercoon or to David Loev. I couldn't even
2  speculate, other than to tell you that they don't call
3  again.
4       BY MR. LEE:
5       Q  You mentioned that Mr. Bercoon is a lawyer;
6  is that right?
7       A  Yes. My understanding is that he is
8  registered with the State of Illinois.
9       Q  Does he, to your knowledge, represent
10 Will Goldstein in any capacity?
11      A  Not that I'm aware of.
12      Q  So I think you had said that Mark and Will
13 are partners. Do you remember that?
14      A  Yes. And I'm -- I'm phrasing that because
15 they -- they seem to -- whatever business they're
16 involved in, they're involved in the business together
17 as partners. But I have no idea what that looks like
18 on a document.
19      Q  So when you refer to "partners," you're
20 referring to a business relationship between the two of
21 them?
22      A  Yes, I am.
23      MR. SPRUNG: You also mentioned that Bercoon is a
24 CPA.
25      THE WITNESS: Yes, he is.

Page 83

1       MR. SPRUNG: Do you know where his CPA is? Is it
2  also Illinois?
3       THE WITNESS: I'm guessing it probably is. He
4  went to UCLA Law.
5       BY MR. LEE:
6       Q  I think you stated a number of times that
7  Mr. Bercoon is very careful in what he says. Do you
8  remember that?
9       A  He is.
10      Q  But you also said that there are times when
11 he has moments of weakness. Do you remember that?
12      A  He does. He does.
13      Q  You said that -- well, my impression is that
14 he may have said some things relating to this offering
15 that you look at, I think you said, admissions. Do you
16 remember that?
17      A  Yes, I do.
18      Q  Can you tell me --
19      A  It was -- when Mark is in the -- the mode of
20 wanting to talk, it's really -- he has a tendency to
21 openly talk about frustrations by -- how can I explain
22 this -- by telling a story as an analogy, and he will
23 tend to do that. He tells these long-winded stories
24 that somehow, I guess, make him feel better about the
25 situation.

Page 84

1       And as it directly results -- relates to
2  Will Goldstein in particular, you know, he is very --
3  at least to me, and I don't know if it's an act or
4  not --
5       I come off somewhat accusatory. And more
6  recently, I would just say that he will make statements
7  like, "Will is just out of control. I don't know what
8  he's doing. I don't know where he is. I think he's in
9  Virginia." For all I know, he could be in the next
10 room.
11      But he tends to -- when I say he tends to
12 talk, you know, it's not necessarily related to this
13 particular matter, but just our business dealings in
14 general over the years.
15      When I have been, you know, unhappy with a
16 particular situation as it relates to Atlanta -- and I
17 refer to Atlanta as the owners of the company -- you
18 know, he'll -- every once in a while, he will -- he'll
19 tend to kind of be on my side.
20      "I understand. And yes, Will is -- you know,
21 he's arrogant and he's out of control and I have a hard
22 time controlling him. And, you know, I don't know what
23 he does, but, you know, we're partners, business
24 partners. And you've just got to bear with me. I'll
25 work it out."

Page 85

1       That's kind of his blabbiness. And he'll
2  tell a very elongated story that he thinks somehow
3  placates and pacifies me, but it really doesn't. It
4  just has made me more suspicious of all of this and of
5  their business dealings in general.
6       And I know I have a tendency to talk a lot.
7  But, you know, we are a business, and our business is
8  directly related to entertainment production and
9  post-production.
10      I'm an operator in the business. I don't
11 have a financial background. I'm not an attorney. I
12 do know the difference between right and wrong, and
13 the -- and I know when something doesn't smell right.
14 To me, none of this smells right.
15      The guys in Atlanta, meaning Mark and Will,
16 view us as very unsophisticated, ignorant. I get the
17 notion that, to some degree, they think that we're
18 idiots.
19      So what I mean to say by that is that, you
20 know, things that, on the surface, to me, look wrong
21 and look as if -- and I'm speculating again -- that
22 there are guilty parties a lot closer to this situation
23 than the so-called identity theft.
24      You know, Mark Bercoon's attitude has always
25 kind of been regarding matters of -- like this -- not

22 (Pages 82 to 85)

Page 86

1    that there have been others like this particular one —
2    that. You know, we're just not sophisticated, we don't
3    really understand the big business picture and how
4    things are done with mergers and acquisitions, and
5    IPOs, and public offerings and things of that nature.
6          He'll tell you that — he'll — if you were
7    to question him, that he thinks I'm brilliant at what I
8    do, and I do a great job and am well-respected in the
9    business and that sort of thing.
10         But he will be the first one to tell you or
11   me that I don't understand the bigger picture with
12   business and finance. And we've had a lot of
13   discussion about that, especially finance, and
14   especially the cost of our money, and especially the
15   leveraging that they've done to the company, and all of
16   those things that I see extremely clear.
17         And the fact that they don't have the right
18   financial options for the company, have completely
19   encumbered the company and put it in dire straits.
20   Those are the conversations that I'm referring to. But
21   we're not that unsophisticated. We're really not.
22         But our focus is the business and our clients
23   and the service that we provide. We've been around for
24   15 years, going on 16, I guess, and that's really what
25   we all deal with at the company day-to-day.

Page 87

1          The finances of the company have been
2    completely controlled out of Atlanta by the owners.
3    The relationship with the banks, with the lenders that
4    L.A. Digital has for the equipment that we own in our
5    inventory, have all been created and managed by
6    Mark Bercoon and Will Goldstein.
7          My controller at L.A. Digital, whose name is
8    Don Schiada, he has basically no relationship with the
9    banks whatsoever, other than to send data when they
10   request it.
11         So everything that's been done in regards to
12   L.A. Digital in terms of the money that's come into the
13   company from lenders, bank loans, leases, et cetera,
14   have all been arranged and managed by Mark Bercoon.
15   Q   Has Mr. Bercoon ever admitted to you that he
16   was involved with this purported L.A. Digital Post IPO?
17   A   No, not once.
18   Q   Has he ever admitted to you that
19   Will Goldstein was involved with this purported
20   Digital Post IPO?
21   A   No.
22   Q   Other than what we've already discussed, I
23   think, in pretty good detail, is there anything else
24   that you can remember relating to the purported
25   L.A. Digital Post or LADP acquisition IPO?

Page 88

1    A   I'm thinking. There's nothing else that I
2    haven't reported. But there are some of the recent
3    calls that I received in the last couple of weeks, and
4    I'm not sure that you actually have that information.
5          And all I would state for the record is that
6    when I get back to my office, I will be more than
7    happy to send you that — the information that I
8    received that I forwarded on.
9    Q   Okay. And we'll work with your — well, at
10   this time, it doesn't appear that L.A. Digital Post has
11   a — has counsel representing the company; is that
12   right?
13   A   Well, L.A. Digital Post has general counsel,
14   but no one is representing L.A. Digital Post in this
15   matter yet.
16         MR. LEE:  Okay. Well, we'll figure it out.
17         MR. SHERWIN:  It is likely that I will be.
18         MR. LEE:  Okay. So we'll — if that happens,
19   we'll work out any sort of request.
20         MR. SHERWIN:  Yeah. I would suggest that you
21   first contact me for any further information regarding
22   L.A. Digital Post.
23         MR. LEE:  Understood.
24         This might be a good time to take a break.
25   Let's go off the record. It is 12:25.

Page 89

1          (A brief recess was taken.)
2          MR. LEE:  We're back on the record. It is 12:47.
3          BY MR. LEE:
4    Q   For the record, there was no substantive
5    discussions between the staff and the witness; is that
6    correct, Mr. Migdal?
7    A   That's correct.
8    Q   So up until today, let's say starting from
9    the first time you received any indication that there
10   was a purported offering of securities by
11   L.A. Digital Post, has there been any offering — any
12   public offering conducted by L.A. Digital Post?
13   A   No.
14   Q   Has there been any acquisition by
15   L.A. Digital Post?
16   A   No.
17   Q   Has there been any efforts, negotiations by
18   L.A. Digital Post to conduct a public offering?
19   A   No.
20   Q   Has there been any efforts, negotiations with
21   anyone by L.A. Digital Post to conduct a reverse
22   merger?
23   A   No.
24   Q   Has there been any efforts, negotiations, by
25   L.A. Digital Post to conduct any merger that would

Page 90

1   result in the shares of L.A. Digital Post being offered
2   to the public or traded on a public exchange?
3        A   Not to my knowledge.
4        Q   Have you ever been a party to any discussions
5   with anyone about L.A. Digital Post offering securities
6   to the public?
7        A   No.
8        MR. LEE:  I'm going to hand the court reporter
9   what's going to be marked as Exhibit No. 4.
10   Exhibit No. 4 is a multi-page document.
11        The first page of Exhibit 4 appears to state
12   "L.A. Digital Post."  It has a website,
13   www.ladigital.com.  It appears to have the title
14   "Confidential Investor Information."  On the bottom, it
15   has contact information, LADP Acquisition.  It has an
16   address, as well as there's banking information.
17        (SEC Exhibit No. 4 was marked for
18        identification.)
19   BY MR. LEE:
20        Q   Mr. Migdal, I'm handing you what has been
21   marked as Exhibit No. 4.
22        If you can tell me whether you've seen it
23   before.
24        A   Yes, I have.
25        Q   Hang on to that.  I'm going to ask you some

Page 91

1   questions.
2        A   Sure.
3        Q   When did you -- well, what is it?  What is
4   Exhibit No. 4?
5        A   Exhibit No. 4 appears to be the same
6   document that I received initially from David Scheibel.
7   That was the first time I actually saw this
8   confidential investor information proposal.
9        Q   And this was -- this document we received in
10   response to the voluntary document request that we
11   issued to you; is that right?
12        A   Yes, that's correct.
13        Q   Okay.  Looking at the first page of
14   Exhibit 4, the www.ladigital.com, is that
15   L.A. Digital Post's website?
16        A   It is.
17        Q   Okay.  On the contact information,
18   LADP Acquisitions, Inc., prior to receiving this
19   document from Mr. Scheibel, have you heard of
20   LADP Acquisitions, Inc., before?
21        A   I believe that LADP Acquisitions, Inc., the
22   first time I heard of it, it potentially was from
23   Dimitri Burnadon and/or the C and D I received from the
24   State of Pennsylvania.  That was the only -- only times
25   I recall it being mentioned.

Page 92

1        Q   And LADP Acquisition, Inc., and
2   L.A. Digital Post, there's no relationship between
3   those two entities; is that right?
4        A   That's correct.
5        Q   Okay.  You had mentioned that you had
6   reviewed banking information related to your
7   communications about L.A. Digital Post's purported
8   public offering, and there's banking information on the
9   bottom of the first page of Exhibit 4.
10        Do you see that?
11        A   I do.
12        Q   And is that the banking information you were
13   referring to?
14        A   Yes.
15        Q   And to your knowledge, that's the same bank
16   that Will Goldstein and Mark Bercoon use?
17        A   It certainly looks like it, yes.
18        Q   Do you know for sure?
19        A   I am -- I am fairly certain.
20        Q   Okay.  This -- LADP Acquisitions has an
21   address.  Do you see that?  5 Concourse Parkway,
22   Suite 2925?
23        A   Yes.
24        Q   Do you recognize that address?
25        A   I don't recognize the street address, but the

Page 93

1   fact that it's Atlanta, Georgia, and the Wachovia Bank
2   is all familiar to me.
3        The exact street address, I'm not sure -- I'm
4   actually not sure what address Mark Bercoon and
5   Will Goldstein use for their office currently.  They've
6   changed offices a few times over the last couple of
7   years.
8        I do recognize the bank, and I recognize the
9   city.  I don't know specifically if 5 Concourse Parkway
10   is the -- is actually the address they occupy where
11   they have their offices or not.
12        Q   Okay.  If you turn to the second page, it
13   says "Executive summary."
14        Do you see that?
15        A   I do.
16        Q   And take a moment to read through that, and
17   I'll give you my question.
18        It appears that the executive summary
19   reflects L.A. Digital Post's business, and my question
20   is, is this information accurate, to the best of your
21   knowledge?
22        A   Yes.
23        MR. LEE:  Okay.
24        MR. SPRUNG:  Sorry.  Does this appear to be from
25   the website?  Do you recognize the executive summary,

24 (Pages 90 to 93)

Exhibit   3   Page   29

Page 94

1  the information provided on page 2 of Exhibit 4, as
2  having come from somewhere else?
3        THE WITNESS:  I do not believe there's an
4  executive summary on the website, first of all.
5  Secondly, the -- the specific paragraphs of
6  page 2 -- the specific statements of page 2 -- I
7  shouldn't say paragraphs -- seem like they have been
8  taken out of context from a combination of the website
9  -- the website and various presentations that I have
10  done for clients over the years.
11        More specifically, requests for a proposal
12  that I would do for a Warner Brothers, a Fox, a Viacom,
13  or just marketing material, company overview that we
14  would basically give as handouts for clients to promote
15  the company as part of a press kit.  So some of the
16  actual statements, not only are they true, but I
17  recognize them from other sources.
18        MR. SPRUNG:  Okay.
19        BY MR. LEE:
20    Q  Does Mark Bercoon or Will Goldstein have
21  access to the proposals --
22    A  Sure.
23    Q  -- or presentations that you've described?
24    A  Of course.
25    Q  If you could turn to the next page, page 3.

Page 95

1  At the top of page 3, there appears to state -- a main
2  heading that says "Management."
3        Do you see that?
4    A  Uh-huh.
5    Q  There are references to Gary Migdal,
6  Don Schiada, Mark Bercoon and Will Goldstein.  Are
7  those -- well, in regards to your bio, is that an
8  accurate bio?
9    A  Not exactly.
10    Q  What's it -- what's inaccurate about it?
11    A  It's not 24 years; it's 27.  So it's a little
12  dated.  That's not accurate.  But conceptually, that's
13  what I do.
14        Don, controller -- Don Schiada is the
15  controller, and that seems to be accurate.
16        William Goldstein is not the chairman;
17  Mark Bercoon is.
18        And as far as Mark Bercoon being the CFO,
19  L.A. Digital does not have a CFO.  Maybe he has deemed
20  himself that from time to time, but -- and as far as
21  his bio, only he can tell you, but it is consistent
22  with my understanding of his background.
23    Q  How about Mr. Goldstein's bio?  Is that
24  consistent with your understanding of his background?
25    A  It's more or less what I've been told.

Page 96

1    Q  In the second to the last sentence in
2  Mr. Goldstein's bio, do you see where it says,
3  "Mr. Goldstein has been partners with Mark Bercoon
4  since October 2001"?
5    A  Yes, I do.
6    Q  To your understanding, is that how long they
7  have been partners?
8    A  Yes.  The best way that I can answer that is
9  that Mark Bercoon was partners with Goldstein prior to
10  L.A. Digital.  So L.A. Digital is 2003, that's probably
11  right.
12    Q  There's a passage in that same sentence,
13  "Will Goldstein and another partner, who has since been
14  bought out, purchased L.A. Digital."
15        Who is that -- well, one, is this a true
16  statement?
17    A  Yes, as far as I know.  I've never seen any
18  paperwork, nor am I aware that any money has changed
19  hands.
20        But my understanding is that Rob Rissinen is
21  who they're referring to, was the partner who was
22  bought out.  That's what I was told.
23        MR. SPRUNG:  Sir, earlier, Mr. Migdal, you had
24  said that the materials you saw contained bios that
25  were from the website while others were not.

Page 97

1        So I -- is this the page you were referring
2  to in your earlier testimony?
3        THE WITNESS:  Yes, it was.
4        MR. SPRUNG:  Okay.  So is the bio for you and the
5  controller consistent with what's on the website for
6  L.A. Digital Post, to the best of your knowledge?
7        THE WITNESS:  I don't think Don Schiada is on the
8  website, actually.  I --
9        MR. SPRUNG:  That's true.  You had mentioned that
10  in your testimony.  I'm sorry.  I you think you said
11  yours -- you had a bio on the website, but the
12  others -- Mr. Schiada, Mr. Bercoon and Mr. Goldstein --
13  were not.
14        THE WITNESS:  That's correct.
15        MR. SPRUNG:  And this bio that's here on page 3
16  of Exhibit 4; does that, in your -- to your knowledge,
17  is that the same bio that's on the website for
18  L.A. Digital Post?
19        THE WITNESS:  In terms of my bio?
20        MR. SPRUNG:  Yes.
21        THE WITNESS:  You know, I'd have to look at them
22  side-by-side.  It seems -- it looks similar.
23        MR. SPRUNG:  Okay.  Thanks.
24        BY MR. LEE:
25    Q  Turning to page 5 of Exhibit 4, do you see

Page 98

1   where it says "Post-production facilities"?
2       A   I do.
3       Q   And it lists New York, Toluca Lake,
4   West Los Angeles.
5       A   I'm sorry.  Yes.
6       Q   Are those the offices of L.A. Digital Post?
7       A   Yes, they are.
8       Q   Are there any other offices?
9       A   Actually, West Los Angeles has two offices.
10  But that is the main one.  There's another office in
11  West LA on La Grange and Bundy, about a mile away from
12  this one.  It's very small and -- it's ten rooms.  It's
13  very insignificant.  But it's more or less accurate.
14  This is how we would promote our locations, for the
15  most part.
16          MR. SPRUNG:  So this material on page 5, do you
17  recognize this as having come from marketing
18  presentations or RFPs?
19          THE WITNESS:  Oh, absolutely.
20          BY MR. LEE:
21      Q   Turn to the next page.  You see, this is --
22  we're now on page 6 of Exhibit 4.  Do you see where it
23  says "Partial client list."
24      A   Uh-huh.
25      Q   It says "Television."

Page 99

1       Do you see that?
2       A   Yes, I do.
3       Q   And there's a list composed of two columns.
4       Do you see that?
5       A   Uh-huh.
6       Q   Is that an accurate -- are those -- let me
7   withdraw that.
8       Is the list an accurate representation of the
9   clients of L.A. Digital Post?
10      A   It's an actual -- it is an actual partial
11  list that's a little dated.  But yes, it's all true.
12  It's just not current.
13      Q   On page 7, do you see where it says "Movies,"
14  and there's another list?
15      A   I do.
16      Q   Is that -- the same question, is that an
17  accurate reflection of the clients of L.A. Digital
18  Post?
19      A   And the same answer.  It's an accurate
20  partial list that's also dated.
21      Q   Okay.  On the last page of Exhibit 4, do you
22  see where it says "Financial highlights"?  There's also
23  a -- looks like a pro forma list of 2009, 2010
24  financial results for L.A. Digital Post.
25      Do you see that?

Page 100

1       A   I do.
2       Q   Okay.  On the first paragraph of -- on
3   page 8, take a look at that and tell me if that
4   accurately reflects the financial information of
5   L.A. Digital Post.  I think it says -- first sentence
6   says "L.A. Digital's revenues for fiscal year end were
7   13.75 million."
8       A   That's probably accurate.  I just want to say
9   for the record, though, that our fiscal year ends in
10  the end of March.  So we're now, actually, in fiscal
11  year 2011 because of where it's going to end.  So
12  probably.  I'm -- I am not saying yes, I'm not saying
13  no, I'm saying probably.  I'd have to really just
14  refresh my memory.
15      Q   But it's kind of in the ballpark?
16      A   Yeah, it seems like it's in the ballpark.  I
17  don't have a reason to doubt that that's not
18  necessarily accurate.
19      Q   Do you see where it says, "Through the
20  offering, L.A. Digital will be able to purchase the
21  equipment it needs so that the amount of equipment it
22  needs to rent from third parties is minimized"?  Do you
23  see that?
24      A   I do.
25      Q   Has L.A. Digital ever contemplated an

Page 101

1   offering so that it could buy equipment?
2       A   No.  L.A. Digital Post needed to raise the --
3   well, we've never contemplated an offering.  We've
4   needed to procure capital equipment leases to basically
5   support the inventory so we wouldn't have to sub-rent
6   from competitors at outrageously high prices.
7       So it's partially accurate that we are sub
8   renting close to $2 million a year from our
9   competitors, whereas we should actually own the
10  equipment.  So I guess this was kind of taken out of
11  context.
12      Q   Okay.
13      A   -- in an effort -- it looks like in an effort
14  to raise capital for what looks like L.A. Digital's
15  needs.
16      But there's -- there's never been any sort of
17  an offering, to my knowledge, in order to raise the
18  capital necessary to buy the equipment.
19      Q   Okay.  The second paragraph starts, "There
20  are also several acquisition targets that management
21  has identified."
22      Do you see that?
23      A   I do.
24      Q   Has L.A. Digital Post ever contemplated an
25  offering to acquire any companies?

Page 102

1    A   Yes. Offering meaning --
2    Q   A securities offering.
3    A   Not to my knowledge.
4    Q   If you take a look at this financial
5    information, do you see where it says "Revenues, cost
6    of revenues 2009, 2010 pro forma"?  Do you see that?
7    A   Uh-huh.
8    Q   I know you don't actually have your own -- or
9    L.A. Digital Post's financial information in front of
10   you, but looking at that, does that seem a fair
11   representation of L.A. Digital Post's financial
12   performance for 2009 and 2010?
13   A   2009, I want to say probably.  2010, not.
14   Well, it says "pro forma," so they're speculating this
15   is how it would be.
16   And I think the next column, "with
17   acquisition," whatever that acquisition was going to
18   be, also speculation.  I can't -- 2010 doesn't look
19   accurate to me, because we're actually really talking
20   about last year being fiscal 2010 because of the March
21   fiscal year.  We were more like in the $12 million
22   range.  Revenues were down.  And as far as with
23   acquisition, I don't know what acquisition.
24   Q   Okay.  Now, we had -- you had mentioned
25   certain presentations to others.

Page 103

1    Looking at that, do you think that the
2    financial information reflected in that table could
3    have been taken from any of the presentations you had
4    given in the past?
5    A   The table, no.  I don't believe this table
6    was taken out of any presentation that I did.  I
7    believe -- because I would not have included this table
8    in a presentation.
9    My presentation would be confined to
10   everything but the financial data.  The financial data
11   would be a completely other set of paperwork and data
12   and documents that would be included separately.  And I
13   can give you just an example.
14   A couple of years ago, I had ongoing meetings
15   with a company called Sterling Partners out of Chicago.
16   They seemed to be very interested in L.A. Digital, in
17   the market, in the business, et cetera.  We went
18   through a series of -- we went through at least six
19   months' worth of due diligence work with them,
20   modeling, modeling, modeling.  It very well could have
21   been within -- within the models that we helped them
22   create, that this data might have been in there.
23   But I -- I really don't know for sure,
24   because what they were looking at was so broad in terms
25   of market opportunity.  This seems to be finite and

Page 104

1    specific to a specific acquisition, and I don't know
2    what acquisition it is.
3    But I would never have created a financial
4    model other than projections in revenue and potential
5    opportunities.  But I would never have included it in a
6    presentation along with all the marketing material.  It
7    would have been completely separate data.  And this
8    doesn't look familiar, in terms of anything that I've
9    done.
10   Q   So other than seeing that table on page 8 of
11   Exhibit 4 in this exhibit, you had never seen this
12   table before?
13   A   Not that I recall.
14   MR. SPRUNG:  What about the page generally,
15   page 8 of Exhibit 4.
16   Other than seeing it when you got it from the
17   investor, had you seen this before?
18   THE WITNESS:  I never created a page that said
19   "Financial highlights."  No, I have never seen that
20   before.
21   BY MR. LEE:
22   Q   Do you have any knowledge who drafted
23   Exhibit No. 4?
24   A   I do not.
25   Q   Have you ever -- strike that.

Page 105

1    In your conversations with Mr. Bercoon, had
2    you and him ever discussed Exhibit No. 4?
3    A   In any context whatsoever?
4    Q   Yes.
5    A   No.
6    Q   You never asked Mr. Bercoon, had he seen this
7    before, had he seen Exhibit No. 4 before?
8    A   No, I did not.
9    MR. LEE:  Handing the court reporter what's going
10   to be marked as Exhibit No. 5.  Exhibit No. 5 is
11   a multi-page exhibit.  The first page is -- appears to
12   state "L.A. Digital Post."  It has Toluca Lake,
13   West Los Angeles and New York.
14   (SEC Exhibit No. 5 was marked for
15   identification.)
16   BY MR. LEE:
17   Q   I'm handing you what has been marked as
18   Exhibit No. 5.
19   If you can tell me whether you've seen this
20   before.
21   A   Are we talking about the entire presentation
22   or just --
23   Q   The entire exhibit.
24   MR. SPRUNG:  So just to be clear, not any
25   particular piece of information in it, but the whole

## Page 106

1  document.
2      Have you ever seen this whole document
3  before?
4      THE WITNESS:  I'm assuming this was in color,
5  right?
6      BY MR. LEE:
7   Q   I don't know.
8   A   It must have been.  You know, it's -- it's
9  hard to actually tell.
10     THE WITNESS:  Well, this document --
11     MR. SPRUNG:  Yes.
12     THE WITNESS:  -- as a standalone document?
13     MR. SPRUNG:  Yes.
14     THE WITNESS:  No, I haven't.  The individual
15  parts of it, yes.  Sure.
16     MR. SPRUNG:  Okay.
17     THE WITNESS:  In various places.
18     MR. SPRUNG:  Could you give us some examples of
19  which parts you've seen in various places.
20     THE WITNESS:  I've seen most of these parts.  The
21  photos are all photos that I consistently use.  The
22  description of the facilities broken down this way is
23  something that we consistently use in how we describe
24  our locations.  We do break it down in terms of
25  location, West LA versus Toluca Lake.

## Page 107

1      Credits -- I mean, we've done marketing
2  material where there's one one-sheets that we've
3  created, fliers to give to clients.  Some of this looks
4  exactly like that, that we would use as a handout.
5      Other parts of it look like they are included
6  on the website.  And certainly, other parts seemingly
7  came from presentations that I have done over the
8  years -- presentations to solicit business, not to
9  solicit stock sales.
10     BY MR. LEE:
11  Q   So when was the first time -- well, we
12  received this in response to the voluntary document
13  request, so when was the first time that you saw
14  Exhibit No. 5?
15  A   Again, it's probably -- and I can't recall if
16  it's David Scheibel I got this from or one of the
17  other investors subsequent to that, but that was the
18  first time I came across this document as a standalone
19  document.
20  Q   And it's your understanding that this
21  document was circulated to investors that have
22  purportedly invested in L.A. Digital Post shares?
23  A   That's what I concluded since I received it
24  from a potential investor.
25     MR. SPRUNG:  Would Mr. Bercoon and Mr. Goldstein

## Page 108

1  have had access to the information that you see
2  reflected in Exhibit 5?
3      THE WITNESS:  Yes.  They would have access to any
4  and all of the presentations that I've done because
5  they've requested them from time to time.  Particular
6  leaders of the company have requested to see the RFPs.
7  They've requested to see contracts that are in force
8  with Viacom, with Warner Brothers, et cetera.
9      They've requested graphics, meaning the
10  company logo.  Mr. Bercoon in particular requested the
11  company logo from me on a couple of different
12  occasions, meaning -- where are the other exhibits?
13  This.  This is a static logo that we use, a
14  high-res logo.  We have a vertical one.  We have a
15  horizontal one.
16     MR. LEE:  Let the record reflect that Mr. Migdal
17  has pointed to Exhibit No. 4 and the logo appearing
18  on the first page.
19     THE WITNESS:  And this particular photo is kind
20  of our -- is a photo that we use on Exhibit 4 in most
21  of the presentation that's we do.  It's a beauty shot,
22  as it's referred to.
23     MR. LEE:  I'm handing the court reporter what's
24  going to be marked as Exhibit 6.  It's a multi-page
25  exhibit.  The first page appears to state

## Page 109

1  "David Scheibel."  It has an address.  It's a letter
2  that appears to be addressed to Mr. Gary Migdal.
3      THE WITNESS:  I would like to add one thing.
4      MR. LEE:  Go ahead.
5      THE WITNESS:  I was just looking at the last page
6  of Exhibit 5.  I don't know if it means anything, but
7  some of the information on here is pretty current.
8      For example, Chelsea Lately, which is a show
9  that we've worked on, that was just last year.  So this
10  is -- this was done -- wait a second -- very recently,
11  because the Lewis Black movie also was done in the last
12  -- in the last -- definitely year, more like the last
13  six months.  So whoever put this together -- so this
14  could have been off the website, because we do --
15     MR. SPRUNG:  I was going to ask --
16     THE WITNESS:  We do update pretty regularly.
17     MR. SPRUNG:  This last page of Exhibit 5 appears
18  to be a graphic that puts various movie posters --
19     THE WITNESS:  We do that.
20     MR. SPRUNG:  So have you seen something like this
21  before that's been used as part of the
22  L.A. Digital Post website or RFP or marketing
23  materials?
24     THE WITNESS:  You know, in the RFPs, we generally
25  don't use graphics other than the photos of

Exhibit  3

Page  33

## Page 110

1  L.A. Digital for the most part. On the website, we
2  would do something like this, and we try to constantly
3  update it. So this could have been taken off the
4  website because it is fairly current.
5      MR. SPRUNG: Okay. Do you have any knowledge or
6  idea who created Exhibit 5?
7      THE WITNESS: No idea.
8      MR. SPRUNG: Okay.
9      THE WITNESS: Now, we have an in-house person
10  that updates the marketing material on the website --
11  Valentine's Day. It's really recent.
12      This could have been done internally, but I
13  would have to ask her, and I've tried not to speak with
14  anyone at the company about this matter, because I
15  don't want to alarm them and make them nervous.
16      But this -- I mean, we try to keep it fairly
17  up to date. So this is definitely not an historical
18  document, for sure. This is more current information.
19      BY MR. LEE:
20   Q  Even in the form of Exhibit 5, even taking it
21  page-by-page, is this something that a L.A. Digital
22  Post marketing pamphlet, as you described -- would it
23  look like this?
24   A  Pretty much. Pretty close.
25   Q  Okay.

## Page 111

1   A  And it exists both in PDF format and in Word
2  format, so it's easy to modify, if need be. Yeah, this
3  is current, absolutely, because I'm really -- this is
4  absolutely current. This is very current. Like, very
5  current, in the last six to eight months current.
6      Because I remember doing these with the --
7  the whole -- the terminology. I just remember how when
8  we edited this and changed it. This is fairly current.
9      MR. SPRUNG: What were you editing it and
10  changing it for? For marketing?
11      THE WITNESS: We were just scaling it down. It
12  was too wordy. We were trying to create -- I know what
13  this is. This is what Melody probably did.
14      We had a series of one-sheets that we created
15  for clients to give out as opposed to some dated
16  material, and we were trying to describe each location
17  very precisely and bulletpoint it. And that's where
18  this list of bullets came up with.
19      This is definitely marketing material that
20  was created in the last year, absolutely. Melody,
21  unfortunately, is no longer with the company, but I
22  believe it's irrelevant because she didn't even know
23  the owners. This is current stuff. Yeah, I remember
24  rewriting it.
25      MR. LEE: I'm handing the witness what has now

## Page 112

1  been marked as Exhibit 6.
2      (SEC Exhibit No. 6 was marked for
3      identification.)
4      BY MR. LEE:
5   Q  Exhibit 6 is, as I stated, a multi-page
6  exhibit. It's something that we received from
7  L.A. Digital Post in response to the voluntary document
8  request.
9      Take a moment to look through it and just let
10  me know if this is a document that you sent to us.
11   A  Well, I believe David Loev sent this to you;
12  right?
13   Q  Yes, on behalf of L.A. Digital Post.
14   A  Exactly. That's how I picked up on it. Yes,
15  I recognize this document completely.
16   Q  Okay. Taking a look at the first page of
17  Exhibit 6, you see where it says "June 21, 2010"?
18   A  Yes.
19   Q  Does that refresh your recollection as to
20  when you spoke with David Scheibel?
21   A  Yes.
22   Q  Was it on June 21, 2010 or before or after?
23   A  I'm assuming it's prior.
24   Q  Okay. Weeks --
25   A  By his statement.

## Page 113

1   Q  Phone call on Friday, June 18th?
2   A  Yes.
3   Q  That's when you remember speaking with him?
4   A  Yes.
5   Q  The next page appears to be some stock
6  certificate that says "LADP Acquisitions, Inc."
7      Do you see that?
8   A  Yes, I do.
9   Q  Was this the stock certificate you referred
10  to earlier in your testimony, about seeing a stock
11  certificate for the first time?
12   A  Yes, it is.
13   Q  On the next page, there appears to be a
14  November 16th, 2009 letter addressed to David Scheibel.
15      Do you see that?
16   A  I do.
17   Q  And on the bottom, it says, "Very truly
18  yours, William A. Goldstein, Chairman."
19      Do you see that?
20   A  Yes, I do.
21   Q  Okay. Now, you testified earlier that you
22  recognized William Goldstein's signature on various
23  documents relating to L.A. Digital Post's offering.
24      Do you remember that?
25   A  I do.

Page 114

1  Q   Is this one of the documents you were
2  referring to?
3  A   It is, specifically.
4  Q   Is this, as far as you know,
5  William Goldstein's signature?
6  A   As far as I know — I'm not a handwriting
7  expert, but it — it looks to be his signature.
8  Q   You had testified that you had — following
9  receipt of this letter, November 16th letter, that you
10  had compared it with other documents bearing
11  Mr. Goldstein's letter.
12  Do you remember that?
13  A   I do. I do.
14  Q   And does those signatures on those documents
15  match the signature on this one?
16  A   They do. It does.
17  Q   Did you ever have any conversations with
18  Mr. Bercoon about the fact that you believe that
19  Mr. Goldstein had signed a letter that purports to
20  reflect an offering being done by
21  LADP Acquisitions, Inc.?
22  A   I did.
23  Q   And what did he say?
24  A   He told me that — well, I stated to him I
25  have — after receiving this packet from

Page 115

1  David Scheibel, I stated to him that — a multitude of
2  questions about, you know, there's a stock certificate
3  that bears Will's signature, there's a welcome letter
4  that bears Will's signature.
5  I said, "Mark, what is going on?" He claimed
6  that someone stole the stamp — a signature stamp.
7  Sorry.
8  MR. SPRUNG: Sitting here today, are you aware of
9  whether there is, in fact, such a signature stamp?
10  THE WITNESS: I am unaware of any such device.
11  MR. SPRUNG: Had anybody ever told you before
12  that Will Goldstein or Mark Bercoon ever used a
13  signature stamp?
14  THE WITNESS: No. Never.
15  BY MR. LEE:
16  Q   So the fifth to the last page of Exhibit 6
17  is — appears to be a printout of an e-mail that was
18  sent by investor@LADPCorp.com to David@MNWestig.com,
19  M-N-W-e-s-t-a-g dot c-o-m.
20  Do you see that?
21  A   Yes, I do.
22  Q   Do you recognize the e-mail address that says
23  investor@LADPCorp.com?
24  A   Absolutely not.
25  Q   Are you familiar with any entity named

Page 116

1  LADP Corp?
2  A   No, I'm not. To my knowledge, there are
3  three entities that I'm aware of in regard to
4  L.A. Digital Post the company. There's
5  L.A. Digital Post, Inc., a California corporation;
6  there's LADP New York, LLC, which is also — that's our
7  operation in New York that is registered in Delaware;
8  and there's LADP, LLC, which is the holding company
9  that owns both entities.
10  Q   Okay.
11  A   That's all I'm aware of.
12  Q   In your testimony, you had said you were
13  aware of a woman that was — that may be associated
14  with Paramount Capital.
15  Do you remember that?
16  A   Yes, I do.
17  Q   Okay. Now, on this e-mail, it appears to be
18  signed by Nicole Sawyer.
19  Do you see that?       ___  ___
20  A   I do.
21  Q   Does this refresh your recollection as to the
22  woman you thought was associated with
23  Paramount Capital?
24  A   It does, and that is exactly the name.
25  Q   Okay. There's also a name Joseph James.

Page 117

1  Do you see that on the last line of the
2  e-mail? I'm sorry —
3  A   Yes.
4  Q   — in the last line of the body of the
5  e-mail.
6  A   Yes, I do.
7  Q   Do you know who Joseph James is?
8  A   I have no idea.
9  Q   Do you know whether Joseph James is
10  affiliated with Paramount?
11  A   I have no idea.
12  Q   Is Joseph James affiliated with
13  L.A. Digital Post?
14  A   Absolutely not.
15  Q   Have you ever spoken with Nicole Sawyer?
16  A   No, I have not.
17  Q   Have you ever had any communication with
18  Nicole Sawyer?
19  A   No, I have not.
20  Q   How about with Joseph James?
21  A   Never.
22  Q   If you turn to the third to the last page, it
23  looks like there are handwritten notes. It says
24  "10/23/2009."
25  Do you know whose handwriting that is?

Page 118

1     A   I have no idea.
2     Q   Did you have any conversations with
3  Mr. Scheibel that these are his notes following a
4  conversation on 10/23/2009?
5     A   Yes, I did.
6     Q   Okay.  Is it your understanding that this is
7  Mr. Scheibel's notes?
8     A   That's my understanding.
9     Q   There's another name -- there are several
10  names here, but let me ask you about the first one that
11  appears, Gary Bouvier.
12        Do you see that?
13     A   I do.
14     Q   B-o-u-v-i-e-r.
15        Do you know who that is?
16     A   I have no idea.
17     Q   Have you ever had any communications with
18  Mr. Bouvier?
19     A   Never.
20     Q   Do you remember anything that Mr. Scheibel
21  may have said about Mr. Bouvier?
22     A   I don't.
23     Q   Do you see on the second paragraph that there
24  appears to be a handwritten notation which says,
25  "Rolling out of L.A. Digital-Will Goldstein, expected

Page 119

1  sale, Jan 1," in a circle.
2        Do you see that?
3     A   I do.
4     Q   Do you agree with my reading of that line?
5     A   I do.
6     Q   Was there any expected sale involving
7  L.A. Digital at or around January 1 of this -- of 2010?
8     A   I have to think for a moment.
9        MR. SPRUNG:  Take your time.
10        THE WITNESS:  That would be this past January?
11        MR. SPRUNG:  Correct.
12        THE WITNESS:  No.
13        BY MR. LEE:
14     Q   Do you see on the second line, where it says
15  "375-400," looks like there's a dollar sign associated
16  with that, "share sale price negotiating."
17        Do you see that?
18     A   I do.
19     Q   Do you agree with my reading of that?
20     A   I do.
21     Q   Okay.  Are you aware of any offering by
22  L.A. Digital where a $3.75 to $4.00 share price was
23  contemplated?
24     A   No, I'm not.
25     Q   Are you aware of any negotiating --

Page 120

1  negotiations that L.A. Digital Post was engaging in
2  involving the price of shares?
3     A   I am not.
4        MR. LEE:  I'm going to hand the court reporter
5  what is going to be marked as Exhibit 7.
6        Mr. Migdal, you --
7        THE WITNESS:  Can we stop for a moment.
8        MR. LEE:  Yeah, of course.
9        THE WITNESS:  And go off the record.
10        MR. LEE:  Sure.
11        We are off the record.  It is 1:35.
12        (A brief recess was taken.)
13        MR. LEE:  We're back on the record.  It is 1:36.
14        For the record, Mr. Migdal asked us whether
15  there were any other questions we had about
16  Exhibit 6 --
17        MR. SPRUNG:  Third to last page.
18        MR. LEE:  -- on the third to last page.
19        BY MR. LEE:
20     Q   And we told him, is there anything -- and now
21  we're asking the question, is there anything else you
22  would like to say about the handwritten notes?
23     A   I -- yes, there is.  I am aware of Find.com.
24     Q   Okay.
25     A   And to my knowledge, Find.com is a -- forgive

Page 121

1  me for a moment.  What's the term?
2        MR. SPRUNG:  Search engine?
3        THE WITNESS:  Yes.  Find.com is a search engine
4  that I believe that Will Goldstein, in conjunction with
5  Gene Simmons of KISS, either own the rights to or have
6  invested in.
7        And I know that they have been trying to --
8  at least, I have been told by Mark Bercoon at different
9  junctures that it's something that they thought they
10  would be able to sell as sort of the next Google-type
11  search engine.
12        And I know that they were in discussions with
13  Gene Simmons regarding Find.com and that sort of
14  opportunity going back at least a year or so ago.  I
15  heard it multiple times.  I don't know whatever became
16  of it, but I know this to be a potential business
17  venture with Gene -- with Gene Simmons of KISS and --
18  and Will Goldstein.
19        MR. SPRUNG:  So does the reference to Find.com on
20  the third to last page of Exhibit 6 suggest to you that
21  Will Goldstein is involved in this transaction?
22        THE WITNESS:  It suggests to me that whoever is
23  involved did have direct conversations with
24  Will Goldstein; otherwise, this is information that is
25  just not public knowledge.  They would have to have had

Page 122

1    some dialog about this. No one really knows about it.
2         MR. SPRUNG: Okay.
3         MR. LEE: I'm going to hand the court reporter
4    what is going to be marked as Exhibit 7. Exhibit 7 is
5    a multi-page document. It appears -- on the first
6    page, it has a November 16th, 2009 date. It looks like
7    a letter written by William A. Goldstein to
8    Richard A. Matthews.
9         (SEC Exhibit No. 7 was marked for
10        identification.)
11        BY MR. LEE:
12   Q    Take a look at Exhibit No. 7.
13        Is Exhibit 7 something that L.A. Digital Post
14   produced to the staff through its lawyers in response
15   to the voluntary document request?
16   A    To the staff?
17   Q    That's us, the SEC.
18   A    Yes. Yes.
19   Q    You had mentioned that -- the name
20   Richard Matthews as being an investor in
21   L.A. Digital Post or LADP Acquisitions earlier in your
22   testimony.
23   A    Yes, I did.
24   Q    Okay. Does this refresh your recollection as
25   to when you may have had discussions with Richard about

Page 123

1    his investment in L.A. Digital Post?
2    A    It does.
3    Q    Okay. And what is that now-refreshed
4    recollection?
5    A    I remember talking to Richard Matthews after
6    I spoke with David Scheibel. And it was the same
7    routine -- if you pardon the expression -- in terms of,
8    you know, no one is returning his phone calls.
9         He was wondering what is happening with the
10   -- with the public offering and thought he would reach
11   out to L.A. Digital, since it's a company that
12   supposedly was merging or going public, et cetera.
13        I remember the unique thing about this
14   conversation with Richard Matthews had to do with
15   page 3 of this exhibit, in that he was actually --
16   whoever it was that sold him the stock did it, like,
17   through his -- it was done through his IRA and his IRA
18   account through his -- through Equity Trust Company,
19   and I had never heard of any of this.
20        I was kind of surprised that it almost looked
21   like there was yet another entity involved in this --
22   in this conversation that I had with him. Because the
23   conversations I had up until that point were all about
24   somebody writing a check or sending a wire, although
25   this resulted, I'm assuming, in a wire as well, but

Page 124

1    this was done directly out of this account. I thought
2    that was a little surprising.
3         But I do recall this discussion with him and
4    I recall forwarding this paperwork on to your staff.
5    The names that are mentioned in here, Nicole Sawyer,
6    Paramount, is all familiar to me.
7    Q    Okay. And on the first page of Exhibit 7,
8    there appears to be a signature.
9         Is that, to your understanding,
10   William Goldstein's signature?
11   A    To my understanding, it is.
12   Q    On the last page you referenced -- on
13   Exhibit No. 7, you referenced Nicole Sawyer in
14   handwritten notes.
15        Do you see that?
16   A    Yes, I do.
17   Q    Does that refresh your recollection as to
18   whether Mr. Matthews told you that Nicole Sawyer sold
19   him shares in LADP Acquisitions, Inc. or
20   L.A. Digital Post?
21   A    Yes, it does.
22   Q    In that she did?
23   A    In that he claimed that she did. "She,"
24   meaning Nicole Sawyer from Paramount, sold him the
25   shares.

Page 125

1         MR. LEE: I'm going to hand the court reporter
2    what is going to be marked as Exhibit 8. Exhibit 8 is
3    a multi-page exhibit. On the first page, it states,
4    "L.A. Digital Post Sterling Partners Diligence 2009."
5         (SEC Exhibit No. 8 was marked for
6         identification.)
7         BY MR. LEE:
8    Q    Mr. Migdal, take a look at Exhibit No. 8.
9         Is this a presentation that you sent to us in
10   response to the voluntary document request?
11   A    It is.
12   Q    Is this one of the presentations that you
13   said could have -- strike that and withdraw the
14   question.
15        You had mentioned in your prior testimony
16   that you believe some of the information reflected in
17   the L.A. Digital Post offering materials reflected in
18   Exhibit 4 could have been taken from your prior
19   presentations to other parties.
20        Do you remember that?
21   A    I do.
22   Q    Is this one of the presentations you think
23   the information could have been taken from?
24   A    It is.
25   Q    Okay. Is there a specific place in Exhibit 8

Page 126

1  that you think the information was taken from?
2      A   Well, firstly, this was a PowerPoint
3  presentation as opposed to a Word document.  But you
4  can certainly copy one to the other.
5      Other than the photo -- well, photos, the
6  definition of services, the facility descriptions,
7  obviously, are identical to one of the other exhibits
8  that you showed me.  This most certainly could have
9  been used to a limited extent in creating the documents
10  I've already seen.
11      Q   Okay.  And does Mark Bercoon and
12  Will Goldstein also have access to this PowerPoint?
13      A   Absolutely.
14      MR. LEE:  I'm going to hand the court reporter
15  what's going to be marked as Exhibit No. 9.  Exhibit
16  Number 9 is a multi-page exhibit.  It also looks like a
17  presentation.  The first page has an L.A. Digital Post
18  logo.  It states "Request for Proposal."  It says
19  "Prepared for MTV Networks," has a date,
20  May 30th, 2008.
21      (SEC Exhibit No. 9 was marked for
22      identification.)
23      THE WITNESS:  This is our copy?
24      MR. LEE:  That is a copy for your counsel.
25      BY MR. LEE:

Page 127

1      Q   All right.  I'm handing Mr. Migdal what has
2  been marked as Exhibit No. 9.
3      Is this a copy of a proposal that you sent to
4  us via your counsel in response to the voluntary
5  document request?
6      A   It is.
7      Q   Is this a proposal that was put together by
8  you?
9      A   Yes, it is.
10      Q   Is this a proposal that you believe
11  information could have been taken from and used in the
12  L.A. Digital Post or LADP acquisition offering
13  materials?
14      A   I do.  Yes, it is.
15      Q   Can you describe for us what information was
16  taken from this proposal, Exhibit No. 9.
17      A   Again, it could be the facility descriptions.
18  It could also be the description of services, some of
19  the -- of the background, slash, overview information
20  on the company and what it provides and what it does.
21  Certainly, lists of relevant clients.
22      I don't believe there's anything else.  It's
23  the same basic information that I -- that I identified
24  in the previous document.  The rest is specific to
25  Viacom and what they wanted us to address in this

Page 128

1  proposal.
2      Oh, yeah.  If you look at the company
3  overview -- it's almost verbatim.  The company overview
4  looks like certainly it was taken from here, but I
5  think some of that is in the Sterling document as well.
6      It's hard to tell which document was cut and
7  pasted.  But the information is kind of consistent with
8  company overview and that kind of thing.  So --
9      Q   Go ahead.
10      A   No, I'm just stating for the record that I
11  don't know which specifically.  It seems that bits and
12  pieces of both documents were cut and pasted into the
13  documents that were used for stock sales.  That's what
14  I recognize.
15      Q   Okay.  Does Mr. Bercoon or -- and
16  Mr. Goldstein have access to Exhibit No. 9?
17      A   Yes.  In fact, not only do they have access,
18  but any RFPs that I would do, requests for proposal,
19  contracts with clients, they always want them.  So
20  they're copied on any contracts that we have.
21      MR. LEE:  I'm going to hand you what is going to
22  be marked as Exhibit 10.  Exhibit 10 is a multi-page
23  exhibit.  The first page appears to be an e-mail that
24  was sent from Kevin Rodrigues, R-o-d-r-i-g-u-e-s, to an
25  HHubbard -- H-u-b-b-a-r-d -- @flash.net.

Page 129

1      (SEC Exhibit No. 10 was marked for
2      identification.)
3      BY MR. LEE:
4      Q   Mr. Migdal, take a look at that.  I'm going
5  to ask you whether you've seen Exhibit 10 before.
6      A   Never.
7      Q   Disregarding the -- who the e-mail was sent
8  to or where it came from, had you ever seen the
9  substance of Exhibit 10 before?
10      A   No, never.
11      Q   If you look and you see on the -- probably on
12  the same -- first paragraph, entity called G&G Capital
13  Marketing, LLC.
14      Do you see that?
15      A   I do.
16      Q   Do you recognize that?
17      A   I do not.
18      Q   In that same block, it says, "We now have the
19  chance to include additional investors into
20  L.A. Digital at one dollar per share for approximately
21  the next four weeks."
22      Do you see that?
23      A   I do.
24      Q   Do you know anything about an offering
25  relating to a dollar per share by L.A. Digital?

Page 130

1    A   I do not, other than -- other than the stock
2  certificates that I received from -- from investors who
3  indicated X amount of shares at X amount of dollars.
4    Q   See where it says, "LADP is scheduled to be
5  entering the public market shortly after this time
6  frame through acquisition." And the time frame it's
7  referring to appears to be approximately the next four
8  weeks.
9    Do you see that?
10    A   I do.
11    Q   Okay. So the date of this e-mail is
12  June 28th, 2010.
13    Do you see that?
14    A   I do.
15    Q   So did L.A. Digital have any plans to go to
16  the public market through acquisition from
17  June 28th, 2010, onward?
18    A   No. L.A. Digital is in default.
19    Q   What does that mean?
20    A   L.A. Digital is in default with their secured
21  lender. L.A. Digital is in dire straits financially as
22  a company. There's no way that L.A. Digital is
23  entering any kind of public domain or offering by
24  anybody at this point in time. This clearly is
25  impossible. Sorry.

Page 131

1    Q   It's okay. Do you see the next sentence, it
2  says, "We are projecting an ROI in the 200 to 300 range
3  conservatively."
4    Do you see that?
5    A   I do.
6    Q   Had you heard, prior to seeing this exhibit,
7  any predictions, projections about a rate of return
8  associated with an offering at L.A. Digital?
9    A   No, I have not.
10    Q   The next line reflects a 300 percent to
11  500 percent return.
12    Had you ever seen that or heard about it
13  before associated with an L.A. Digital public offering?
14    A   No, I have not.
15    Q   In the second page of Exhibit 10, on the last
16  line of the second paragraph, see where it says,
17  "L.A. Digital will do the same, if not better, since it
18  is scheduled to enter the AMEX," exclamation point?
19    A   I do.
20    Q   I'm interpreting AMEX to mean the American
21  Stock Exchange.
22    Do you agree with that?
23    A   I do.
24    Q   Did L.A. Digital Post have any plans to list
25  its shares on the American Stock Exchange?

Page 132

1    A   No, it did not.
2    Q   The signature block towards the end of the
3  exhibit says "Charles Gebig."
4    Do you see that?
5    A   I do.
6    Q   All right. Do you know who Charles Gebig is?
7    A   I have no idea.
8    Q   There's a number of cell, office and fax
9  numbers there.
10    Do you see that?
11    A   I do.
12    Q   Do you recognize any of those numbers?
13    A   Not at all. I don't even know where 239 is.
14    Q   The e-mail seems to be addressed to
15  Henry Hubbard.
16    Do you know who Mr. Hubbard is?
17    A   I have no clue.
18    Q   Have you had any communications with him?
19    A   No, I have not. I don't believe so.
20    Let me just state for the record this: I
21  don't know who Henry Hubbard is. I also don't remember
22  the name of everyone who contacted me as an investor.
23    However, I would say, based on the date of
24  this apparent solicitation, I had never spoken to this
25  person, even calling L.A. Digital. I can't -- I don't

Page 133

1  recall, but it's 60 days ago. I would certainly
2  remember. So no.
3    MR. LEE: Okay. I'm going to hand the court
4  reporter what's going to be marked as Exhibit 11.
5  Exhibit 11 is a six-page exhibit. The top of it says
6  "individuals and entities." It has the name "In the
7  matter of L.A. Digital Post, Inc., LA 3858."
8    (SEC Exhibit No. 11 was marked for
9    identification.)
10    BY MR. LEE:
11    Q   I'm handing the witness what has been marked
12  as Exhibit No. 11. Exhibit No. 11 is a list of
13  individuals and entities.
14    I'm going to go off the record and ask you to
15  take some time and look at these individuals and see
16  whether you recognize any of them, and we'll go back on
17  the record and you can tell me whether you do or not.
18    MR. LEE: We're off the record. It is 2:00.
19    (A brief recess was taken.)
20    MR. LEE: Let's get back on the record. It is
21  2:03.
22    For the record, there was no substantive
23  discussions between the staff and Mr. Migdal.
24    Mr. Migdal did ask a question to me about who
25  some of the entities and individuals are as a general

34 (Pages 130 to 133)

Page 134

1  matter, and I told him that I couldn't give him the
2  details of any of the names listed on Exhibit
3  Number 11.
4      BY MR. LEE:
5      Q   Do you agree with that, Mr. Migdal?
6      A   I do.  I do.
7      Q   Other than what you have testified about
8  already, do you recognize any of the names on
9  Exhibit No. 11?
10      A   I do.
11      Q   Okay.  And what are those, if you could tell
12  us.
13      A   I recognize some of the names.  I don't --
14  some of them I recognize, but I'm not sure even why.
15  The first one I recognize is
16  Michelle Beuerlein.  The name is familiar, and I do not
17  know why.
18      Q   Okay.
19      A   I'm just -- I'm being honest.  But I
20  recognize the name, and I can't remember why.
21          Going down the page, Crutchfield.  Now, it's
22  not exactly the name that I know, but it's very close.
23  There is an associate of Mark Bercoon's and
24  Will Goldstein's, and his name is Brian Crutchfield.
25  I'm not sure how he spells his name.  I don't know if

Page 135

1  it's Robert Byron Crutchfield.  It may be that he goes
2  by the name of just Brian Crutchfield.
3          Brian -- it's got to be Byron Crutchfield.
4  He -- I don't -- he probably just uses Brian and not
5  Robert, but he's an associate of Will Goldstein's and
6  Mark Bercoon's.  In fact, he acted as the broker of
7  record for the Salem Halifax loan that L.A. Digital
8  procured approximately a year ago.
9      Q   Do you have any knowledge of whether
10  Robert Byron Crutchfield is connected in any way with
11  the offering of -- the purported offering of
12  L.A. Digital Post securities?
13      A   No, I have no idea.
14      Q   Okay.
15      A   Dart Financial.
16      Q   What is that entity?
17      A   Dart Financial is an entity that Mark Bercoon
18  has used to do high-interest short-term loans with, and
19  there actually is one on L.A. Digital for equipment.
20  My understanding about Dart and who they are -- I have
21  tried to do my own research to understand who they are
22  because their interest rates are astronomical.
23          My understanding is Dart Financial is a group
24  of attorneys out of Chicago who amongst -- other than
25  practicing law, they make short-term high-interest

Page 136

1  loans.  We borrowed approximately $800,000 from them
2  and on -- and are on a repayment plan.  It's a very
3  aggressive, high-interest loan in the neighborhood of,
4  like, 80 percent interest.
5      Q   Do you have any knowledge to whether
6  Dart Financial is connected in any away with a
7  purported offering of LADP Acquisition or L.A. Digital
8  Post shares?
9      A   I do not.  I only know them in the context
10  that I stated.
11      Q   Okay.
12      A   Cary Epstein.
13      Q   Who's that?
14      A   Cary Epstein is an attorney.  He's in
15  Los Angeles.  He has -- Cary Epstein was the
16  attorney -- Mark Bercoon originally met Cary Epstein
17  in -- involved in the purchase of L.A. Digital from the
18  previous owners.  Cary Epstein represented the previous
19  owner, Mark Bianchi, in the acquisition.
20          Since that time, Mark had commented on
21  several occasions that he had done deals with Cary
22  Epstein, the context of which I have no idea.  But he
23  is local, he is an attorney and he lives in Benedict
24  Canyon.
25      Q   Any -- do you have any knowledge to whether

Page 137

1  Cary Epstein is connected in any way with the purported
2  offering of LADP Acquisitions or L.A. Digital Post?
3      A   I do not.
4          Under Cary Epstein, I see Dart Financial.  I
5  don't know -- I don't know what the FBO means.
6      Q   Okay.
7      A   But I'm familiar with Dart Financial, as I
8  stated a moment ago.  I just -- I have no idea what FBO
9  stands for.
10          Paramount Capital.
11      Q   All right.  We've already talked about them.
12      A   Okay.  I recognize them.
13      Q   All right.
14      A   Mark Rosenberg.
15      Q   Who's that?
16      A   Mark Rosenberg works for Will Goldstein and
17  Mark Bercoon out of Atlanta.  He is an old friend of
18  Will Goldstein's from, I believe, a -- from a
19  security -- he had a lock company, slash, security
20  business.
21          Mark, as far as I know, does odd jobs for
22  them, works with them.  Specifically, I can't tell you
23  what, because I don't know.  But I know that he
24  absolutely works with them and I recognized his name.
25  And I have met him.

Page 138

1    Q   Any knowledge of whether he is connected in
2  any way with a purported offering of LADP Acquisition
3  or L.A. Digital Post shares?
4    A   No, I do not know.
5       David Scheibel, I recognize that name.
6    Q   Okay.
7    A   I recognize Scottrade, if Scottrade is what I
8  think it is.  It's publicized everywhere.
9       Simmons Abramson Marketing, LLC, I recognize
10 that.
11   Q   And what is that entity?
12   A   I believe that is the entity of Gene Simmons
13 and Richard Abramson -- who I believe was his agent at
14 one point -- in a marketing company that they have to
15 market various products.  And I'm of the understanding
16 that one of those products was Find.com.
17      Richard Abramson was a name that was
18 mentioned frequently by both Will Goldstein and
19 Mark Bercoon going back a few years ago as someone who
20 was going to raise money, bring in business, et cetera.
21 Nothing ever came to fruition on behalf of
22 L.A. Digital.
23   Q   Any knowledge of whether that entity is
24 connected in any way to an offering of securities by
25 LADP Acquisitions or L.A. Digital Post?

Page 139

1    A   No, I have no idea.
2       Joseph Vitale.  I have mentioned him already.
3  I recognize that name.
4       That's it.
5    Q   Okay.  Thank you.
6       Have you spoken with anyone other than with
7  your counsel about this investigation, other than what
8  you've already testified about?
9    A   My wife.
10   Q   Anyone else?
11   A   Jenna Andrews.
12   Q   Anyone else?
13   A   Don Schiada.
14   Q   Anyone else?
15   A   No.
16   Q   Who is Jenna Andrews?
17   A   She's the senior vice president of operations
18 of L.A. Digital.  She's in the office next to me.  She
19 is aware of this to a very limited extent.  The offices
20 are a little amplified, so having a completely private
21 call is sometimes a little bit difficult.
22      And in her position, I had -- I felt
23 responsible enough to loop her in, because I'm,
24 obviously, not in the office all day today as well.
25   Q   And what did you tell her about the

Page 140

1  investigation?
2    A   Well, she knows about the phone calls.  I
3  think it's safe to say that -- not all of management,
4  but there's at least probably a half a dozen people at
5  L.A. Digital who are aware that there is something odd
6  going on because of the calls that we've received.
7       The calls, as I stated earlier, didn't always
8  come directly to me.  They'd go to the receptionist,
9  the accounting department, and a lot of the folks had a
10 tendency to really talk about their particular
11 situation.
12      So she is aware that there is an apparent
13 stock fraud scheme, and that L.A. Digital was used as
14 the -- I guess, the vehicle for that, unbeknownst to
15 any of us.
16   Q   Okay.  How about anything related to the
17 actual SEC investigation?
18   A   In terms of my testimony --
19   Q   Your testimony --
20   A   -- or in terms of the exhibits?
21   Q   The existence of an SEC investigation.
22   A   She knows that I'm here today doing this.
23   Q   Anything else?
24   A   No.
25   Q   How about Don Schiada?

Page 141

1    A   Don is aware of a little bit more because
2  he -- I you think he fielded a couple of phone calls,
3  and he knows that his name was used in the
4  presentation.
5    Q   Have you had any conversations with
6  Mr. Schiada about the SEC investigation?
7    A   He knows that I'm here today.
8    Q   Anything else?
9    A   No.
10   Q   Have you spoken with anyone about the
11 substance of what you would be testifying to here
12 today?
13   A   No.
14   Q   Who else knows, other than what you've
15 already testified to, that you would be here today
16 giving your testimony?
17   A   David Loev, the previous counsel of record.
18   Q   Outside of your counsel.
19   A   And outside of L.A. Digital general counsel?
20   Q   Correct.
21   A   Nobody.
22   Q   You had said Mark knew.
23   A   Oh, I'm sorry.  Mark Bercoon is aware that
24 I'm here today.
25   Q   I only did that to remind you to see

Page 142

1  whether -- do you think Will Goldstein knows that you
2  are here today?
3      A   Of course.
4      Q   Do you say that because you've had a
5  conversation with somebody or communication with
6  someone in which they relayed to you that
7  Will Goldstein knows that you're here today?
8      A   No.
9      Q   You're saying that by virtue of you think
10  that Mark Bercoon is Will Goldstein's front man?
11      A   I believe that Mark Bercoon and
12  Will Goldstein are business partners, and to a greater
13  degree, that Mark Bercoon is the front man for
14  Will Goldstein and some of his business dealings --
15  certainly in L.A. Digital, currently -- and that Will
16  must be aware of my presence here today for the mere
17  fact that I believe that it's Mark's obligation to tell
18  him, since he has seen his name connected with all the
19  documents, all the exhibits that you've asked me to
20  examine, as well as the fact that I have communicated
21  to Mark Bercoon on multiple occasions that the -- the
22  investors calling are looking for Will Goldstein.
23      And I'm assuming that he knows. I don't know
24  for a fact, but I would bet on it.
25      Q   Has anyone suggested or instructed you to

Page 143

1  testify -- let me strike that.
2      Has anyone suggested or instructed you to
3  provide certain statements in your testimony here
4  today?
5      A   No.
6      Q   Have you reviewed any documents in
7  preparation for your testimony?
8      A   No.
9      MR. LEE:  We don't -- the staff has no further
10  questions for you at this time. We may, however, call
11  you again if that proves necessary. We will contact
12  you through your counsel if we need to do that.
13      The staff always provides an opportunity for
14  you or your counsel to clarify anything you've said
15  here today or to ask -- your counsel could ask any
16  clarifying questions if he wants to. So I'm providing
17  that opportunity now for either of you to do that.
18      MR. SHERWIN:  I have no questions. I want to let
19  the staff know that we want to give the staff as much
20  information as possible about this. It's within
21  Mr. Migdal's ability to provide you with information,
22  and so feel free to contact us.
23      MR. LEE:  We appreciate that. And again, you
24  know, I didn't say this when we were on the record, but
25  we, the staff, appreciate your coming here on such

Page 144

1  short notice and the amount of cooperation that you've
2  shown here today. So I just want to make a note of
3  that.
4      We're off the record. It is 2:19 on
5  August 13th, 2010.
6      (Whereupon, at 2:19 p.m., the examination was
7  concluded.)
8          * * * * *

Page 145

REPORTER'S CERTIFICATE

I, Rich Alossi, reporter, hereby certify that the foregoing
transcript of 144 pages is a complete, true and accurate
transcript of the testimony indicated, held on August 13,
2010, at 9:59 a.m. in the matter of: L.A. Digital Post, Inc.

I further certify that this proceeding was recorded by me,
and that the foregoing transcript has been prepared under my
direction.

Date: _____
Official Reporter: _____
Diversified Reporting Services, Inc.

37 (Pages 142 to 145)

Exhibit  3   Page  42

Page 145

1                        REPORTER'S CERTIFICATE

2

3

4      I, Rich Alossi, reporter, hereby certify that the foregoing

5      transcript of 144 pages is a complete, true and accurate

6      transcript of the testimony indicated, held on August 13,

7      2010, at 9:59 a.m. in the matter of:  L.A. Digital Post, Inc.

8

9

10     I further certify that this proceeding was recorded by me,

11     and that the foregoing transcript has been prepared under my

12     direction.

13

14

15

16                          Date:  _9/14/10_____

17                Official Reporter: _Rich Alossi /RAm_

18                Diversified Reporting Services, Inc.

19

20

21

22

23

24

25

Exhibit ___3___  Page___43

Page 146

1                          PROOFREADER'S CERTIFICATE

2

3    In the Matter of:    L.A. DIGITAL POST, INC.

4    Witness:             Gary Migdal

5    File Number:         LA-03858-A

6    Date:                Friday, August 13, 2010

7    Location:            Los Angeles, California

8

9

10        This is to certify that I, Robert T. Moser (the

11   undersigned), do hereby swear and affirm that the attached

12   proceedings before the U.S. Securities and Exchange

13   Commission were held according to the record and that this is

14   the original, complete, true and accurate transcript that has

15   been compared to the reporting or recording accomplished at

16   the hearing.

17

18

19

20   _____          9/14/10
                                     _____

21   (Proofreader's Name)            (Date)

22

23

24

25

Exhibit ___3___ Page ___43a___