# EXHIBIT 7

Case 2:10-cv-06835-RGK -JCG   Document 9-7   Filed 09/14/10   Page 2 of 113   Page ID
#:435

[ No Subject ] - Yahoo! Mail                                              Page 1 of 1





**[ No Subject ]**                                    Thursday, June 18, 2009 5:59 PM

**From:** "Marc Bercoon" <mbercoon@nporta.com>
**To:** wagatlanta@yahoo.com
2 Files (1241KB)

  

LADP Sub...    Private Pl...

Exhibit ____7____ Page____58

# PRIVATE PLACEMENT MEMORANDUM
## LADP CORP

### 10,000 Shares Common Stock

LADP Corp is a Delware corporation formed recently in May, 2009, which owns all the outstanding ownership interest of LADP, LLC which is the 100% owner of LA Digital Post, Inc. & Affiliate, a business entity which dates back to 1995. In this private placement memorandum (this "Memorandum"), the "Company," "us," "our," and "we" refer to LADP Corp. We rent post production editing equipment and provide technical support to major film and television clients.

The Offering (the "Offering") consists of Ten Million Shares of Common Shares ("Common Stock") offered at a price of $1.00 per Share. Each Share has a par value $0.01 per share. No public offering of our Common Stock is contemplated in the foreseeable future. There is no market for our Common Stock. We have arbitrarily determined the Subscription Price (hereinafter defined). The maximum amount which shall be raised pursuant to this Offering is Ten Million Dollars $10,000,000. The minimum amount which shall be raised shall be determined by us in our sole and absolute discretion. This Offering shall close after the sale of such minimum number of Shares as we in our sole and absolute discretion determine or with the sale of the maximum of Ten Million (10,000,000) Shares.

|  | Subscription Price | Selling Commissions (1) | Proceeds to Company (2) |
|---|---|---|---|
| Per Share | $1.00 | $0.125 | $0.875 |
| 10,000 Shares (Maximum Offering) | $10,000,000 | $1,250,000 | $8,750,000 |

(1)     We shall pay a selling commission to registered broker-dealers, "finders", individuals and entities legally authorized to receive such commissions (the "Selling Agents") of twelve and a half (12.5%) percent of the Subscription Price per Share sold, provided that such payments are permitted under federal and applicable state securities laws. We shall also pay a non-accountable expense allowance of three (3%) percent of the Subscription Price per Share sold which is not reflected in the above table, provided that such payments are permitted under federal and applicable state securities laws.

(2)     Legal, printing and other expenses of the Offering, which are estimated to be approximately $100,000 if the maximum number of Shares is sold, are not reflected in the above table.

This Offering shall close after the sale of such minimum number of Shares as we in our sole and absolute discretion determine or with the sale of the maximum of 10,000 Shares. The total amount to be raised pursuant to this Offering is a maximum of $10,000,000. The Offering will terminate on or prior to November 26 2009, subject to one or more extensions, in our sole and absolute discretion, with no restrictions upon either the number of extensions or upon the length of time for each of said extensions. The Offering may be so extended without amending this Memorandum and without notice to prospective and/or existing Investors.

May 20, 2009

Exhibit ___7___ Page___59

THE SECURITIES OFFERED PURSUANT TO THIS PRIVATE PLACEMENT MEMORANDUM AND THE EXHIBITS ANNEXED HERETO AND THE SUBSCRIPTION PACKAGE (COLLECTIVELY, THE "OFFERING MATERIALS") HAVE NEITHER BEEN FILED OR REGISTERED WITH NOR APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"). THE SEC HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THE OFFERING MATERIALS. NO STATE SECURITIES LAW ADMINISTRATOR HAS PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR THE ADEQUACY OF THE OFFERING MATERIALS, ANY REPRESENTATION TO THE CONTRARY OF WHAT IS STATED IN THIS PARAGRAPH IS UNLAWFUL.

THE INVESTMENT WHICH IS DESCRIBED IN THIS MEMORANDUM INVOLVES A HIGH DEGREE OF RISK AND THE PURCHASE OF THE SECURITIES SHOULD BE CONSIDERED ONLY BY PERSONS WHO: (1) CAN AFFORD TO SUSTAIN A LOSS OF THEIR ENTIRE INVESTMENT; (2) HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT; AND (3) HAVE ADEQUATE MEANS TO PROVIDE FOR THEIR CURRENT AND FUTURE NEEDS, INCLUDING CONTINGENCIES.

INVESTORS SHALL BE REQUIRED TO REPRESENT THAT THEY ARE FAMILIAR WITH, AND UNDERSTAND, THE TERMS OF THIS OFFERING.

THIS OFFERING IS BEING MADE PURSUANT TO AN EXEMPTION FROM THE REGISTRATION PROVISIONS OF THE SECURITIES ACT OF 1933 (THE "ACT" OR THE "1933 ACT"), AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS ("BLUE SKY" LAWS) FOR NON-PUBLIC OFFERINGS AND IN RELIANCE UPON INTENDED COMPLIANCE WITH THE PROVISIONS OF SECTIONS 4(2) OF THE ACT AND RULE 506 OF REGULATION D PROMULGATED UNDER THE ACT. THE SECURITIES WHICH WILL BE ISSUED WILL BE RESTRICTED AND CANNOT BE FREELY TRADED. ACCORDINGLY, THE SECURITIES MAY NOT BE SOLD, PLEDGED, HYPOTHECATED, DONATED OR OTHERWISE TRANSFERRED, WHETHER OR NOT FOR CONSIDERATION, UNLESS THE SECURITIES ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION APPLIES. IN ADDITION TO RESTRICTIONS UNDER FEDERAL LAWS, THE SECURITIES PURCHASED IN ONE STATE CANNOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED IN THAT STATE OR ANOTHER STATE UNTIL WE HAVE REGISTERED THE SECURITIES OR UNLESS AN EXEMPTION UNDER STATE SECURITIES LAW APPLIES.

IN VIEW OF THE FACT THAT THIS OFFERING IS LIMITED SOLELY TO ACCREDITED INVESTORS, WE ARE NOT REQUIRED TO PROVIDE PROSPECTIVE INVESTORS WITH DISCLOSURE WITH RESPECT TO OUR COMPANY. THIS DOCUMENT IS NOT INTENDED TO BE A FULL DISCLOSURE DOCUMENT; IT IS ONLY INTENDED TO PROVIDE PROSPECTIVE INVESTORS WITH A BRIEF OVERVIEW OF OUR COMPANY AND OUR MANAGEMENT.

THIS MEMORANDUM CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE DOCUMENTS WHICH RELATE TO THIS OFFERING, AS WELL AS SUMMARIES OF VARIOUS PROVISIONS OF RELEVANT STATUTES AND THE APPLICABLE REGULATIONS THEREUNDER. ALTHOUGH WE BELIEVE THAT THESE SUMMARIES ARE ACCURATE, THESE SUMMARIES DO NOT PURPORT TO BE COMPLETE AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE TEXTS OF SUCH DOCUMENTS, STATUTES AND REGULATIONS.

Exhibit _____7_____ Page___60

NO SECURITIES MAY BE RESOLD OR OTHERWISE DISPOSED OF BY AN INVESTOR UNLESS, IN THE OPINION OF OUR COUNSEL, REGISTRATION UNDER THE APPLICABLE FEDERAL OR STATE SECURITIES LAWS IS NOT REQUIRED OR COMPLIANCE IS MADE WITH SUCH REGISTRATION REQUIREMENTS.   THE SALE, TRANSFER OR OTHER DISPOSITION OF ANY SECURITIES PURCHASED PURSUANT HERETO MAY BE SUBSTANTIALLY RESTRICTED BY UNITED STATES AND APPLICABLE STATE SECURITIES LAWS. ACCORDINGLY, THE SECURITIES SHOULD NOT BE PURCHASED BY INVESTORS WHO NEED LIQUIDITY IN THEIR INVESTMENTS. AN INVESTOR MAY HAVE TO CONTINUE TO BEAR THE ECONOMIC RISK OF HIS INVESTMENT FOR AN INDEFINITE PERIOD, UNLESS A MARKET FOR THE SECURITIES IS ESTABLISHED. THERE CAN BE NO ASSURANCE THAT A MARKET SHALL DEVELOP IN THE FUTURE.

THE OFFERING PRICE OF THE SECURITIES WAS DETERMINED BY US AND THERE CAN BE NO ASSURANCE THAT SUCH PRICE BEARS A RELATIONSHIP TO OUR FINANCIAL POSITION, BOOK VALUE OR ANY OTHER GENERALLY ACCEPTED CRITERIA OF VALUE.

THE OFFEREE, BY ACCEPTING DELIVERY OF THE OFFERING MATERIALS, AGREES TO RETURN THE OFFERING MATERIALS AND ALL ACCOMPANYING AND RELATED DOCUMENTS TO US UPON REQUEST IF THE OFFEREE DOES NOT AGREE TO PURCHASE ANY OF THE SECURITIES OFFERED HEREBY.

THIS OFFERING DOES NOT CONSTITUTE AN OFFER OR SOLICITATION BY ANYONE IN ANY JURISDICTION IN WHICH SUCH AN OFFERING OR SOLICITATION IS NOT AUTHORIZED. IN ADDITION, THE OFFERING MATERIALS CONSTITUTE AN OFFER ONLY IF A NAME AND IDENTIFICATION NUMBER APPEAR IN THE APPROPRIATE SPACES PROVIDED ON THE COVER PAGE HEREOF AND ONLY TO THE PERSON WHOSE NAME APPEARS ON THE COVER PAGE.

IF WE AND OUR AFFILIATES ARE INCORRECT IN OUR ASSUMPTIONS AS TO THE CIRCUMSTANCES OF ANY PROSPECTIVE INVESTOR, THEN THE DELIVERY OF THIS MEMORANDUM TO SUCH PROSPECTIVE INVESTOR DOES NOT CONSTITUTE AN OFFER AND THIS MEMORANDUM MUST BE RETURNED TO US IMMEDIATELY. WE RESERVE THE RIGHT, IN OUR SOLE AND ABSOLUTE DISCRETION, TO REJECT ANY SUBSCRIPTION FOR SECURITIES IN WHOLE OR IN PART.

THIS MEMORANDUM IS STRICTLY CONFIDENTIAL AND MAY NOT BE DISTRIBUTED OR REPRODUCED. ITS CONTENTS MAY NOT BE DIVULGED, IN WHOLE OR IN PART. ANY DISTRIBUTION OR REPRODUCTION OF THIS MEMORANDUM IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, OTHER THAN AS SPECIFICALLY SET FORTH HEREIN, IS UNAUTHORIZED AND FORBIDDEN AND MAY BE A VIOLATION OF FEDERAL AND/OR STATE SECURITIES LAWS.

NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATION OR GIVE ANY INFORMATION WITH RESPECT TO THIS OFFERING WHICH IS INCONSISTENT WITH THE INFORMATION WHICH IS SET FORTH HEREIN.   NO OFFERING LITERATURE OR ADVERTISING IN ANY FORM SHALL BE EMPLOYED IN THE OFFERING OF THE SECURITIES UNLESS SUCH OFFERING LITERATURE IS DATED WITH THE SAME DATE OF THIS MEMORANDUM OR LATER AND THE INFORMATION WHICH IS SET FORTH THEREIN IS CONSISTENT WITH THE INFORMATION WHICH IS SET FORTH HEREIN. IF THERE IS ANY INCONSISTENCY BETWEEN SUCH OFFERING LITERATURE OR ADVERTISING AND ANY INFORMATION WHICH IS SET FORTH HEREIN, OR IF SUCH

Exhibit ___7___   Page___61___

OFFERING LITERATURE IS DATED PRIOR TO THE DATE OF THIS MEMORANDUM, SUCH OFFERING LITERATURE IS UNAUTHORIZED. NO PROSPECTIVE INVESTOR MAY RELY UPON ANY INFORMATION OR REPRESENTATION WHICH MAY BE MADE OR GIVEN IN VIOLATION OF THIS PARAGRAPH.

Exhibit _____ 7 _____   Page _____ 62

## CERTAIN NOTICES UNDER STATE SECURITIES LAWS

### NASAA UNIFORM LEGEND

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY UPON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSIONS OR REGULATORY AUTHORITY.  THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT"), AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE ("BLUE SKY" LAWS) AND ARE BEING OFFERED AND SOLD IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

### CONNECTICUT RESIDENTS

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE BANKING COMMISSIONER OF THE STATE OF CONNECTICUT.  THE COMMISSIONER HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THIS OFFERING.  ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

### FOR FLORIDA RESIDENTS

THE SECURITIES REFERRED TO HEREIN HAVE NOT BEEN REGISTERED UNDER THE FLORIDA SECURITIES ACT.

EACH FLORIDA RESIDENT WHO SUBSCRIBES FOR THE PURCHASE HEREIN SHALL HAVE THE RIGHT, PURSUANT TO SECTION 517.061(12)(A)(5) OF THE FLORIDA SECURITIES ACT, TO WITHDRAW HIS SUBSCRIPTION AND RECEIVE A FULL REFUND OF ALL MONIES PAID WITHIN THREE (3) BUSINESS DAYS AFTER THE EXECUTION OF THIS SUBSCRIPTION AGREEMENT OR PAYMENT FOR HIS INVESTMENT HAS BEEN MADE, WHICHEVER IS LATER.  WITHDRAWAL WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON.  TO ACCOMPLISH THIS WITHDRAWAL, A SUBSCRIBER NEED ONLY SEND A LETTER OR TELEGRAM TO US AT THE ADDRESS SET FORTH IN THE OFFERING DOCUMENTS, INDICATING HIS OR HER INTENTION TO WITHDRAW. SUCH LETTER OR TELEGRAM SHOULD BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED THIRD BUSINESS DAY.  IT IS PRUDENT TO SEND SUCH LETTER BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME WHEN IT WAS MAILED.

Exhibit _____7_____ Page 63

## FOR PENNSYLVANIA RESIDENTS

UNDER THE PROVISIONS OF SECTION 207(M) OF THE PENNSYLVANIA SECURITIES ACT OF 1972, A PENNSYLVANIA RESIDENT WHO ACCEPTS AN OFFER TO PURCHASE SECURITIES EXEMPTED FROM REGISTRATION BY SECTION 203(D) DIRECTLY FROM AN ISSUER OR AN AFFILIATE OF AN ISSUER SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE WITHOUT INCURRING ANY LIABILITY TO THE SELLER OR ANY OTHER PERSON WITHIN TWO (2) BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE ISSUER OF HIS WRITTEN BINDING CONTRACT OF PURCHASE OR IN THE CASE OF A TRANSACTION IN WHICH THERE IS NO WRITTEN BINDING CONTRACT OF PURCHASE, WITHIN TWO (2) BUSINESS DAYS AFTER MAKING THE INITIAL PAYMENT FOR THE SECURITIES BEING OFFERED.

EACH PERSON ENTITLED TO EXERCISE THE RIGHT TO WITHDRAW GRANTED BY SECTION 207(M) AND WHO WISHES TO EXERCISE SUCH RIGHT, MUST WITHIN THE AFOREMENTIONED TWO (2) BUSINESS DAYS CAUSE A WRITTEN NOTICE OR TELEGRAM TO BE SENT TO THE COMPANY AT THE ADDRESS PROVIDED IN THE OFFERING MATERIALS INDICATING HIS INTENTION TO WITHDRAW. SUCH LETTER OR TELEGRAM MUST BE SENT AND POSTMARKED ON OR PRIOR TO THE END OF THE AFOREMENTIONED SECOND BUSINESS DAY. IF YOU ARE SENDING A LETTER IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME WHEN IT WAS MAILED. SHOULD YOU MAKE THIS REQUEST ORALLY, YOU MUST ASK FOR WRITTEN CONFIRMATION THAT YOUR REQUEST HAS BEEN RECEIVED. AN INVESTOR RESIDING IN PENNSYLVANIA MAY NOT SELL HIS SECURITIES WITHIN TWELVE (12) MONTHS AFTER THE DATE OF HIS PURCHASE.

## FOR NEW YORK RESIDENTS

THESE OFFERING MATERIALS HAVE NOT BEEN REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW YORK BECAUSE OF OUR REPRESENTATION THAT THIS IS INTENDED TO BE A NON PUBLIC OFFERING PURSUANT TO SEC REGULATION D AND THAT IF ALL OF THE CONDITIONS AND LIMITATIONS OF REGULATION D ARE NOT COMPLIED WITH, THE OFFERING WILL BE RESUBMITTED TO THE ATTORNEY GENERAL FOR AMENDED EXEMPTION. THE OFFERING LITERATURE USED IN CONNECTION WITH THIS OFFERING HAS NOT BEEN PRE-FILED WITH THE ATTORNEY GENERAL AND HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL. THE PURCHASER WILL BE REQUIRED TO REPRESENT THAT IT HAS ADEQUATE MEANS OF PROVIDING FOR ITS CURRENT NEEDS AND POSSIBLE PERSONAL CONTINGENCIES, AND THAT IT HAS NO NEED FOR LIQUIDITY OF THIS INVESTMENT.

THESE SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING.

Exhibit _____7_____    Page _64_

## TABLE OF CONTENTS

CERTAIN NOTICES UNDER STATE SECURITIES LAWS..................................5
SCHEDULE OF EXHIBITS..................................8
WHO MAY INVEST..................................9
SUMMARY OF THE OFFERING..................................11
THE OFFERING..................................11
EXECUTIVE SUMMARY..................................14
TERMS OF THE OFFERING..................................46
RISK FACTORS..................................48
FORWARD LOOKING STATEMENTS..................................52
DILUTION..................................53
CAPITALIZATION..................................53
DESCRIPTION OF THE SECURITIES..................................55
REPORTS TO SHAREHOLDERS..................................55

Exhibit _____7_____ Page_____65

<u>Schedule of Exhibits</u>

A.     Confidential Prospective Purchaser Questionnaire.*

B.     Purchaser Representative Questionnaire.*

C.     Subscription Agreement.*

D.     Financial Statements for the years ended December 31, 2007 and 2008.

*     These documents are not annexed as exhibits to this Memorandum; however, copies of these documents are contained in a separate subscription package which shall be distributed to each potential investor (the "Subscription Package"). The Subscription Package is an integral part of this Memorandum, and each potential investor should carefully review the Subscription Package.

8

Exhibit ___7___ Page ___66___

## Who May Invest

Many state securities commissioners have established investor suitability standards within their respective jurisdictions for the marketing of private placement securities offerings. These standards appear to have been imposed, among other reasons, because of the relative lack of liquidity of securities of such private placement offerings as compared with other securities investments. Investment in the Shares involves a high degree of risk and is suitable only for persons of substantial financial means who have no need for liquidity in their investments.

Shares shall be sold only to those investors who meet the suitability requirements which are set forth in this Section. Assuming that the applicable suitability requirements are satisfied, the Shares may be sold to individuals, corporations, pension, profit sharing or Keogh plans, or individual retirement accounts.

In reliance upon an exemption from the registration provisions of the 1933 Act, and by reason of intended compliance with the provisions of Sections 4(2) of the 1933 Act and Rule 506 of Regulation D promulgated under the 1933 Act, the Shares have not been registered under the 1933 Act. Accordingly, prior to the investors purchasing Shares, we shall take all actions which are reasonably necessary (including requiring each prospective investor to complete and return the Subscription Agreement and the Purchaser Questionnaire and, in certain instances, requiring that a Purchaser Representative be used) in order to be satisfied that the prerequisites of applicable state regulatory exemptions have been met. Each Purchaser Representative, if any, must also complete and return the Purchaser Representative Questionnaire.

This offering is limited solely to accredited investors. We shall accept subscriptions from an unlimited number of accredited investors as such term is defined in Rule 501 pursuant to the 1933 Act. Pursuant to Rule 501, an accredited investor includes (i) a natural person who (with spouse, if any) has a net worth which exceeds $1,000,000 at the time of the purchase; (ii) a natural person who has had an individual income in excess of $200,000 for the prior two years (or joint income with such spouse which exceeds $300,000 in each such year) and have a reasonable expectation of reaching the same income level (or joint income level) in the current year; (iii) an organization as described in section 501 (c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000; (iv) a trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506 (b)(2)(ii); or (v) an entity in which all of the equity owners are accredited investors.

Offers shall be made and subscriptions shall be accepted only from investors residing within jurisdictions in which the offering has been registered or licensed, unless in the opinion of counsel either: (i) such registration or licensing is not required; or (ii) an exemption from such registration and licensing is available and has been obtained, or can be obtained by a filing subsequent to such sale. This investment is available to those investors who as of the date of the execution of the Subscription Agreement have a net worth (exclusive of home, furnishings and automobiles) in excess of four times the Subscription Price for the Shares which are purchased by such investor. We reserve the right, in our sole and absolute discretion, to accept subscriptions from investors who do not satisfy the foregoing suitability standards. The foregoing suitability standards are minimum

Exhibit _____7_____   Page ____67____

requirements for prospective investors and the satisfaction of these standards does not necessarily mean that the purchase of Shares is a suitable investment for the prospective investor.

A prospective investor may also have to meet other suitability standards established by the laws or regulations ("Blue Sky" Laws) of the state of such investor's residence. See "CERTAIN NOTICES UNDER STATE SECURITIES LAWS."

To assist us in determining a person's qualifications, each investor must provide us with a completed Purchaser Questionnaire, which shall be substantially in the form of Exhibit "A", which is contained in the Subscription Package. All Purchaser Questionnaires shall be reviewed by us to assure that there is compliance with the suitability standards, and subscriptions shall not be accepted from any individual who does not represent in the Purchaser Questionnaire that such standards are met.

Each person requiring the assistance of a Purchaser Representative shall be so notified by us. We shall supply each prospective investor requiring a Purchaser Representative with a Purchaser Representative Questionnaire and require that the same be completed by such Purchaser Representative.

A Purchaser Representative must have sufficient knowledge and experience in financial and business matters, either alone or together with other Purchaser Representatives for the prospective investor or together with the prospective investor, to evaluate the merits and risks of an investment by the investor in us. Each Purchaser Representative shall have to first satisfy us as to such qualifications by submitting to us a Purchaser Representative Questionnaire, which shall be substantially in the form of Exhibit "B" which is contained in the Subscription Package. In addition, a Purchaser Representative must also satisfy (or we must reasonably believe that such Purchaser Representative satisfies) all of the following conditions: (i) he is not an Affiliate of us (unless he is a close relative of the investor or a company, a trust or estate in which the investor or his relative has a 50% or greater interest); (ii) designation by the investor as the investor's Purchaser Representative; and (iii) disclosure to the investor, before such designation, of any material relationship between such Representative and his Affiliates and us and its Affiliates and any compensation which such Representative shall receive.

Each investor shall be required to make certain representations and warranties to us and to agree to indemnify, hold harmless and pay all judgments and claims against us and our Counsel for any liability which is incurred as a result of any misrepresentation made or breach of any warranty of such investor.

The attention of each prospective investor is directed to the Subscription Agreement for a complete description of those warranties and representations which each investor shall be required to make. The following are of particular importance: each investor must (i) warrant that such investor meets the suitability standards which are set forth in the fifth paragraph of this section "Who may invest" and acknowledge that such investor has received a copy of this Memorandum and read same and (ii) represent that such investor is aware that (a) there are United States and state restrictions upon the transfer of his or her investment in Shares which shall make their sale or other disposition difficult or impossible, (b) there is no guarantee of profit, or against loss, as a result of purchasing Shares, and (c) that only those investors who can afford a total loss of their investment should consider purchasing Shares.

Exhibit _____ 7 Page____ 68

## SUMMARY OF THE OFFERING

The following is a summary of certain material contained in this Memorandum. This summary is qualified in its entirety by the detailed information and financial statements (including notes thereto) appearing elsewhere herein and should be read in conjunction with such material.

## THE OFFERING

Securities Offered:
Maximum Offering:

10,000,000 Shares. Each share is common stock, par value $0.01 at a price of $1.00 per Share. No public offering of our Common Stock is contemplated in the foreseeable future. There is no market for the Shares. We do not currently pay dividends on our Common Stock and do not anticipate paying any dividends in the foreseeable future.

Common Stock Outstanding:

90,000,000 Shares

Common Stock Outstanding, assuming the maximum number of Shares are sold pursuant to this Offering:

100,000,000 Shares

Purchase Price:

$1.00 per Share.

Terms of the Offering:

The Offering will terminate on, or prior to, November 26, 2009, subject to one or more extensions, in our sole and absolute discretion, with no restriction upon either the number of extensions or upon the length of time for each of said extensions. This Offering may be so extended without amending this Private Placement Memorandum and without notice to either the investors who have submitted their subscription documents to us or to prospective investors. We are offering the Shares on a "best efforts" basis with no minimum number of Shares required to be sold. We may in our discretion accept subscriptions for fractional Shares; provided however, that no fractional shares of Common Stock may be issued.

11

Exhibit ____7____    Page ___69___

**Use of Proceeds:**

Assuming the sale of the maximum of 10,000,000 Shares offered herein, our net proceeds are expected to be approximately $8,350,000, after deducting commissions, legal, printing and other expenses of the Offering. We contemplate utilizing the net proceeds of this Offering for (i) expansion of our business including, but not limited to, purchasing new equipment for the purposes of then renting out such equipment, either as part of packages where customers rents our facilities, or part of arrangements where we rent out and deliver our equipment to our customers for their use at their locations, (ii) to repay existing debt; and (iii) for expenses related to this offering.

**Risk Factors:**

An investment in the Shares offered hereby is speculative and involves a high degree of risk. There can be no guarantees of profit, or against loss, as a result of purchasing Shares. Only those investors who can afford immediate and substantial dilution and a total loss of their investment should consider purchasing Shares. See "RISK FACTORS" and "DILUTION."

**Registration Rights/Transferability/Liquidity:**

The Shares being offered hereby have not been registered under the 1933 Act or under the securities laws of any state. The Shares are offered pursuant to an exemption from registration under the 1933 Act in reliance upon intended compliance with the provisions of Sections 4(2) of the Act and Rule 506 of Regulation D promulgated under the Act. Accordingly, the Shares may not be sold, pledged, hypothecated, donated or otherwise transferred, whether or not for consideration, until we register the Shares or an exemption from registration applies. Although the Shares shall not be registered in various states, we shall comply with the registration or other qualification requirement concerning the offering of securities in each state in which the Shares shall be offered. In addition to restrictions under federal laws, the Shares purchased in one state cannot be sold, transferred, pledged or hypothecated in that state or in another state until we have registered the Shares or an exemption

Exhibit ___7___  Page _69A_

under state securities law applies. We are not presently a reporting company pursuant to either Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "1934 Act"), and therefore, do not presently file any reports with the Securities and Exchange Commission (the "SEC"). No public offering of our Common Stock is contemplated in the foreseeable future. There is no certainty with respect to if, and when, a public market shall develop. Investors should understand that the Shares are not liquid and may have little or no value if an Investor desires to liquidate his or her investment in the Shares. Accordingly, the Shares should not be purchased by anyone who requires liquidity or who cannot afford a complete loss of his investment. The lack of liquidity of, and significant risks associated with, an investment in us makes the purchase of Shares suitable only for an Investor who has substantial net worth, who has no need for liquidity with respect to this investment, who understands the risks involved and has reviewed these risks with his or her legal and investment advisors, and who has adequate means of providing for his or her current and foreseeable needs and contingencies. See "RISK FACTORS"         -"Registration         Rights/ Transferability/ Liquidity".

**Closing:**

The Offering shall terminate on November 26, 2009, subject to one or more extensions, in our sole and absolute discretion with no restrictions upon either the number of extensions or upon the length of time for said extensions. This Offering may be so extended without amending this Memorandum and without notice to either the investors who have submitted their subscription documents to us or to prospective investors. The Initial Closing will be held when we first accept subscriptions for one or more Share, as determined by our management, in its sole and absolute discretion. Subsequent subscriptions shall be accepted as determined by us in our sole and absolute discretion.

13

Exhibit ___7___ Page ___70___

# EXECUTIVE SUMMARY

LADP, LLC ("LA Digital") rents post-production editing systems and provides technical support to major film and television clients. LA Digital owns 198 non-linear digital editing systems with an average utilization rate of 77%.

LA Digital rents editing systems to its customers on a short-term basis, typically six to 50 weeks, for use at the client's site or at one of the 99 editing rooms located at LA Digital's four facilities in Los Angeles and New York.

As part of editing system rentals, LA Digital provides custom configuration, full-service installation, and 24/7 technical support. LA Digital clients include major film studios (e.g. 20th Century Fox, Paramount Pictures, Warner Brothers, New Line Cinema, Lions Gate), major television networks (e.g. ABC, NBC, CBS), cable television networks (e.g. HBO, E! Entertainment, Versus), and independent production companies (e.g. Mark Burnett Productions).

**Reputation for Quality and Customer Service.** Over the past fourteen years, LA Digital, has established a reputation for high quality products and customer service. They have created strong brand name within the entertainment industry. LA Digital, in particular, has been able to price its services at a slight premium to the pricing of its competitors, which reflects the superior service and reliability that LA Digital provides its customers.

Generally, the Company does not have any long-term or exclusive agreements with its customers, and therefore business is won based on customer satisfaction with reliability, timeliness, quality and price.

**Strong Customer Relationships.** Management has formed strong strategic relationships with a significant number of major motion picture studios, such as 20th Century Fox, Paramount Pictures, Warner Brothers, New Line Cinema and Lions Gate, and cable and television networks, such as ABC, NBC, CBS, HBO, MTV, E! Entertainment and Versus. These networks and studios rely on the Company to deliver high-quality equipment and technical support.

Frequently, Management will be invited to project planning meetings to assist and consult on post-production matters. The Company also maintains strong relationships with directors, editors, and various other decision makers who are involved in selecting equipment rental providers. These customer relationships act as an effective barrier to entry to potential new competitors.

**Niche Market in Large and Stable Industry.** The Company provides a niche service within the larger post-production services market, which according to Fortis Bank is a $4 billion industry. The Company rents post-production editing equipment to its customers, who are looking to outsource the equipment management, technical support staffing, and technology risk related to the owning post-production equipment. According to First Research, the demand for post-production editing equipment and related services is dependent upon the overall $46 billion film and television production industry which is projected to grow at a 4.1% annual rate through 2012.

**Experienced Management Team**
Gary Migdal, currently CEO and President of LA Digital, joined the firm in 1995 and has over 24 years of post-production management experience and has extensive industry relationships. By retaining significant ownership in the Company, Management believes it will have the proper incentives in place to remain focused on the business.

14

Exhibit _____ 7 _____ Page _____ 71

## Products

The Company primarily rents post-production editing equipment consisting of non-linear digital editing systems, data storage devices, video tape recorders and other peripherals. The Company also provides technical support services, rents editing rooms (in conjunction with renting editing systems), and on occasion sells equipment

## Pricing

Pricing for the Company's products and services is generally customized on a project by project basis. However in general, the Company is considered to be a higher-cost provider amongst its competitors. Despite this, the Company has been able to maintain its blue chip customer base by offering the latest in digital editing technologies and providing unequaled customer support.

## Rent Versus Own Rationale

While certain editors and post-production companies purchase editing equipment for in-house use, a sizable portion rent editing equipment for economic and practical reasons: (1) initial capital costs to purchase post-production editing equipment are high, (2) multiple non-standard video formats necessitate a large inventory of editing systems, video tape recorders, and components to accommodate the demands of different projects, (3) project-by-project nature of the entertainment industry results in relatively low utilization rates on equipment owned in-house versus equipment owned by third-party rental companies, (4) deadline-sensitive nature of projects requires the highest level of technical support, with dedicated personnel on-call 24/7 – an expensive proposition for most service providers in the entertainment industry, and (5) on-going costs to manage, maintain and store editing equipment are significant. For these reasons, customers outsource to the Company the equipment management, technical support staffing, and technology risk associated with owning post-production editing equipment, in order to focus on the artistic and creative processes.

## Equipment Rentals

The Company rents complete editing and finishing systems, data storage devices, video tape recorders, and other components. Equipment is delivered for use at the client's site or at one of the Company's facilities in Los Angeles and New York. The equipment is typically rented between six and 50 weeks with billing on a weekly basis. Historically, equipment is rented for an average period of 30 weeks.

The Company differentiates itself within the market by offering its clients the very latest in existing and emerging digital editing technologies, and providing them with technical expertise and support infrastructure. Editing systems are custom configured for every client to meet the specific needs and demands of each individual project. All systems undergo vigorous testing and diagnostics prior to the start of any editing project deployment. Systems are fully integrated to help eliminate potential problems, increase reliability and create a more user-friendly interface. A key selling point for customers is access to the Company's highly skilled technical support staff, who can be available on-site at the client's site or via a 24/7 call center. The Company also makes service and maintenance contracts available to customers that purchase systems.

An editing system consists primarily of (1) editing software (e.g. Avid or Apple) that operates on a

Exhibit _____ 7   Page ____ 72

high-powered computer (e.g. Mac or PC), and (2) input/output device for video and audio, also known as a break-out box. A typical editing system will also include data storage devices, video tape recorders, monitors, speakers and other components. A picture of a typical editing system is shown below.

The Company currently owns 473 systems that can be used for editing and finishing.

<u>Editing Systems</u>

*Avid Media Composer.* Avid Media Composer is the worldwide standard for non-linear digital editing software.
Media Composer converts video and audio from video tape to digital media, stores the digital media on a range of data storage devices, then allows the user to preview, play back and edit the digital media. Media Composer can be combined with a Meridien or an Adrenaline hardware accelerator. Hardware accelerators perform intensive media
processing tasks such as scaling, compression, and filtering that would otherwise slow down editing that is processed on the host computer.

     

Avid Meridien Media Composer                    Avid Adrenaline Media Composer

The Company has 242 Meridien systems and 160 Adrenaline systems, which are typically rented on a weekly basis for $650 and $1,000, respectively.

*Apple Final Cut Pro.* Final Cut Pro is a competing editing software program developed by Apple. The Apple Final Cut Pro has the ability to process many formats including DV, HDV, DVCProHD, XDCAM, 2K, and IMAX. The software logs and captures video onto the computer's hard drive, where it can be manipulated and edited. The Company has 25 Apple Final Cut Pro systems, which are typically rented on a weekly basis for $675.



Exhibit _____ 7 _____ Page _____ 73

Editing Systems, Finishing

*Avid Symphony.* Avid Symphony is a digital, non-linear video editing system that is used for finishing. Finishing refers to final touch-up enhancements that include color correction, transition effects, and shot stabilization. Avid Symphony differentiates itself from Avid Media Composer with the addition of secondary color correction, uncompressed high definition support, higher real-time performance, and other advanced features. Avid Symphony can be combined with a Meridien or a Nitris hardware accelerator.





Avid Symphony Meridien                    Avid Symphony Nitris

The Company has 36 Avid Symphony Meridien systems for standard definition finishing and ten Avid Symphony Nitris systems for high definition finishing. The Company rents the Symphony Meridien and Symphony Nitris on a weekly basis for $1,400 and $2,900, respectively.

Data Storage

Digital video editing creates an immense amount of data which must be stored and accessed either through local storage or networked storage devices. The Company offers a certain amount of data storage as part of its editing system rental packages, but also provides additional storage if requested for additional charge.

*Local storage.* The Company rents local storage devices (i.e. hard drives) that range from 36 gigabytes (1 gigabyte = $10^9$ bytes) to 2 terabytes (1 terabyte = $10^{12}$ bytes). The Company has a variety of Avid hard drives that can store 36-146 gigabytes and rent for $20-$50 per week. For greater storage capacity and data redundancy, the Company also offers Avid disk arrays that can hold 1-2 terabytes of data and rent for $300-$600 per week.

*Networked storage.* The Company rents networked storage solutions which allow multiple editors to share data and work collaboratively. The Company offers Avid Unity LANshare which can store 2,880-8,000 gigabytes of data and can be accessed simultaneously by up to 20 editors. The Company rents the Avid Unity LANshare, which costs $50,000-$100,000 depending on the storage option, for $1,400-$4,000 per week.

17

Exhibit ___7___   Page ___74___

## Video Tape Recorders

Video tape recorders are used to play and record video. The Company rents a large array of standard definition and high definition video tape recorders including:



| Standard Definition: | High Definition: |
|---|---|
| ⓐ Beta | ⓐ XDCAM |
| ⓐ Digibeta | ⓐ IMX |
| ⓐ DVC Pro | ⓐ HDCAM SR |
| ⓐ DVCAM | |

The Company rents video tape recorders for approximately $150-$3,750 per week depending on the model.

## Other Peripherals

The Company also offers peripherals and other miscellaneous equipment for rent to its customers. These products range from monitors and speakers to additional computers. Below is a list of typical peripherals and other miscellaneous equipment the Company rents to its customers:



| | |
|---|---|
| ⓐ Audio recorders and players | ⓐ Monitors and scopes |
| ⓐ High definition decoders, sync generators, serial digital legalizers | ⓐ Speakers |
| | ⓐ Computers |
| | ⓐ Furniture |
| ⓐ Audio mixers | |

18

Exhibit ___7___ Page___75___

## Technical Support

The Company is one of only a few Avid Authorized Level 3 Support Providers worldwide. As an authorized provider, the Company can offer Avid Assurance maintenance contracts. Avid Assurance contracts provide total customer support including unlimited telephone support, access to system software maintenance releases, discounts on spare parts and advanced parts exchange. Avid Assurance is offered to customers who purchase equipment from the Company. The Company is also an Authorized Apple Service & Support Agent.

The Company employs a highly qualified staff of Avid Certified Service Representatives who provide expertise for Avid editing systems, various SCSI and fibre channel storage devices, and editing system peripherals on both the Macintosh and Windows NT platforms. The Company has a substantial inventory of editing systems and spare parts readily available at all times. The Company's technicians are responsible for ensuring that the editing systems are well-maintained and are available for use on short notice.

The Company has annual service contracts with Warner Brothers, E! Entertainment and NBC Studios. For its other customers, the Company offers technical support services a la carte. The Company provides custom configuration, full-service installation and 24/7 technical support, which is typically priced at $125-$175 per hour.

## Editing Room Rentals

For those customers that do not have their own editing facilities or require overflow space, the Company provides 149 in-house editing rooms at seven locations in Los Angeles and New York. The rooms are turnkey editing environments that feature valet parking, a private security entrance, kitchenette, office/reception area, basic janitorial services, onsite security and 24-hour technical support along with the actual editing system. Each facility offers the Company's full line of editing products and services and can be custom configured to the specifications of each client.



The editing rooms are priced $200 to $600 per week, and are generally rented in conjunction with an editing system.

## Equipment Sales

Although its principal business is rental of editing equipment, the Company also occasionally sells equipment as an official Avid and Hewlett Packard reseller. In general, the Company targets gross margins of 15% to 30% when selling equipment to its customers. Note that in the projected financial results included herein, no equipment sales are assumed.

Exhibit ___7___   Page ___76___

## Capital Expenditures

According to Management, the post-production editing systems which the Company rents generally have up to a ten
year useful life. While editing technology is continually being improved by Avid, Apple, and other developers, adoption of new technology by the motion picture and television production industry occurs more slowly. The post-production industry tends to adopt the next generation of editing products only after it has undergone a field-testing period of at least one year. For example, Avid introduced Media Composer Adrenaline in 2003 as a replacement for Media Composer Meridien and discontinued production of Meridien as of December 31, 2006. Early adopters of Media Composer Adrenaline faced significant software and hardware problems with inadequate technical support from Avid. As such, a significant portion of the post-production community continues to utilize the familiar and proven Meridien systems. For the twelve month period ending September 30, 2007, the Company's Meridien systems experienced a utilization rate of approximately 60%.

Management typically purchases equipment in response to customer demand. Break-even on the cost of purchasing post-production editing equipment generally occurs within 36 weeks of being on rental (excluding costs of providing technical services).

Management will evaluate the cost-benefit of purchasing additional editing equipment on a system by system basis.
In the financial projections included herein, Management has projected that the Company will purchase 361 editing systems, 15 finishing systems, and additional storage and peripherals over the next five years at a cost of $11.0 million.

## Customers

The Company's customers include major film studios (e.g. 20th Century Fox, Paramount Pictures, Warner Brothers, New Line Cinema, Lions Gate), major television networks (e.g. ABC, NBC, CBS), cable television networks (e.g. HBO, MTV, E! Entertainment, Versus), and independent production and post-production companies (e.g. Mark Burnett Productions).

Because of the project-by-project nature of the entertainment industry, the Company has few long-term or exclusive service agreements. Customers typically rent post-production editing equipment for a duration of time that is dependent upon the type of project. On average, customers rent the Company's editing systems for a period of 30 weeks.

- Feature Film, Studio – 26 to 50 weeks
- Television Program – 6 to 12 weeks
- Feature Film, Independent – 12 to 40 weeks
- Television Series (episodic and reality) – Indefinite

## Industry Overview

The Company rents post-production editing equipment and provides technical support to major

20

Exhibit  7  Page  77

film and television clients. The Company provides a niche service within the larger post-production services market, which according to Fortis Bank is a $4 billion industry. The demand for post-production editing equipment and related services is dependent upon the overall $46 billion film and television production industry.

The entertainment industry creates motion pictures, television programming, and interactive multimedia content for distribution through theatrical exhibition, home video, pay and basic cable television, direct-to-home, private cable, broadcast television, on-line services and video games. Content is released into a "first-run" distribution channel, and later into one or more additional channels or media. Entertainment content produced in the United States is often exported and is in increasingly high demand internationally. In addition to newly produced content, film and television libraries may be released repeatedly into distribution.

**Post-Production**

As summarized in the chart below, the steps in creating a film or television show can be categorized into four broad areas: (1) Development, (2) Pre-Production, (3) Production, and (4) Post-production. Post-production refers to the final stage whereby video and audio recorded in the production phase is edited and manipulated. In addition to the editing of video and audio, post-production also includes the creation of soundtracks and special effects.



**Non-Linear Editing**

Non-linear editing for film and television postproduction is a modern editing method which involves being able to access any frame in a video clip with the same ease as any other. This method is similar in concept to the "cut and paste" technique used in film editing. However, when working with film, the editing process is destructive as the actual film negative must be cut. The introduction of digital video technology enabled a non-linear and non-destructive editing process. With digital editing systems, the original source files are not lost or modified. The editor works on low-resolution copies of the original video. This makes it possible to edit both standard-definition broadcast quality and high definition broadcast quality very quickly on normal computers which do not have the power to do the full processing of the huge full-quality original data in real-time. The editing system records the decisions of the editor in an edit decision list. The editing system makes it easy to change cuts and undo

21

Exhibit ____7____  Page____78

previous decisions simply by editing the edit decision list.

Exhibit ___7___ Page___79__

The market for post-production editing equipment rentals is directly affected by the volume of film and television production, and indirectly affected by the overall revenue of the film and television industry.

## Motion Picture Industry

According to First Research, U.S. motion picture production and distribution is a $33 billion industry. The industry is highly concentrated with the largest 50 companies accounting for almost 80 percent of revenue. Major companies include Disney, Sony Pictures, MGM, Paramount, Fox, Universal, and Warner Brothers. Production companies create movies that are released first in movie theatres and later through television, DVD, and other distribution channels. The industry is forecasted to grow at an annual rate of 4.1% between 2007 and 2012.

*Theaters.* In 2006, 607 films were released which generated box office receipts of $9.5 billion. Box office receipts have remained relatively consistent since 2002, despite an increase in the number of films released. According to PricewaterhouseCoopers, box office receipts will grow to $11.7 billion in 2011, a 4.2% annual growth rate. According to Variety.com, there were 997 films in some stage of post-production as of November 9, 2007.



23

Exhibit ___7___ Page__80

*Home Video.* The biggest market for motion pictures is the home video market, which consists of both movie rentals and movie sales. In 2006, the U.S. home video market was approximately $26.3 billion, the majority of which came from DVD sales. According to Veronis Suhler Stevenson, the U.S. home video market will grow to approximately $31.2 billion by 2011, a 3.5% annual growth rate. In terms of number of titles available, according to Digital Entertainment Group, there were 68,000 DVD titles available in 2006 up from 20,000 titles in 2002.



## Television Industry

According to First Research, U.S. television program production and distribution is a $13 billion industry and is forecasted to grow at an annual growth rate of 4.1% between 2007 and 2012. The industry is highly concentrated with the largest 50 companies accounting for almost 80 percent of revenue. The major companies include NBC Universal, CBS Paramount, Disney/ABC, Fox Television Studios, Warner Brothers, and Sony Pictures Television. Production companies create television movies, dramas, situational comedies (sitcoms), reality, game, talk shows, documentaries, children's, art, sports and news programs. Shows are aired initially on a "first-run" basis, then may be re-released in syndication and on other media like DVDs. The industry has been impacted by the following trends:

24

Exhibit _____7_____ Page_____81

*Reality Television.* The demand for equipment rentals has increased significantly since reality television became popular. The majority of the creation process for a reality television series is completed in post-production. Reality television requires more cameras, more footage, and therefore more editing equipment than traditional television programs. According to tvtracker.com, there will be 56 network reality series airing this season, up from 51 last year. Entire cable networks, including MTV and Bravo, build their original lineups almost exclusively with this genre.

*High Definition.* In the U.S., legislation has mandated a full transition of television broadcasts from analog to digital high definition signals by February 17, 2009. As a result, more media is being filmed and edited for distribution in high definition. Management is seeing greater demand from its customers for editing systems capable of editing and finishing high definition media, as well as greater demand for data storage.

*Existing Media Libraries.* There is a significant amount of post-production work related to the re-distribution of original programming in syndication, DVD and other media. As "first run" television programming moves from prime time to syndication, the content is edited to make room for more commercials. In addition, as existing media libraries of older television programs and films are converted for distribution on new media channels, the content is typically re-mastered, edited, restored, re-colored, converted and reformatted.

*Other Media.* The growth of content made for internet distribution will create opportunities for the Company. The content developed for YouTube.com and other "amateur" websites would not be the Company's target market, but rather the burgeoning number of internet-only broadcast channels that are producing first rate content.

## Vertical Growth Opportunities

Management is evaluating several opportunities to expand its product offerings vertically and provide existing customers a "one stop shop" for their other production and post-production needs. Management is evaluating production equipment rental such as lighting and equipment storage. In addition, the Company is evaluating partnering with another company to market digital asset management technology for safeguarding content transmitted over the internet or via satellite.

## Competition

The Company is one of the largest providers of post-production editing equipment rentals with approximately 473
editing systems and 149 editing rooms. The post-production editing equipment rental market is a highly competitive industry centered in Los Angeles and New York, where most of the domestic motion picture and television production is located. A large number of companies

Exhibit _____7_____ Page__82__

offer post-production services with no single provider having a dominant market share. In addition, the major film studios and television networks often have the capability to perform in-house some or all of the services the Company offers. The Company competes for customers based on reliability, timeliness, quality and price.

Management considers companies in Los Angeles and New York with inventories of 50 or more editing systems to be the Company's most direct competitors. A list of such competitors is shown below followed by brief descriptions.

*Wexler Video.* Wexler Video rents production (e.g. cameras) and post-production equipment. Wexler Video is generally considered to be a low cost provider with a lower level of customer service. Wexler is located in Los Angeles and has been in business for more than 20 years. Management estimates the company has 500 to 600 editing systems and does not offer editing rooms. Telecorps Holdings, LLC, sponsored by H.I.G. Capital, purchased the company in March 2007. Terms of the transaction were not disclosed.

*Postworks Orbit.* Postworks Orbit provides digital equipment rentals to the motion picture and television production industry. The company also offers rentable editing rooms. Postworks Orbit has offices in Los Angeles and New York and Management estimates that the company has approximately 300 editing systems and 50 editing rooms for rent. The company was formed by the merger of Postworks and Orbit Digital in October 2006.

*Pivotal Post.* Pivotal Post provides digital equipment rentals to the motion picture and television production industry. The company is headquartered in Los Angeles with additional offices in New York and the United Kingdom. Management estimates that the company has 150 editing systems and 20 editing rooms.

*Digital Symphony (Division of Ascent Media Group).* Digital Symphony provides complete Avid editing systems at remote locations and through in-house editing rooms for rent. The company also provides customer service and technical support to their customers. Digital Symphony is located in Los Angeles and Management estimates the company has 100 to 150 editing systems and over 30 editing rooms.

*Global Entertainment Partners.* Global Entertainment Partners was formed in 1994 as an Avid Rental company serving the feature film industry. Since then, the service offering has expanded to include post-production film transfers including high definition and standard definition Telecine of feature film dailies as well digital mastering. The company also offers technical support and customer service. The company has two locations in Los Angeles and Management estimates that the company has 80 editing systems and 30 editing rooms.

*Atlas Digital.* Atlas Digital provides digital equipment rentals to the motion picture and television production industry. Atlas Digital has one office in Los Angeles. Management estimates that the company has 75 to 80 editing systems.

Exhibit _____7_____ Page_____83_____

*Runway Editorial.* Runway Editorial provides digital equipment rentals such as Avid and Final Cut Pro and rents editing rooms to the motion picture and television industry. The company also provides customer service and technical support to their customers.
Runway has four offices in the Los Angeles area. Management estimates that the company has 50 to 60 editing systems and 18 editing rooms. Runway Editorial is owned by The New Post Group which is a full-service production company.

*Catalyst Digital.* Catalyst Digital provides digital equipment rentals to the motion picture and television production industry. Management estimates that the company has approximately 50 editing systems for rent.

*Go Edit.* Go Edit provides digital equipment rentals to the motion picture and television production industry. The company also offers rentable editing rooms and customer support. Go Edit is located in Los Angeles and management estimates that the company has 25 to 50 editing systems.

## Vendors

The Company purchases new post-production editing systems and components primarily from Avid Technology,
Inc. (NASDAQ: AVID). The Company also purchases used and refurbished equipment from various other sources.

Avid is considered the industry standard, with the majority of major feature films, television programs, and commercials created with its systems. Avid estimates that approximately 90% of primetime television shows, 85% of feature films, and 80% of commercials are made using one or more Avid products. The Company is one of the largest Avid Authorized Rental Centers in North America and benefits from preferred pricing when purchasing equipment from Avid.

The Company typically secures commitments from customers before new inventory is purchased and made available for rent. Equipment is sourced from multiple locations, with the Company preferring to located used or refurbished equipment from bankrupt businesses, competitors, customers, resellers or other third parties. The Company typically updates its equipment to keep up with industry improvements but primarily in response to customer demand.

## Sales & Marketing

The Company markets its services through industry referrals, regular contact with the existing client base, a direct sales force, trade show participation, and trade publication advertising. The Company relies primarily upon its strong brand reputation in the industry and certain strategic business relationships to bring in referral business.

Exhibit _____7_____ Page_____84

The Company maintains a nine person direct sales force that regularly calls upon existing customers and customers who have rented from the Company in the past, as well as reaching out to potential new customers. One of the sales initiatives has been the Company's "preferred vendor" program. Through this initiative, the Company offers customers preferred rental rates in exchange for promotion within the customers' organization as the preferred provider of post-production editing equipment and technical support services.

Management also has aligned itself closely with key organizations in the post-production editing community. The Company works with strategic organizations to coordinate and sponsor educational and value-added industry events. These organizations include the *Directors Guild of America*, the *Motion Picture Editors Guild*, the *American Cinema Editors Society*, the *Hollywood Post Alliance*, and the *International Avid Users Group Organization*.

In addition, the Company regularly advertises in trade publications for editors including the *ACE Guild* and the *Motion Picture Editors Guild*. The Company also advertises in the *Blubook, LA 411*, and *Creative Handbook*, which are service provider listings frequently utilized by the entertainment industry. The Company spent approximately $250,000 on advertising for the twelve month period ended September 30, 2007. The Company also maintains an internet presence through its websites: ladigital.com.

## Company History

*LA Digital*. LA Digital was founded in 1995. In August 2003, Marc Bercoon, Will Goldstein and another partner (who has since been bought out) purchased LA Digital for an enterprise value of approximately $11.2 million. Mr. Bercoon and Mr. Goldstein together own 77.6% of the fully-diluted membership interests in LA Digital. LA Digital currently employs 43 people at four offices. LA Digital has 198 editing systems and 99 editing rooms.

## Corporate Structure

LADP has two wholly owned subsidiaries (i) LA Digital Post, Inc. a California corporation with operations in Los Angeles and (ii) LADP New York, LLC a Delaware limited liability company with operations in New York.

## Management

The Company's management team is comprised of individuals who have diverse and complementary skills and
substantial collective experience in the media and technology industries. Management and the directors on the Board of Directors are summarized below.

Exhibit ____7____   Page____85

**Gary Migdal,** *President (LA Digital)*
Gary Migdal is the President of LA Digital. Mr. Migdal has been with the LA Digital since its
inception in 1995. Mr. Migdal has over 24 years of post-production management experience and
has extensive industry relationships.
Mr. Migdal will be responsible for the Company's sales effort. Prior to joining LA Digital, Mr.
Migdal held senior management positions at three other leading post-production companies in the
Los Angeles area.

**Don Schiada,** *Controller (LA Digital)*
Don Schiada is the Controller of LA Digital. Mr. Schiada has 20 years of accounting
experience, including five years with LA Digital. Previously, Mr. Schiada served three years as
General Accounting Manager at the California Power Exchange, and prior to that, served
eight years as Assistant Controller at the insurance division of Countrywide Funding. Mr.
Schiada is a CPA.

**Marc Bercoon,** *Vice Chairman & Interim Chief Financial Officer*
Marc Bercoon will be a Vice Chairman of the Company and will act as an Interim Chief
Financial Officer of the Company until a permanent replacement is found. Mr. Bercoon began
his career as an attorney with a Chicago- based national law firm currently known as Katten,
Muchin, & Rosenman, followed by various senior positions with the Equity Group, a private
investment company owned and controlled by Chicago investor, Sam Zell. Mr. Bercoon has been
partners with Will Goldstein since October 2001 in various ventures, including JC
Nationwide, Inc. a physician staffing company founded by Mr. Goldstein in 1992. Mr.
Bercoon was Vice Chairman and Chief Financial Officer for JC Nationwide, Inc., until it was
sold in January 2005. In August 2003, Mr. Bercoon, Will Goldstein and another partner (who
has since been bought out) purchased LA Digital. Prior to 2001, Mr. Bercoon as a Vice President
of the Trump Group, a private investment company based in South Florida with over $1 billion of
assets under management. Mr. Bercoon earned his B.S. in Accountancy with high honors from the
University of Illinois (Urbana, IL) and his J.D. from the UCLA School of Law. Mr. Bercoon
passed the Illinois CPA exam in 1982.

**Will Goldstein,** *Chairman*
Will Goldstein will be Chairman of the Company. Mr. Goldstein is an investor/entrepreneur who
has been involved in the formation and development of many businesses. Mr. Goldstein
began his professional career as an entrepreneur in 1987 by acquiring a locksmith and
security store with one location in Norfolk, Virginia. Mr. Goldstein grew this business to four
locations and in excess of 20 mobile units. In 1992, Mr. Goldstein sold the firm to the largest
security company in Virginia. In the same year, Mr. Goldstein founded Nationwide Medical
Services, Inc., a physician staffing company. Under Mr. Goldstein's leadership, Nationwide
Medical grew at a rate of in excess of 200% per year for its first six years, achieving $18
million in sales by 1998. Mr. Goldstein successfully negotiated and managed Nationwide
through a series of transactions, including the 1998 merger between Nationwide and
Jackson & Coker, in which the surviving entity became JC Nationwide. With Mr. Goldstein
as Chairman and CEO, JC Nationwide grew to approximately $70 million in revenue. In January
2005, JC Nationwide was acquired by World Health Alternatives, a publicly traded health care
staffing company. Mr. Goldstein has been partners with Marc Bercoon since October 2001 in

Exhibit ___7___ Page ___86___

various ventures, including JC Nationwide, Inc. In August 2003, Marc Bercoon, Will Goldstein and another partner (who has since been bought out) purchased LA Digital. Mr. Goldstein earned his Bachelor's Degree in Business Administration from Old Dominion University.

## Employees

The Company had 97 full-time employees as of September 30, 2007 as summarized below:

| Employees by Department | | | | | |
|---|---|---|---|---|---|
| | | | Annual Compensation | | |
| | | Employees | | Average | Total |
| Technicians | | 32 | $ | 65,738 | $ 2,103,615 |
| Administrative | | 17 | | 48,569 | 825,674 |
| General | | 15 | | 64,685 | 970,280 |
| Finance | | 11 | | 51,049 | 561,535 |
| Sales | | 9 | | 97,471 | 877,236 |
| Warehouse | | 8 | | 34,186 | 273,485 |
| Executives | | 5 | | 338,000 | 1,690,000 |
| | | 97 | $ | 75,277 | $ 7,301,825 |

Exhibit _____ 7 _____ Page _____ 87 _____

## Terms of the Offering

### Offering procedures

A maximum of 10,000,000 Shares are being offered by us at a price of $1.00 per Share (a maximum of $10,000,000). There is no minimum number of Shares which must be sold for completion of this Offering. The Offering shall terminate after the sale of such number of Shares as we, in our sole and absolute discretion, determine or with the sale of the maximum of 10,000 Shares. Our affiliates and members of our Management may purchase Shares for their own accounts.

The Offering shall terminate on November 26, 2009, subject to one or more extensions, in our sole and absolute discretion with no restrictions upon either the number of extensions or upon the length of time for said extensions. This Offering may be so extended without amending this Memorandum and without notice to either the investors who have submitted their subscription documents to us or to prospective investors.

The Initial Closing will be held when we first accept subscriptions for one or more Shares, as determined by our management, in its sole and absolute discretion. Subsequent subscriptions shall be accepted as determined by us in our sole and absolute discretion.

We reserve the right, in our sole and absolute discretion, to withdraw or modify this Offering and to reject any subscription for Shares in whole or in part. In the event of a complete rejection, we shall return to the prospective Investor all of his or her subscription documents and subscription funds, without interest. In the event of a partial rejection, we shall return to the applicable Investor the appropriate portion of his or her subscription funds without interest, and the applicable Investor shall be required to deliver to us promptly such other documents as we may request, including, but not limited to, a newly executed Subscription Agreement.

### Subscription Price of Shares

The Subscription Price is $1.00 per Share. We, in our sole and absolute discretion, may sell fractional Shares to an Investor; provided, however, that no fractional shares of common stock may be issued. The investment is payable by each Investor upon delivery of a duly completed Subscription Agreement and the other required documents as hereinafter described.

### Plan of Distribution

Subscriptions for Shares shall be solicited on a "best efforts" basis by us on our own behalf and/or through registered broker-dealers and finders. We shall pay a selling commission of twelve and a half (12.5%) percent of the Subscription Price per Share and a non-accountable expense allowance of three (3%) percent, if such payments are permitted under applicable federal and state securities laws. All commissions shall be paid by us promptly after (i) acceptance of the subscription for Shares, (ii) receipt of all necessary documentation and (iii) the

Exhibit _____ 7 _____ Page _____ 88 _____

applicable Closing.  To the extent the aforesaid commissions are not payable, the amount which shall be available for expansion of our business shall be increased.  See "USE OF PROCEEDS."

Persons who assist in the sale of Shares may be deemed "Underwriters" as that term is defined in the 1933 Act, and the compensation received may be deemed to be "underwriting compensation."  We may indemnify certain broker-dealers and finders against certain liabilities, including liabilities under the 1933 Act.

## Method of Purchasing Shares

Offers to purchase Shares should be made by completing, signing and returning to the company, LADP Corp, 5 Concourse Parkway, Atlanta, Georgia 30328.

(1) the Purchaser Questionnaire, substantially in the form of Exhibit "A" which is contained in the Subscription Package;

(2) the Purchaser Representative Questionnaire, substantially in the form of Exhibit "B" which in contained in the Subscription Package, if an Investor utilizes the services of a Purchaser Representative;

(3) the Subscription Agreement, substantially in the form of Exhibit "C" which is contained in the Subscription Package; and

(4) a check in an amount equal to the number of Shares subscribed for multiplied by $10.00 payable to "_____; " or wire funds in an amount equal to the number of Shares subscribed for multiplied by $10.00 plus a wiring fee of $20 to _____, to the following account:

_____

_____

_____

Attn: _____,
Tel: (###) ###-####
Fax: (###) ###-####

ABA/Routing No.: #########
Account No.: _____
Account of: _____
              ACCOUNT
Subscriber: [INSERT INVESTOR NAME]
Reference:   LADP Corp

47

Exhibit ___7___ Page ___89___

## Risk Factors

An investment in our securities involves a high degree of risk. If any of the following risks actually occur, our business, financial conditions and operations will be materially affected.

**Technological advances will require additional spending.** Customer acceptance of and demand for newly introduced editing technology may require the Company to upgrade its existing equipment inventory or purchase new equipment. In general, Management purchases equipment in response to customer demand. The cost of purchasing equipment is generally recovered within 36 weeks of rental (not including costs of providing technical support services). On average, customers rent the Company's editing system for a period of 30 weeks. Therefore, on average, the cost of the purchasing an editing systems has been nearly repaid by the end of the first rental period. The relatively rapid break-even period mitigates the risk from technological obsolescence as the equipment has essentially already been "paid for". Management has projected that the Company will purchase 361 editing systems, 15 finishing systems, and additional storage and peripherals over the next five years at a cost of $11.0 million.

**Decreasing cost of equipment may induce customers to purchase.** Over the past ten years, the cost to purchase Avid editing systems and storage has decreased and may continue to decrease in the future. Lower equipment costs may induce some of the Company's customers to purchase equipment rather than rent it from the Company. Management believes the initial equipment cost is only one aspect of the total cost, which also includes on-going technical support and servicing. In addition, customers are generally unable to match the high utilization rates that equipment rental companies are able to achieve. Management also believes that customers are unwilling to be "long" on technology, and are unwilling to manage an equipment inventory. Instead, customers are looking to outsource technology risk, technical support staffing, and equipment management, to focus instead on the artistic and creative processes.

**Customer concentration.** The Company's primary customers are major film studios, television networks, cable networks, and independent production companies. The Company's three largest customers compose approximately 20% of total revenue. The loss of one or more of these customers could adversely affect the business.

**Industry is highly competitive.** The post-production industry is a highly competitive, service-oriented business. The Company competes with a variety of post-production firms some of which have a national presence and, to a lesser extent, the in-house post-production operations of its major motion picture studio customers. In addition, the Company does not have any long-term or exclusive rental agreements with its customers. Business is acquired on a purchase order basis and is based primarily on customer satisfaction with reliability, timeliness, quality and price.

**Protracted writer's strike will negatively affect revenues.** The Company derives

Exhibit ___7___ Page__90__

substantially all of its revenue from clients in the entertainment industry. Management believes the current Writer's Guild of America (WGA) strike could have a negative impact on the Company if it continued beyond 12 months. An extended writer's strike would decrease the production (and related post-production) of film and television programming. The impact on the Company would be somewhat mitigated because (1) reality television shows, which composed a significant portion
of the Company's revenues, are expected to take the place of shows that were written by WGA writers, and (2) feature films, for which studios have stockpiled enough scripts to continue film production through 2008 and 2009, will continue to be produced in the near future.

**Operating costs are relatively fixed in the short-run.** The Company's largest expenses are salaries and rent, which were approximately $8.7 million and $2.8 million, respectively in LTM 9/30/07. These costs are largely fixed
in the short-run, and can not be quickly reduced if revenues decrease.

**Loss of key personnel would adversely affect business.** The Company is dependent on the efforts and abilities of certain senior management, particularly those of David Pincus, Josh Kandal, and Gary Migdal. In addition, the Company's success depends upon its ability to attract and retain qualified sales, operations, and technical personnel. The competition for qualified personnel is intense and the loss of any such persons, and as well as the failure to recruit additional key personnel in a timely manner, could have a material adverse effect on the Company.

**We may need additional financing to fund our ongoing operational needs and to meet our loan obligations.**

It is possible, even if the maximum number of Shares offered pursuant to this Memorandum are purchased, that we shall require additional financing to meet our capital requirements and loan obligations. This would be more likely if fewer than the maximum number of Shares are purchased. If we require additional financing, we shall be dependent upon sources such as:

- future earnings;

- the availability of funds from private sources, including, but not limited to, our shareholders, loans and additional private placements; and

- the availability of funds from public sources including, but not limited, an initial public offering of our securities which we intend at some point to proceed with.

Market conditions for private and public offerings are subject to uncertainty and there can be no assurance when or whether a private and/or public offering shall be successfully completed or that other funds shall be made available to us. Our ability to obtain additional funds is limited. Such financing may only be available, if at all, upon terms which may not be advantageous to us. If adequate funds are not available from operations or additional sources of financing, our business shall be materially adversely affected.

Exhibit _____7_____ Page___91___

We contemplate utilizing the net proceeds of this Offering to repay some of our outstanding debt and fund our intended expansion of the business.

**We do not currently pay dividends on our Common Stock**

We do not currently pay dividends on our Common Stock and do not anticipate paying any in the foreseeable future. There can be no assurance that we will have sufficient earnings to earnings to pay any dividends with respect to our Common Stock. Moreover, even if we had sufficient earnings, we are not obligated to declare dividends with respect to our Common Stock. Presently, we intend to retain earnings, if any, for our business. It is also possible that the terms of any future debt financing may restrict the payment of dividends.

**Control**

Upon completion of this Offering, assuming the sale of the maximum number of Shares issued in this Offering, Subscribers will own 10 % of our issued and outstanding Common Stock and will not be in a position to exercise any control over any part of our operations.

**There can be no assurance of a public market for our securities**

There is no current market for our securities. There can be no assurance that a market will exist in the future. We are contemplating conducting an Initial Public Offering ("IPO") in the future. However, there can be no assurance that we will attempt an IPO, or that any such attempt would be successful. There can be no assurance that, if a trading market does develop as a result of a future IPO, our Common Stock can be resold either at or near its original offering prices.

**The Shares being offered by this Memorandum are not registered with the Securities and Exchange Commission and are therefore restricted from transferability**

None of our securities has been registered under the Act or under the securities laws of any state. The Shares of Preferred Stock and the Common Stock issuable upon conversion of the Preferred Stock (collectively, the "Securities") may not be sold, pledged, hypothecated, donated or otherwise transferred, whether or not for consideration, except upon registration or the issuance to us of a legal opinion, acceptable to our counsel, that the transfer of the Securities does not violate the Act, as then in effect, and applicable state securities laws. In addition, each investor will be required to agree not to sell the Securities acquired pursuant to this Offering for a Lock-Up Period after the closing of an IPO which we intend to proceed with at some point in the near future as may be required by the underwriters of the IPO or the NASD.

**Conflicts of Interest**

The Offering which is described in this memorandum involves or may involve conflicts of interest among the persons who are associated with this Offering including, but not limited to,

Exhibit ___7___ Page _92_

engaging in other businesses similar or dissimilar to ours and allocating their time and services between us and any such other entities.

**The Shares being offered by this Memorandum are not a liquid investment of funds.**

There is presently no market for the Shares of Common Stock and, in the absence of an IPO, it is foreseeable that no public market will develop. None of the Securities have been registered under the Act or any Blue Sky Law, and, therefore, cannot be resold until subsequently so registered or unless an exemption therefrom is available. It is anticipated that Rule 144 under the Act will not be available to investors in connection with such sales unless and until an IPO occurs.

The lack of liquidity of, and significant risks associated with, an investment in us, makes the purchase of Shares suitable only for an investor who has substantial net worth, who has no need for liquidity with respect to this investment, who understands the risks involved and has reviewed these risks with his or her legal and investment advisors, and who has adequate means of providing for his or her current and foreseeable needs and contingencies.

**Our Board of Directors has the authority to issue shares of Stock without shareholder approval.**

Our Board of Directors, within the limitations and restrictions contained in our Certificate of Incorporation and without further action by our shareholders, has the authority to issue additional shares of stock from time to time in one or more series and to fix the number of shares and the relative rights, conversion rights, voting rights, and terms of redemption, liquidation preferences and any other preferences, special rights and qualifications of any such series. Any issuance of stock could adversely affect the rights of holders of our Common Stock.

**Litigation and related matters**

Aspects of our current and future business activities involve risks of liability. We may be exposed to liability under federal and state securities laws, other federal and state laws and court decisions.

If the plaintiffs in any suits against us were to successfully prosecute their claims, or if we were to settle such suits by making significant payments to the plaintiffs, our operating results and financial condition would be materially and adversely affected. We do not carry insurance which would cover any such payments. Our certificate of incorporation provides that none of our directors shall be personally liable to us or our shareholders for damages for any breach of duty in such capacity, except as otherwise provided by applicable law. In addition, our by-laws provide for the indemnification of our officers, directors and agents to the maximum extent permitted under Delaware law. We may in the future be the subject of indemnification claims by our officers, directors or agents who are or may become defendants in litigation.

Exhibit _____ 7   Page_93

In addition, the defense of litigation may in the future, to a certain extent, divert the efforts and attention of our management and staff. The amount of time that management and other employees are required to devote in connection with the defense of litigation could be substantial and might materially divert their attention from their other responsibilities within the Company.

In the normal course of business, we may be defendant in various civil actions and arbitrations arising out of our activities as an employer and as a result of other business activities. There can be no assurance that substantial payments in connection with the resolution of disputed claims will not occur in the future.

**The price of the Shares in this Offering has been arbitrarily determined.**

The Offering price of the Shares has been arbitrarily determined by us and should not be construed as indicative of the value of the Shares. There can be no assurance that any of the Shares, if transferable, could be sold for the Subscription Price or for any other amount.

### Forward Looking Statements

Statements in this Memorandum discuss future expectations and plans, which are considered forward-looking statements as defined by section 27A of the 1933 Act and section 21E of the 1934 Act. Sentences which incorporate words such as "believes," "intends," "expects," "predicts," "may," "will," "should," "contemplates," "anticipates," or similar statements are based on our beliefs and expectations using the most current information available to us. This Memorandum should be read in conjunction with the financial statements and the notes to those statements which appear elsewhere in this Memorandum. In view of the fact that our discussions in this Memorandum are based upon our estimates and beliefs concerning circumstances and events which have not yet occurred, the anticipated results are subject to changes and variations as future operations and events actually occur and could differ materially from those discussed in the forward-looking statements. Moreover, although we reasonably expect, to the best of our knowledge and belief, that the results to be achieved by us will be as set forth in the following discussion, the following discussion is not a guarantee and there can be no assurance that any of the potential results which are described will occur. Furthermore, there will usually be differences between the forecasted and actual results because events and circumstances frequently do not occur as expected, and the differences may be material.

Exhibit _____7_____ Page___94_

### Dilution

The purchasers of the Shares being offered hereby will incur an immediate and substantial dilution.

### Capitalization

The following table sets forth our capitalization as of _____.

Exhibit ___7___ Page___95___

## PRINCIPAL SHAREHOLDERS

The following table sets forth certain information, as of the date of this memorandum, with respect to the ownership of our Common Stock by (i) each officer and director, (ii) each person (including any "group" as such term is defined in Section 13(d)(3) of the 1934 Act) known by us to be the beneficial owner of more than five (5%) percent of any class of our Common Stock and (iii) directors and officers as a group

| Name | Amount of Beneficial Ownership | Prior to Offering(1) | After this Offering: Assuming Maximum Sold (2) |
|---|---|---|---|
| ———— | ———— Common Stock | 100% | 90% |

54

Exhibit ____ 7 ____   Page ___ 96

## DESCRIPTION OF THE SECURITIES

**Common Stock**

We are authorized to issue one hundred million (100,000,000) shares of Common Stock (the "Common Stock"), par value $0.01. The holders of our Common Stock are entitled to one vote per each Share held and have the sole right and power to vote upon all matters upon which a vote of shareholders is taken. The holders are not permitted to vote their shares cumulatively. Upon our liquidation, dissolution, or winding up, the holders of the Common Stock shall be entitled to receive our net assets in proportion to the respective number of shares held by them. The holders of Common Stock shall not have any preemptive right to subscribe for or purchase any Shares of any class of stock. The outstanding shares of Common Stock and the Shares offered hereby shall not be subject to further call or redemption and shall be fully paid and non-assessable.

40,000,000 shares of our authorized 100,000,000 shares of Common Stock are issued and outstanding prior to this Offering.

Our subsidiaries have never paid any dividends on our Common Stock. There can be no assurance that we shall have sufficient earnings to pay any dividends with respect to the Common Stock. Moreover, even if we have sufficient earnings, we are not obligated to declare dividends with respect to the Common Stock. The future declaration of any cash or stock dividends shall be in the sole and absolute discretion of the Board of Directors and shall depend upon the earnings, capital requirements, our financial position, general economic conditions and other pertinent factors. It is also possible that the terms of any future debt financing may restrict the payment of dividends. To date, no dividends have been paid on our Common Stock and we presently intend to retain earnings, if any, for the development and expansion of our business.

## REPORTS TO SHAREHOLDERS

We intend to issue an annual report, including certified financial statements, to holders of our Common and Preferred shares. We shall provide such other reports as our Management, in its sole and absolute discretion, may deem necessary or appropriate.

Exhibit _____7_____ Page_____97_____

# PRIVATE PLACEMENT MEMORANDUM
# LADP CORP

### 10,000 Shares Common Stock

LADP Corp is a Delware corporation formed recently in May, 2009, which owns all the outstanding ownership interest of LADP, LLC which is the 100% owner of LA Digital Post, Inc. & Affiliate, a business entity which dates back to 1995. In this private placement memorandum (this "Memorandum"), the "Company," "us," "our," and "we" refer to LADP Corp. We rent post production editing equipment and provide technical support to major film and television clients.

The Offering (the "Offering") consists of Ten Million Shares of Common Shares ("Common Stock") offered at a price of $1.00 per Share. Each Share has a par value $0.01 per share. No public offering of our Common Stock is contemplated in the foreseeable future. There is no market for our Common Stock. We have arbitrarily determined the Subscription Price (hereinafter defined). The maximum amount which shall be raised pursuant to this Offering is Ten Million Dollars $10,000,000. The minimum amount which shall be raised shall be determined by us in our sole and absolute discretion. This Offering shall close after the sale of such minimum number of Shares as we in our sole and absolute discretion determine or with the sale of the maximum of Ten Million (10,000,000) Shares.

| | Subscription Price | Selling Commissions (1) | Proceeds to Company (2) |
|---|---|---|---|
| Per Share | $1.00 | $0.125 | $0.875 |
| 10,000 Shares (Maximum Offering) | $10,000,000 | $1,250,000 | $8,750,000 |

(1) We shall pay a selling commission to registered broker-dealers, "finders", individuals and entities legally authorized to receive such commissions (the "Selling Agents") of twelve and a half (12.5%) percent of the Subscription Price per Share sold, provided that such payments are permitted under federal and applicable state securities laws. We shall also pay a non-accountable expense allowance of three (3%) percent of the Subscription Price per Share sold which is not reflected in the above table, provided that such payments are permitted under federal and applicable state securities laws.

(2) Legal, printing and other expenses of the Offering, which are estimated to be approximately $100,000 if the maximum number of Shares is sold, are not reflected in the above table.

This Offering shall close after the sale of such minimum number of Shares as we in our sole and absolute discretion determine or with the sale of the maximum of 10,000 Shares. The total amount to be raised pursuant to this Offering is a maximum of $10,000,000. The Offering will terminate on or prior to November 26 2009, subject to one or more extensions, in our sole and absolute discretion, with no restrictions upon either the number of extensions or upon the length of time for each of said extensions. The Offering may be so extended without amending this Memorandum and without notice to prospective and/or existing Investors.

May 20, 2009

Exhibit ___7___ Page___98___

THE SECURITIES OFFERED PURSUANT TO THIS PRIVATE PLACEMENT MEMORANDUM AND THE EXHIBITS ANNEXED HERETO AND THE SUBSCRIPTION PACKAGE (COLLECTIVELY, THE "OFFERING MATERIALS") HAVE NEITHER BEEN FILED OR REGISTERED WITH NOR APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC").  THE SEC HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THE OFFERING MATERIALS.  NO STATE SECURITIES LAW ADMINISTRATOR HAS PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR THE ADEQUACY OF THE OFFERING MATERIALS, ANY REPRESENTATION TO THE CONTRARY OF WHAT IS STATED IN THIS PARAGRAPH IS UNLAWFUL.

THE INVESTMENT WHICH IS DESCRIBED IN THIS MEMORANDUM INVOLVES A HIGH DEGREE OF RISK AND THE PURCHASE OF THE SECURITIES SHOULD BE CONSIDERED ONLY BY PERSONS WHO: (1) CAN AFFORD TO SUSTAIN A LOSS OF THEIR ENTIRE INVESTMENT; (2) HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT; AND (3) HAVE ADEQUATE MEANS TO PROVIDE FOR THEIR CURRENT AND FUTURE NEEDS, INCLUDING CONTINGENCIES.

INVESTORS SHALL BE REQUIRED TO REPRESENT THAT THEY ARE FAMILIAR WITH, AND UNDERSTAND, THE TERMS OF THIS OFFERING.

THIS OFFERING IS BEING MADE PURSUANT TO AN EXEMPTION FROM THE REGISTRATION PROVISIONS OF THE SECURITIES ACT OF 1933 (THE "ACT" OR THE "1933 ACT"), AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS ("BLUE SKY" LAWS) FOR NON-PUBLIC OFFERINGS AND IN RELIANCE UPON INTENDED COMPLIANCE WITH THE PROVISIONS OF SECTIONS 4(2) OF THE ACT AND RULE 506 OF REGULATION D PROMULGATED UNDER THE ACT. THE SECURITIES WHICH WILL BE ISSUED WILL BE RESTRICTED AND CANNOT BE FREELY TRADED.  ACCORDINGLY, THE SECURITIES MAY NOT BE SOLD, PLEDGED, HYPOTHECATED, DONATED OR OTHERWISE TRANSFERRED, WHETHER OR NOT FOR CONSIDERATION, UNLESS THE SECURITIES ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION APPLIES. IN ADDITION TO RESTRICTIONS UNDER FEDERAL LAWS, THE SECURITIES PURCHASED IN ONE STATE CANNOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED IN THAT STATE OR ANOTHER STATE UNTIL WE HAVE REGISTERED THE SECURITIES OR UNLESS AN EXEMPTION UNDER STATE SECURITIES LAW APPLIES.

IN VIEW OF THE FACT THAT THIS OFFERING IS LIMITED SOLELY TO ACCREDITED INVESTORS, WE ARE NOT REQUIRED TO PROVIDE PROSPECTIVE INVESTORS WITH DISCLOSURE WITH RESPECT TO OUR COMPANY. THIS DOCUMENT IS NOT INTENDED TO BE A FULL DISCLOSURE DOCUMENT; IT IS ONLY INTENDED TO PROVIDE PROSPECTIVE INVESTORS WITH A BRIEF OVERVIEW OF OUR COMPANY AND OUR MANAGEMENT.

THIS MEMORANDUM CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE DOCUMENTS WHICH RELATE TO THIS OFFERING, AS WELL AS SUMMARIES OF VARIOUS PROVISIONS OF RELEVANT STATUTES AND THE APPLICABLE REGULATIONS THEREUNDER.  ALTHOUGH WE BELIEVE THAT THESE SUMMARIES ARE ACCURATE, THESE SUMMARIES DO NOT PURPORT TO BE COMPLETE AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE TEXTS OF SUCH DOCUMENTS, STATUTES AND REGULATIONS.

Exhibit ____7____ Page____99____

NO SECURITIES MAY BE RESOLD OR OTHERWISE DISPOSED OF BY AN INVESTOR UNLESS, IN THE OPINION OF OUR COUNSEL, REGISTRATION UNDER THE APPLICABLE FEDERAL OR STATE SECURITIES LAWS IS NOT REQUIRED OR COMPLIANCE IS MADE WITH SUCH REGISTRATION REQUIREMENTS.   THE SALE, TRANSFER OR OTHER DISPOSITION OF ANY SECURITIES PURCHASED PURSUANT HERETO MAY BE SUBSTANTIALLY RESTRICTED BY UNITED STATES AND APPLICABLE STATE SECURITIES LAWS. ACCORDINGLY, THE SECURITIES SHOULD NOT BE PURCHASED BY INVESTORS WHO NEED LIQUIDITY IN THEIR INVESTMENTS. AN INVESTOR MAY HAVE TO CONTINUE TO BEAR THE ECONOMIC RISK OF HIS INVESTMENT FOR AN INDEFINITE PERIOD, UNLESS A MARKET FOR THE SECURITIES IS ESTABLISHED. THERE CAN BE NO ASSURANCE THAT A MARKET SHALL DEVELOP IN THE FUTURE.

THE OFFERING PRICE OF THE SECURITIES WAS DETERMINED BY US AND THERE CAN BE NO ASSURANCE THAT SUCH PRICE BEARS A RELATIONSHIP TO OUR FINANCIAL POSITION, BOOK VALUE OR ANY OTHER GENERALLY ACCEPTED CRITERIA OF VALUE.

THE OFFEREE, BY ACCEPTING DELIVERY OF THE OFFERING MATERIALS, AGREES TO RETURN THE OFFERING MATERIALS AND ALL ACCOMPANYING AND RELATED DOCUMENTS TO US UPON REQUEST IF THE OFFEREE DOES NOT AGREE TO PURCHASE ANY OF THE SECURITIES OFFERED HEREBY.

THIS OFFERING DOES NOT CONSTITUTE AN OFFER OR SOLICITATION BY ANYONE IN ANY JURISDICTION IN WHICH SUCH AN OFFERING OR SOLICITATION IS NOT AUTHORIZED. IN ADDITION, THE OFFERING MATERIALS CONSTITUTE AN OFFER ONLY IF A NAME AND IDENTIFICATION NUMBER APPEAR IN THE APPROPRIATE SPACES PROVIDED ON THE COVER PAGE HEREOF AND ONLY TO THE PERSON WHOSE NAME APPEARS ON THE COVER PAGE.

IF WE AND OUR AFFILIATES ARE INCORRECT IN OUR ASSUMPTIONS AS TO THE CIRCUMSTANCES OF ANY PROSPECTIVE INVESTOR, THEN THE DELIVERY OF THIS MEMORANDUM TO SUCH PROSPECTIVE INVESTOR DOES NOT CONSTITUTE AN OFFER AND THIS MEMORANDUM MUST BE RETURNED TO US IMMEDIATELY. WE RESERVE THE RIGHT, IN OUR SOLE AND ABSOLUTE DISCRETION, TO REJECT ANY SUBSCRIPTION FOR SECURITIES IN WHOLE OR IN PART.

THIS MEMORANDUM IS STRICTLY CONFIDENTIAL AND MAY NOT BE DISTRIBUTED OR REPRODUCED. ITS CONTENTS MAY NOT BE DIVULGED, IN WHOLE OR IN PART. ANY DISTRIBUTION OR REPRODUCTION OF THIS MEMORANDUM IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, OTHER THAN AS SPECIFICALLY SET FORTH HEREIN, IS UNAUTHORIZED AND FORBIDDEN AND MAY BE A VIOLATION OF FEDERAL AND/OR STATE SECURITIES LAWS.

NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATION OR GIVE ANY INFORMATION WITH RESPECT TO THIS OFFERING WHICH IS INCONSISTENT WITH THE INFORMATION WHICH IS SET FORTH HEREIN.   NO OFFERING LITERATURE OR ADVERTISING IN ANY FORM SHALL BE EMPLOYED IN THE OFFERING OF THE SECURITIES UNLESS SUCH OFFERING LITERATURE IS DATED WITH THE SAME DATE OF THIS MEMORANDUM OR LATER AND THE INFORMATION WHICH IS SET FORTH THEREIN IS CONSISTENT WITH THE INFORMATION WHICH IS SET FORTH HEREIN. IF THERE IS ANY INCONSISTENCY BETWEEN SUCH OFFERING LITERATURE OR ADVERTISING AND ANY INFORMATION WHICH IS SET FORTH HEREIN, OR IF SUCH

Exhibit      7      Page 100

OFFERING LITERATURE IS DATED PRIOR TO THE DATE OF THIS MEMORANDUM, SUCH OFFERING LITERATURE IS UNAUTHORIZED. NO PROSPECTIVE INVESTOR MAY RELY UPON ANY INFORMATION OR REPRESENTATION WHICH MAY BE MADE OR GIVEN IN VIOLATION OF THIS PARAGRAPH.

Exhibit ___7___ Page___10f

## CERTAIN NOTICES UNDER STATE SECURITIES LAWS

### NASAA UNIFORM LEGEND

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY UPON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSIONS OR REGULATORY AUTHORITY.   THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT"), AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE ("BLUE SKY" LAWS) AND ARE BEING OFFERED AND SOLD IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

### CONNECTICUT RESIDENTS

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE BANKING COMMISSIONER OF THE STATE OF CONNECTICUT.   THE COMMISSIONER HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THIS OFFERING.   ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

### FOR FLORIDA RESIDENTS

THE SECURITIES REFERRED TO HEREIN HAVE NOT BEEN REGISTERED UNDER THE FLORIDA SECURITIES ACT.

EACH FLORIDA RESIDENT WHO SUBSCRIBES FOR THE PURCHASE HEREIN SHALL HAVE THE RIGHT, PURSUANT TO SECTION 517.061(12)(A)(5) OF THE FLORIDA SECURITIES ACT, TO WITHDRAW HIS SUBSCRIPTION AND RECEIVE A FULL REFUND OF ALL MONIES PAID WITHIN THREE (3) BUSINESS DAYS AFTER THE EXECUTION OF THIS SUBSCRIPTION AGREEMENT OR PAYMENT FOR HIS INVESTMENT HAS BEEN MADE, WHICHEVER IS LATER. WITHDRAWAL WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, A SUBSCRIBER NEED ONLY SEND A LETTER OR TELEGRAM TO US AT THE ADDRESS SET FORTH IN THE OFFERING DOCUMENTS, INDICATING HIS OR HER INTENTION TO WITHDRAW. SUCH LETTER OR TELEGRAM SHOULD BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED THIRD BUSINESS DAY. IT IS PRUDENT TO SEND SUCH LETTER BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME WHEN IT WAS MAILED.

Exhibit _____7_____  Page_____102

## FOR PENNSYLVANIA RESIDENTS

UNDER THE PROVISIONS OF SECTION 207(M) OF THE PENNSYLVANIA SECURITIES ACT OF 1972, A PENNSYLVANIA RESIDENT WHO ACCEPTS AN OFFER TO PURCHASE SECURITIES EXEMPTED FROM REGISTRATION BY SECTION 203(D) DIRECTLY FROM AN ISSUER OR AN AFFILIATE OF AN ISSUER SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE WITHOUT INCURRING ANY LIABILITY TO THE SELLER OR ANY OTHER PERSON WITHIN TWO (2) BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE ISSUER OF HIS WRITTEN BINDING CONTRACT OF PURCHASE OR IN THE CASE OF A TRANSACTION IN WHICH THERE IS NO WRITTEN BINDING CONTRACT OF PURCHASE, WITHIN TWO (2) BUSINESS DAYS AFTER MAKING THE INITIAL PAYMENT FOR THE SECURITIES BEING OFFERED.

EACH PERSON ENTITLED TO EXERCISE THE RIGHT TO WITHDRAW GRANTED BY SECTION 207(M) AND WHO WISHES TO EXERCISE SUCH RIGHT, MUST WITHIN THE AFOREMENTIONED TWO (2) BUSINESS DAYS CAUSE A WRITTEN NOTICE OR TELEGRAM TO BE SENT TO THE COMPANY AT THE ADDRESS PROVIDED IN THE OFFERING MATERIALS INDICATING HIS INTENTION TO WITHDRAW. SUCH LETTER OR TELEGRAM MUST BE SENT AND POSTMARKED ON OR PRIOR TO THE END OF THE AFOREMENTIONED SECOND BUSINESS DAY. IF YOU ARE SENDING A LETTER IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME WHEN IT WAS MAILED. SHOULD YOU MAKE THIS REQUEST ORALLY, YOU MUST ASK FOR WRITTEN CONFIRMATION THAT YOUR REQUEST HAS BEEN RECEIVED. AN INVESTOR RESIDING IN PENNSYLVANIA MAY NOT SELL HIS SECURITIES WITHIN TWELVE (12) MONTHS AFTER THE DATE OF HIS PURCHASE.

## FOR NEW YORK RESIDENTS

THESE OFFERING MATERIALS HAVE NOT BEEN REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW YORK BECAUSE OF OUR REPRESENTATION THAT THIS IS INTENDED TO BE A NON PUBLIC OFFERING PURSUANT TO SEC REGULATION D AND THAT IF ALL OF THE CONDITIONS AND LIMITATIONS OF REGULATION D ARE NOT COMPLIED WITH, THE OFFERING WILL BE RESUBMITTED TO THE ATTORNEY GENERAL FOR AMENDED EXEMPTION.   THE OFFERING LITERATURE USED IN CONNECTION WITH THIS OFFERING HAS NOT BEEN PRE-FILED WITH THE ATTORNEY GENERAL AND HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL.   THE PURCHASER WILL BE REQUIRED TO REPRESENT THAT IT HAS ADEQUATE MEANS OF PROVIDING FOR ITS CURRENT NEEDS AND POSSIBLE PERSONAL CONTINGENCIES, AND THAT IT HAS NO NEED FOR LIQUIDITY OF THIS INVESTMENT.

THESE SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING.

Exhibit ___7___  Page ___103___

# TABLE OF CONTENTS

CERTAIN NOTICES UNDER STATE SECURITIES LAWS.................................5

SCHEDULE OF EXHIBITS.....................................................................8

WHO MAY INVEST...............................................................................9

SUMMARY OF THE OFFERING..............................................................11

THE OFFERING....................................................................................11

EXECUTIVE SUMMARY........................................................................14

TERMS OF THE OFFERING...................................................................46

RISK FACTORS....................................................................................48

FORWARD LOOKING STATEMENTS.......................................................52

DILUTION...........................................................................................53

CAPITALIZATION................................................................................53

DESCRIPTION OF THE SECURITIES.......................................................55

REPORTS TO SHAREHOLDERS............................................................55

Exhibit ____7____ Page __104__

<u>Schedule of Exhibits</u>

A.    Confidential Prospective Purchaser Questionnaire.*

B.    Purchaser Representative Questionnaire.*

C.    Subscription Agreement.*

D.    Financial Statements for the years ended December 31, 2007 and 2008.

*    These documents are not annexed as exhibits to this Memorandum; however, copies of these documents are contained in a separate subscription package which shall be distributed to each potential investor (the "Subscription Package").  The Subscription Package is an integral part of this Memorandum, and each potential investor should carefully review the Subscription Package.

8

Exhibit _____7_____ Page ___105___

## Who May Invest

Many state securities commissioners have established investor suitability standards within their respective jurisdictions for the marketing of private placement securities offerings. These standards appear to have been imposed, among other reasons, because of the relative lack of liquidity of securities of such private placement offerings as compared with other securities investments. Investment in the Shares involves a high degree of risk and is suitable only for persons of substantial financial means who have no need for liquidity in their investments.

Shares shall be sold only to those investors who meet the suitability requirements which are set forth in this Section. Assuming that the applicable suitability requirements are satisfied, the Shares may be sold to individuals, corporations, pension, profit sharing or Keogh plans, or individual retirement accounts.

In reliance upon an exemption from the registration provisions of the 1933 Act, and by reason of intended compliance with the provisions of Sections 4(2) of the 1933 Act and Rule 506 of Regulation D promulgated under the 1933 Act, the Shares have not been registered under the 1933 Act. Accordingly, prior to the investors purchasing Shares, we shall take all actions which are reasonably necessary (including requiring each prospective investor to complete and return the Subscription Agreement and the Purchaser Questionnaire and, in certain instances, requiring that a Purchaser Representative be used) in order to be satisfied that the prerequisites of applicable state regulatory exemptions have been met. Each Purchaser Representative, if any, must also complete and return the Purchaser Representative Questionnaire.

This offering is limited solely to accredited investors. We shall accept subscriptions from an unlimited number of accredited investors as such term is defined in Rule 501 pursuant to the 1933 Act. Pursuant to Rule 501, an accredited investor includes (i) a natural person who (with spouse, if any) has a net worth which exceeds $1,000,000 at the time of the purchase; (ii) a natural person who has had an individual income in excess of $200,000 for the prior two years (or joint income with such spouse which exceeds $300,000 in each such year) and have a reasonable expectation of reaching the same income level (or joint income level) in the current year; (iii) an organization as described in section 501 (c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000; (iv) a trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506 (b)(2)(ii); or (v) an entity in which all of the equity owners are accredited investors.

Offers shall be made and subscriptions shall be accepted only from investors residing within jurisdictions in which the offering has been registered or licensed, unless in the opinion of counsel either: (i) such registration or licensing is not required; or (ii) an exemption from such registration and licensing is available and has been obtained, or can be obtained by a filing subsequent to such sale. This investment is available to those investors who as of the date of the execution of the Subscription Agreement have a net worth (exclusive of home, furnishings and automobiles) in excess of four times the Subscription Price for the Shares which are purchased by such investor. We reserve the right, in our sole and absolute discretion, to accept subscriptions from investors who do not satisfy the foregoing suitability standards. The foregoing suitability standards are minimum

Exhibit _____ 7 _____ Page 106

requirements for prospective investors and the satisfaction of these standards does not necessarily mean that the purchase of Shares is a suitable investment for the prospective investor.

A prospective investor may also have to meet other suitability standards established by the laws or regulations ("Blue Sky" Laws) of the state of such investor's residence. See "CERTAIN NOTICES UNDER STATE SECURITIES LAWS."

To assist us in determining a person's qualifications, each investor must provide us with a completed Purchaser Questionnaire, which shall be substantially in the form of Exhibit "A", which is contained in the Subscription Package. All Purchaser Questionnaires shall be reviewed by us to assure that there is compliance with the suitability standards, and subscriptions shall not be accepted from any individual who does not represent in the Purchaser Questionnaire that such standards are met.

Each person requiring the assistance of a Purchaser Representative shall be so notified by us. We shall supply each prospective investor requiring a Purchaser Representative with a Purchaser Representative Questionnaire and require that the same be completed by such Purchaser Representative.

A Purchaser Representative must have sufficient knowledge and experience in financial and business matters, either alone or together with other Purchaser Representatives for the prospective investor or together with the prospective investor, to evaluate the merits and risks of an investment by the investor in us. Each Purchaser Representative shall have to first satisfy us as to such qualifications by submitting to us a Purchaser Representative Questionnaire, which shall be substantially in the form of Exhibit "B" which is contained in the Subscription Package. In addition, a Purchaser Representative must also satisfy (or we must reasonably believe that such Purchaser Representative satisfies) all of the following conditions: (i) he is not an Affiliate of us (unless he is a close relative of the investor or a company, a trust or estate in which the investor or his relative has a 50% or greater interest); (ii) designation by the investor as the investor's Purchaser Representative; and (iii) disclosure to the investor, before such designation, of any material relationship between such Representative and his Affiliates and us and its Affiliates and any compensation which such Representative shall receive.

Each investor shall be required to make certain representations and warranties to us and to agree to indemnify, hold harmless and pay all judgments and claims against us and our Counsel for any liability which is incurred as a result of any misrepresentation made or breach of any warranty of such investor.

The attention of each prospective investor is directed to the Subscription Agreement for a complete description of those warranties and representations which each investor shall be required to make. The following are of particular importance: each investor must (i) warrant that such investor meets the suitability standards which are set forth in the fifth paragraph of this section "Who may invest" and acknowledge that such investor has received a copy of this Memorandum and read same and (ii) represent that such investor is aware that (a) there are United States and state restrictions upon the transfer of his or her investment in Shares which shall make their sale or other disposition difficult or impossible, (b) there is no guarantee of profit, or against loss, as a result of purchasing Shares, and (c) that only those investors who can afford a total loss of their investment should consider purchasing Shares.

10

Exhibit ___7___ Page___107

## SUMMARY OF THE OFFERING

The following is a summary of certain material contained in this Memorandum. This summary is qualified in its entirety by the detailed information and financial statements (including notes thereto) appearing elsewhere herein and should be read in conjunction with such material.

## THE OFFERING

Securities Offered:
Maximum Offering:

10,000,000 Shares. Each share is common stock, par value $0.01 at a price of $1.00 per Share. No public offering of our Common Stock is contemplated in the foreseeable future. There is no market for the Shares. We do not currently pay dividends on our Common Stock and do not anticipate paying any dividends in the foreseeable future.

Common Stock Outstanding:

90,000,000 Shares

Common Stock Outstanding, assuming the maximum number of Shares are sold pursuant to this Offering:

100,000,000 Shares

Purchase Price:

$1.00 per Share.

Terms of the Offering:

The Offering will terminate on, or prior to, November 26, 2009, subject to one or more extensions, in our sole and absolute discretion, with no restriction upon either the number of extensions or upon the length of time for each of said extensions. This Offering may be so extended without amending this Private Placement Memorandum and without notice to either the investors who have submitted their subscription documents to us or to prospective investors. We are offering the Shares on a "best efforts" basis with no minimum number of Shares required to be sold. We may in our discretion accept subscriptions for fractional Shares; provided however, that no fractional shares of Common Stock may be issued.

11

Exhibit _____7_____ Page _____108_____

**Use of Proceeds:**

Assuming the sale of the maximum of 10,000,000 Shares offered herein, our net proceeds are expected to be approximately $8,350,000, after deducting commissions, legal, printing and other expenses of the Offering. We contemplate utilizing the net proceeds of this Offering for (i) expansion of our business including, but not limited to, purchasing new equipment for the purposes of then renting out such equipment, either as part of packages where customers rents our facilities, or part of arrangements where we rent out and deliver our equipment to our customers for their use at their locations, (ii) to repay existing debt; and (iii) for expenses related to this offering.

**Risk Factors:**

An investment in the Shares offered hereby is speculative and involves a high degree of risk. There can be no guarantees of profit, or against loss, as a result of purchasing Shares. Only those investors who can afford immediate and substantial dilution and a total loss of their investment should consider purchasing Shares. See "RISK FACTORS" and "DILUTION."

**Registration Rights/Transferability/Liquidity:**

The Shares being offered hereby have not been registered under the 1933 Act or under the securities laws of any state. The Shares are offered pursuant to an exemption from registration under the 1933 Act in reliance upon intended compliance with the provisions of Sections 4(2) of the Act and Rule 506 of Regulation D promulgated under the Act. Accordingly, the Shares may not be sold, pledged, hypothecated, donated or otherwise transferred, whether or not for consideration, until we register the Shares or an exemption from registration applies. Although the Shares shall not be registered in various states, we shall comply with the registration or other qualification requirement concerning the offering of securities in each state in which the Shares shall be offered. In addition to restrictions under federal laws, the Shares purchased in one state cannot be sold, transferred, pledged or hypothecated in that state or in another state until we have registered the Shares or an exemption

12

Exhibit _____7_____ Page____109___

under state securities law applies. We are not presently a reporting company pursuant to either Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "1934 Act"), and therefore, do not presently file any reports with the Securities and Exchange Commission (the "SEC"). No public offering of our Common Stock is contemplated in the foreseeable future. There is no certainty with respect to if, and when, a public market shall develop. Investors should understand that the Shares are not liquid and may have little or no value if an Investor desires to liquidate his or her investment in the Shares. Accordingly, the Shares should not be purchased by anyone who requires liquidity or who cannot afford a complete loss of his investment. The lack of liquidity of, and significant risks associated with, an investment in us makes the purchase of Shares suitable only for an Investor who has substantial net worth, who has no need for liquidity with respect to this investment, who understands the risks involved and has reviewed these risks with his or her legal and investment advisors, and who has adequate means of providing for his or her current and foreseeable needs and contingencies. See "RISK FACTORS"   -"Registration   Rights/ Transferability/ Liquidity".

**Closing:**

The Offering shall terminate on November 26, 2009, subject to one or more extensions, in our sole and absolute discretion with no restrictions upon either the number of extensions or upon the length of time for said extensions. This Offering may be so extended without amending this Memorandum and without notice to either the investors who have submitted their subscription documents to us or to prospective investors. The Initial Closing will be held when we first accept subscriptions for one or more Share, as determined by our management, in its sole and absolute discretion. Subsequent subscriptions shall be accepted as determined by us in our sole and absolute discretion.

13

Exhibit _____7_____ Page_____110

## EXECUTIVE SUMMARY

LADP, LLC ("LA Digital") rents post-production editing systems and provides technical support to major film and television clients. LA Digital owns 198 non-linear digital editing systems with an average utilization rate of 77%.

LA Digital rents editing systems to its customers on a short-term basis, typically six to 50 weeks, for use at the client's site or at one of the 99 editing rooms located at LA Digital's four facilities in Los Angeles and New York.

As part of editing system rentals, LA Digital provides custom configuration, full-service installation, and 24/7 technical support. LA Digital clients include major film studios (e.g. 20th Century Fox, Paramount Pictures, Warner Brothers, New Line Cinema, Lions Gate), major television networks (e.g. ABC, NBC, CBS), cable television networks (e.g. HBO, E! Entertainment, Versus), and independent production companies (e.g. Mark Burnett Productions).

**Reputation for Quality and Customer Service.** Over the past fourteen years, LA Digital, has established a reputation for high quality products and customer service. They have created strong brand name within the entertainment industry. LA Digital, in particular, has been able to price its services at a slight premium to the pricing of its competitors, which reflects the superior service and reliability that LA Digital provides its customers.

Generally, the Company does not have any long-term or exclusive agreements with its customers, and therefore business is won based on customer satisfaction with reliability, timeliness, quality and price.

**Strong Customer Relationships.** Management has formed strong strategic relationships with a significant number of major motion picture studios, such as 20th Century Fox, Paramount Pictures, Warner Brothers, New Line Cinema and Lions Gate, and cable and television networks, such as ABC, NBC, CBS, HBO, MTV, E! Entertainment and Versus. These networks and studios rely on the Company to deliver high-quality equipment and technical support.

Frequently, Management will be invited to project planning meetings to assist and consult on post-production matters. The Company also maintains strong relationships with directors, editors, and various other decision makers who are involved in selecting equipment rental providers. These customer relationships act as an effective barrier to entry to potential new competitors.

**Niche Market in Large and Stable Industry.** The Company provides a niche service within the larger post-production services market, which according to Fortis Bank is a $4 billion industry. The Company rents post-production editing equipment to its customers, who are looking to outsource the equipment management, technical support staffing, and technology risk related to the owning post-production equipment. According to First Research, the demand for post-production editing equipment and related services is dependent upon the overall $46 billion film and television production industry which is projected to grow at a 4.1% annual rate through 2012.

**Experienced Management Team**
Gary Migdal, currently CEO and President of LA Digital, joined the firm in 1995 and has over 24 years of post-production management experience and has extensive industry relationships. By retaining significant ownership in the Company, Management believes it will have the proper incentives in place to remain focused on the business.

Exhibit _____ 7 _____ Page _____ 111

## Products

The Company primarily rents post-production editing equipment consisting of non-linear digital editing systems, data storage devices, video tape recorders and other peripherals. The Company also provides technical support services, rents editing rooms (in conjunction with renting editing systems), and on occasion sells equipment

## Pricing

Pricing for the Company's products and services is generally customized on a project by project basis. However in general, the Company is considered to be a higher-cost provider amongst its competitors. Despite this, the Company has been able to maintain its blue chip customer base by offering the latest in digital editing technologies and providing unequaled customer support.

## Rent Versus Own Rationale

While certain editors and post-production companies purchase editing equipment for in-house use, a sizable portion rent editing equipment for economic and practical reasons: (1) initial capital costs to purchase post-production editing equipment are high, (2) multiple non-standard video formats necessitate a large inventory of editing systems, video tape recorders, and components to accommodate the demands of different projects, (3) project-by-project nature of the entertainment industry results in relatively low utilization rates on equipment owned in-house versus equipment owned by third-party rental companies, (4) deadline-sensitive nature of projects requires the highest level of technical support, with dedicated personnel on-call 24/7 – an expensive proposition for most service providers in the entertainment industry, and (5) on-going costs to manage, maintain and store editing equipment are significant. For these reasons, customers outsource to the Company the equipment management, technical support staffing, and technology risk associated with owning post-production editing equipment, in order to focus on the artistic and creative processes.

## Equipment Rentals

The Company rents complete editing and finishing systems, data storage devices, video tape recorders, and other components. Equipment is delivered for use at the client's site or at one of the Company's facilities in Los Angeles and New York. The equipment is typically rented between six and 50 weeks with billing on a weekly basis. Historically, equipment is rented for an average period of 30 weeks.

The Company differentiates itself within the market by offering its clients the very latest in existing and emerging digital editing technologies, and providing them with technical expertise and support infrastructure. Editing systems are custom configured for every client to meet the specific needs and demands of each individual project. All systems undergo vigorous testing and diagnostics prior to the start of any editing project deployment. Systems are fully integrated to help eliminate potential problems, increase reliability and create a more user-friendly interface. A key selling point for customers is access to the Company's highly skilled technical support staff, who can be available on-site at the client's site or via a 24/7 call center. The Company also makes service and maintenance contracts available to customers that purchase systems.

An editing system consists primarily of (1) editing software (e.g. Avid or Apple) that operates on a

15

Exhibit ____7____   Page __112__

high-powered computer (e.g. Mac or PC), and (2) input/output device for video and audio, also known as a break-out box. A typical editing system will also include data storage devices, video tape recorders, monitors, speakers and other components. A picture of a typical editing system is shown below.

The Company currently owns 473 systems that can be used for editing and finishing.

Editing Systems

*Avid Media Composer*. Avid Media Composer is the worldwide standard for non-linear digital editing software.
Media Composer converts video and audio from video tape to digital media, stores the digital media on a range of data storage devices, then allows the user to preview, play back and edit the digital media. Media Composer can be combined with a Meridien or an Adrenaline hardware accelerator. Hardware accelerators perform intensive media
processing tasks such as scaling, compression, and filtering that would otherwise slow down editing that is processed on the host computer.






Avid Meridien Media Composer                    Avid Adrenaline Media Composer

The Company has 242 Meridien systems and 160 Adrenaline systems, which are typically rented on a weekly basis for $650 and $1,000, respectively.

*Apple Final Cut Pro*. Final Cut Pro is a competing editing software program developed by Apple. The Apple Final Cut Pro has the ability to process many formats including DV, HDV, DVCProHD, XDCAM, 2K, and IMAX. The software logs and captures video onto the computer's hard drive, where it can be manipulated and edited. The Company has 25 Apple Final Cut Pro systems, which are typically rented on a weekly basis for $675.



Exhibit _____7_____ Page_____113

Editing Systems, Finishing

*Avid Symphony.* Avid Symphony is a digital, non-linear video editing system that is used for finishing. Finishing refers to final touch-up enhancements that include color correction, transition effects, and shot stabilization. Avid Symphony differentiates itself from Avid Media Composer with the addition of secondary color correction, uncompressed high definition support, higher real-time performance, and other advanced features. Avid Symphony can be combined with a Meridien or a Nitris hardware accelerator.




Avid Symphony Meridien



Avid Symphony Nitris

The Company has 36 Avid Symphony Meridien systems for standard definition finishing and ten Avid Symphony Nitris systems for high definition finishing. The Company rents the Symphony Meridien and Symphony Nitris on a weekly basis for $1,400 and $2,900, respectively.

Data Storage

Digital video editing creates an immense amount of data which must be stored and accessed either through local storage or networked storage devices. The Company offers a certain amount of data storage as part of its editing system rental packages, but also provides additional storage if requested for additional charge.

*Local storage.* The Company rents local storage devices (i.e. hard drives) that range from 36 gigabytes (1 gigabyte $= 10^9$ bytes) to 2 terabytes (1 terabyte $= 10^{12}$ bytes). The Company has a variety of Avid hard drives that can store 36-146 gigabytes and rent for $20-$50 per week. For greater storage capacity and data redundancy, the Company also offers Avid disk arrays that can hold 1-2 terabytes of data and rent for $300-$600 per week.

*Networked storage.* The Company rents networked storage solutions which allow multiple editors to share data and work collaboratively. The Company offers Avid Unity LANshare which can store 2,880-8,000 gigabytes of data and can be accessed simultaneously by up to 20 editors. The Company rents the Avid Unity LANshare, which costs $50,000-$100,000 depending on the storage option, for $1,400-$4,000 per week.

Exhibit _____ 7 _____ Page _____ 114

### Video Tape Recorders

Video tape recorders are used to play and record video. The Company rents a large array of standard definition and high definition video tape recorders including:



| Standard Definition: | High Definition: |
|---|---|
| ⓪ Beta | ⓪ XDCAM |
| ⓪ Digibeta | ⓪ IMX |
| ⓪ DVC Pro | ⓪ HDCAM SR |
| ⓪ DVCAM | |

The Company rents video tape recorders for approximately $150-$3,750 per week depending on the model.

### Other Peripherals

The Company also offers peripherals and other miscellaneous equipment for rent to its customers. These products range from monitors and speakers to additional computers. Below is a list of typical peripherals and other miscellaneous equipment the Company rents to its customers:



| | |
|---|---|
| ⓪ Audio recorders and players | ⓪ Monitors and scopes |
| ⓪ High definition decoders, sync generators, serial digital legalizers | ⓪ Speakers |
| | ⓪ Computers |
| ⓪ Audio mixers | ⓪ Furniture |

18

Exhibit ___7___ Page___115___

## Technical Support

The Company is one of only a few Avid Authorized Level 3 Support Providers worldwide. As an authorized provider, the Company can offer Avid Assurance maintenance contracts. Avid Assurance contracts provide total customer support including unlimited telephone support, access to system software maintenance releases, discounts on spare parts and advanced parts exchange. Avid Assurance is offered to customers who purchase equipment from the Company. The Company is also an Authorized Apple Service & Support Agent.

The Company employs a highly qualified staff of Avid Certified Service Representatives who provide expertise for Avid editing systems, various SCSI and fibre channel storage devices, and editing system peripherals on both the Macintosh and Windows NT platforms. The Company has a substantial inventory of editing systems and spare parts readily available at all times. The Company's technicians are responsible for ensuring that the editing systems are well-maintained and are available for use on short notice.

The Company has annual service contracts with Warner Brothers, E! Entertainment and NBC Studios. For its other customers, the Company offers technical support services a la carte. The Company provides custom configuration, full-service installation and 24/7 technical support, which is typically priced at $125-$175 per hour.

## Editing Room Rentals

For those customers that do not have their own editing facilities or require overflow space, the Company provides 149 in-house editing rooms at seven locations in Los Angeles and New York. The rooms are turnkey editing environments that feature valet parking, a private security entrance, kitchenette, office/reception area, basic janitorial services, onsite security and 24-hour technical support along with the actual editing system. Each facility offers the Company's full line of editing products and services and can be custom configured to the specifications of each client.



The editing rooms are priced $200 to $600 per week, and are generally rented in conjunction with an editing system.

## Equipment Sales

Although its principal business is rental of editing equipment, the Company also occasionally sells equipment as an official Avid and Hewlett Packard reseller. In general, the Company targets gross margins of 15% to 30% when selling equipment to its customers. Note that in the projected financial results included herein, no equipment sales are assumed.

Exhibit _____ 7 _____ Page _____ 116

## Capital Expenditures

According to Management, the post-production editing systems which the Company rents generally have up to a ten year useful life. While editing technology is continually being improved by Avid, Apple, and other developers, adoption of new technology by the motion picture and television production industry occurs more slowly. The post- production industry tends to adopt the next generation of editing products only after it has undergone a field-testing period of at least one year. For example, Avid introduced Media Composer Adrenaline in 2003 as a replacement for Media Composer Meridien and discontinued production of Meridien as of December 31, 2006. Early adopters of Media Composer Adrenaline faced significant software and hardware problems with inadequate technical support from Avid. As such, a significant portion of the post-production community continues to utilize the familiar and proven Meridien systems. For the twelve month period ending September 30, 2007, the Company's Meridien systems experienced a utilization rate of approximately 60%.

Management typically purchases equipment in response to customer demand. Break-even on the cost of purchasing post-production editing equipment generally occurs within 36 weeks of being on rental (excluding costs of providing technical services).

Management will evaluate the cost-benefit of purchasing additional editing equipment on a system by system basis.
In the financial projections included herein, Management has projected that the Company will purchase 361 editing systems, 15 finishing systems, and additional storage and peripherals over the next five years at a cost of $11.0 million.

## Customers

The Company's customers include major film studios (e.g. 20th Century Fox, Paramount Pictures, Warner Brothers, New Line Cinema, Lions Gate), major television networks (e.g. ABC, NBC, CBS), cable television networks (e.g. HBO, MTV, E! Entertainment, Versus), and independent production and post-production companies (e.g. Mark Burnett Productions).

Because of the project-by-project nature of the entertainment industry, the Company has few long-term or exclusive service agreements. Customers typically rent post-production editing equipment for a duration of time that is dependent upon the type of project. On average, customers rent the Company's editing systems for a period of 30 weeks.

- Feature Film, Studio – 26 to 50 weeks
- Feature Film, Independent – 12 to 40 weeks
- Television Program – 6 to 12 weeks
- Television Series (episodic and reality) – Indefinite

## Industry Overview

The Company rents post-production editing equipment and provides technical support to major

Exhibit ___7___  Page ___117___

film and television clients. The Company provides a niche service within the larger post-production services market, which according to Fortis Bank is a $4 billion industry. The demand for post-production editing equipment and related services is dependent upon the overall $46 billion film and television production industry.

The entertainment industry creates motion pictures, television programming, and interactive multimedia content for distribution through theatrical exhibition, home video, pay and basic cable television, direct-to-home, private cable, broadcast television, on-line services and video games. Content is released into a "first-run" distribution channel, and later into one or more additional channels or media. Entertainment content produced in the United States is often exported and is in increasingly high demand internationally. In addition to newly produced content, film and television libraries may be released repeatedly into distribution.

**Post-Production**

As summarized in the chart below, the steps in creating a film or television show can be categorized into four broad areas: (1) Development, (2) Pre-Production, (3) Production, and (4) Post-production. Post-production refers to the final stage whereby video and audio recorded in the production phase is edited and manipulated. In addition to the editing of video and audio, post-production also includes the creation of soundtracks and special effects.



**Non-Linear Editing**

Non-linear editing for film and television postproduction is a modern editing method which involves being able to access any frame in a video clip with the same ease as any other. This method is similar in concept to the "cut and paste" technique used in film editing. However, when working with film, the editing process is destructive as the actual film negative must be cut. The introduction of digital video technology enabled a non-linear and non- destructive editing process. With digital editing systems, the original source files are not lost or modified. The editor works on low-resolution copies of the original video. This makes it possible to edit both standard-definition broadcast quality and high definition broadcast quality very quickly on normal computers which do not have the power to do the full processing of the huge full-quality original data in real-time. The editing system records the decisions of the editor in an edit decision list. The editing system makes it easy to change cuts and undo

Exhibit ___7___ Page___ 118

previous decisions simply by editing the edit decision list.

22

Exhibit ___7___ Page___119___

The market for post-production editing equipment rentals is directly affected by the volume of film
and television production, and indirectly affected by the overall revenue of the film and television
industry.

## Motion Picture Industry

According to First Research, U.S. motion picture production and distribution is a $33 billion
industry. The industry is highly concentrated with the largest 50 companies accounting for almost
80 percent of revenue. Major companies include Disney, Sony Pictures, MGM, Paramount, Fox,
Universal, and Warner Brothers. Production companies create movies that are released first in
movie theatres and later through television, DVD, and other distribution channels. The industry
is forecasted to grow at an annual rate of 4.1% between 2007 and 2012.

*Theaters.* In 2006, 607 films were released which generated box office receipts of $9.5 billion.
Box office receipts have remained relatively consistent since 2002, despite an increase in the
number of films released. According to PricewaterhouseCoopers, box office receipts will
grow to $11.7 billion in 2011, a 4.2% annual growth rate. According to Variety.com, there
were 997 films in some stage of post-production as of November 9, 2007.



23

Exhibit _____ 7 ___ Page_____ 120

*Home Video.* The biggest market for motion pictures is the home video market, which consists of both movie rentals and movie sales. In 2006, the U.S. home video market was approximately $26.3 billion, the majority of which came from DVD sales. According to Veronis Suhler Stevenson, the U.S. home video market will grow to approximately $31.2 billion by 2011, a 3.5% annual growth rate. In terms of number of titles available, according to Digital Entertainment Group, there were 68,000 DVD titles available in 2006 up from 20,000 titles in 2002.



**Television Industry**

According to First Research, U.S. television program production and distribution is a $13 billion industry and is forecasted to grow at an annual growth rate of 4.1% between 2007 and 2012. The industry is highly concentrated with the largest 50 companies accounting for almost 80 percent of revenue. The major companies include NBC Universal, CBS Paramount, Disney/ABC, Fox Television Studios, Warner Brothers, and Sony Pictures Television. Production companies create television movies, dramas, situational comedies (sitcoms), reality, game, talk shows, documentaries, children's, art, sports and news programs. Shows are aired initially on a "first-run" basis, then may be re-released in syndication and on other media like DVDs. The industry has been impacted by the following trends:

24

Exhibit _____7_____ Page___

*Reality Television.* The demand for equipment rentals has increased significantly since reality television became popular. The majority of the creation process for a reality television series is completed in post-production. Reality television requires more cameras, more footage, and therefore more editing equipment than traditional television programs. According to tvtracker.com, there will be 56 network reality series airing this season, up from 51 last year. Entire cable networks, including MTV and Bravo, build their original lineups almost exclusively with this genre.

*High Definition.* In the U.S., legislation has mandated a full transition of television broadcasts from analog to digital high definition signals by February 17, 2009. As a result, more media is being filmed and edited for distribution in high definition. Management is seeing greater demand from its customers for editing systems capable of editing and finishing high definition media, as well as greater demand for data storage.

*Existing Media Libraries.* There is a significant amount of post-production work related to the re-distribution of original programming in syndication, DVD and other media. As "first run" television programming moves from prime time to syndication, the content is edited to make room for more commercials. In addition, as existing media libraries of older television programs and films are converted for distribution on new media channels, the content is typically re-mastered, edited, restored, re-colored, converted and reformatted.

*Other Media.* The growth of content made for internet distribution will create opportunities for the Company. The content developed for YouTube.com and other "amateur" websites would not be the Company's target market, but rather the burgeoning number of internet-only broadcast channels that are producing first rate content.

### Vertical Growth Opportunities

Management is evaluating several opportunities to expand its product offerings vertically and provide existing customers a "one stop shop" for their other production and post-production needs. Management is evaluating production equipment rental such as lighting and equipment storage. In addition, the Company is evaluating partnering with another company to market digital asset management technology for safeguarding content transmitted over the internet or via satellite.

### Competition

The Company is one of the largest providers of post-production editing equipment rentals with approximately 473 editing systems and 149 editing rooms. The post-production editing equipment rental market is a highly competitive industry centered in Los Angeles and New York, where most of the domestic motion picture and television production is located. A large number of companies

25

Exhibit _____ 7 _____ Page _____ 122

offer post-production services with no single provider having a dominant market share. In addition, the major film studios and television networks often have the capability to perform in-house some or all of the services the Company offers. The Company competes for customers based on reliability, timeliness, quality and price.

Management considers companies in Los Angeles and New York with inventories of 50 or more editing systems to be the Company's most direct competitors. A list of such competitors is shown below followed by brief descriptions.

*Wexler Video.* Wexler Video rents production (e.g. cameras) and post-production equipment. Wexler Video is generally considered to be a low cost provider with a lower level of customer service. Wexler is located in Los Angeles and has been in business for more than 20 years. Management estimates the company has 500 to 600 editing systems and does not offer editing rooms. Telecorps Holdings, LLC, sponsored by H.I.G. Capital, purchased the company in March 2007. Terms of the transaction were not disclosed.

*Postworks Orbit.* Postworks Orbit provides digital equipment rentals to the motion picture and television production industry. The company also offers rentable editing rooms. Postworks Orbit has offices in Los Angeles and New York and Management estimates that the company has approximately 300 editing systems and 50 editing rooms for rent. The company was formed by the merger of Postworks and Orbit Digital in October 2006.

*Pivotal Post.* Pivotal Post provides digital equipment rentals to the motion picture and television production industry. The company is headquartered in Los Angeles with additional offices in New York and the United Kingdom. Management estimates that the company has 150 editing systems and 20 editing rooms.

*Digital Symphony (Division of Ascent Media Group).* Digital Symphony provides complete Avid editing systems at remote locations and through in-house editing rooms for rent. The company also provides customer service and technical support to their customers. Digital Symphony is located in Los Angeles and Management estimates the company has 100 to 150 editing systems and over 30 editing rooms.

*Global Entertainment Partners.* Global Entertainment Partners was formed in 1994 as an Avid Rental company serving the feature film industry. Since then, the service offering has expanded to include post-production film transfers including high definition and standard definition Telecine of feature film dailies as well digital mastering. The company also offers technical support and customer service. The company has two locations in Los Angeles and Management estimates that the company has 80 editing systems and 30 editing rooms.

*Atlas Digital.* Atlas Digital provides digital equipment rentals to the motion picture and television production industry. Atlas Digital has one office in Los Angeles. Management estimates that the company has 75 to 80 editing systems.

Exhibit _____ 7 _____ Page _____ 123

***Runway Editorial.*** Runway Editorial provides digital equipment rentals such as Avid and Final Cut Pro and rents editing rooms to the motion picture and television industry. The company also provides customer service and technical support to their customers.
Runway has four offices in the Los Angeles area. Management estimates that the company has 50 to 60 editing systems and 18 editing rooms. Runway Editorial is owned by The New Post Group which is a full-service production company.

***Catalyst Digital.*** Catalyst Digital provides digital equipment rentals to the motion picture and television production industry. Management estimates that the company has approximately 50 editing systems for rent.

***Go Edit.*** Go Edit provides digital equipment rentals to the motion picture and television production industry. The company also offers rentable editing rooms and customer support. Go Edit is located in Los Angeles and management estimates that the company has 25 to 50 editing systems.

## Vendors

The Company purchases new post-production editing systems and components primarily from Avid Technology,
Inc. (NASDAQ: AVID). The Company also purchases used and refurbished equipment from various other sources.

Avid is considered the industry standard, with the majority of major feature films, television programs, and commercials created with its systems. Avid estimates that approximately 90% of primetime television shows, 85%
of feature films, and 80% of commercials are made using one or more Avid products. The Company is one of the largest Avid Authorized Rental Centers in North America and benefits from preferred pricing when purchasing equipment from Avid.

The Company typically secures commitments from customers before new inventory is purchased and made available for rent. Equipment is sourced from multiple locations, with the Company preferring to located used or refurbished equipment from bankrupt businesses, competitors, customers, resellers or other third parties. The Company typically updates its equipment to keep up with industry improvements but primarily in response to customer demand.

## Sales & Marketing

The Company markets its services through industry referrals, regular contact with the existing client base, a direct sales force, trade show participation, and trade publication advertising. The Company relies primarily upon its strong brand reputation in the industry and certain strategic business relationships to bring in referral business.

Exhibit _____7_____ Page _124_

The Company maintains a nine person direct sales force that regularly calls upon existing customers and customers who have rented from the Company in the past, as well as reaching out to potential new customers. One of the sales initiatives has been the Company's "preferred vendor" program. Through this initiative, the Company offers customers preferred rental rates in exchange for promotion within the customers' organization as the preferred provider of post-production editing equipment and technical support services.

Management also has aligned itself closely with key organizations in the post-production editing community. The Company works with strategic organizations to coordinate and sponsor educational and value-added industry events. These organizations include the *Directors Guild of America*, the *Motion Picture Editors Guild*, the *American Cinema Editors Society*, the *Hollywood Post Alliance*, and the *International Avid Users Group Organization*.

In addition, the Company regularly advertises in trade publications for editors including the *ACE Guild* and the *Motion Picture Editors Guild*. The Company also advertises in the *Blubook, LA 411*, and *Creative Handbook*, which are service provider listings frequently utilized by the entertainment industry. The Company spent approximately $250,000 on advertising for the twelve month period ended September 30, 2007. The Company also maintains an internet presence through its websites: ladigital.com.

## Company History

*LA Digital*. LA Digital was founded in 1995. In August 2003, Marc Bercoon, Will Goldstein and another partner (who has since been bought out) purchased LA Digital for an enterprise value of approximately $11.2 million. Mr. Bercoon and Mr. Goldstein together own 77.6% of the fully-diluted membership interests in LA Digital. LA Digital currently employs 43 people at four offices. LA Digital has 198 editing systems and 99 editing rooms.

## Corporate Structure

LADP has two wholly owned subsidiaries (i) LA Digital Post, Inc. a California corporation with operations in Los Angeles and (ii) LADP New York, LLC a Delaware limited liability company with operations in New York.

## Management

The Company's management team is comprised of individuals who have diverse and complementary skills and
substantial collective experience in the media and technology industries. Management and the directors on the Board of Directors are summarized below.

28

Exhibit _____ 7 _____ Page _____ 125 _____

**Gary Migdal,** *President (LA Digital)*

Gary Migdal is the President of LA Digital. Mr. Migdal has been with the LA Digital since its inception in 1995. Mr. Migdal has over 24 years of post-production management experience and has extensive industry relationships.

Mr. Migdal will be responsible for the Company's sales effort. Prior to joining LA Digital, Mr. Migdal held senior management positions at three other leading post-production companies in the Los Angeles area.

**Don Schiada,** *Controller (LA Digital)*

Don Schiada is the Controller of LA Digital. Mr. Schiada has 20 years of accounting experience, including five years with LA Digital. Previously, Mr. Schiada served three years as General Accounting Manager at the California Power Exchange, and prior to that, served eight years as Assistant Controller at the insurance division of Countrywide Funding. Mr. Schiada is a CPA.

**Marc Bercoon,** *Vice Chairman & Interim Chief Financial Officer*

Marc Bercoon will be a Vice Chairman of the Company and will act as an Interim Chief Financial Officer of the Company until a permanent replacement is found. Mr. Bercoon began his career as an attorney with a Chicago- based national law firm currently known as Katten, Muchin, & Rosenman, followed by various senior positions with the Equity Group, a private investment company owned and controlled by Chicago investor, Sam Zell. Mr. Bercoon has been partners with Will Goldstein since October 2001 in various ventures, including JC Nationwide, Inc. a physician staffing company founded by Will Goldstein in 1992. Mr. Bercoon was Vice Chairman and Chief Financial Officer for JC Nationwide, Inc., until it was sold in January 2005. In August 2003, Mr. Bercoon, Will Goldstein and another partner (who has since been bought out) purchased LA Digital. Prior to 2001, Mr. Bercoon as a Vice President of the Trump Group, a private investment company based in South Florida with over $1 billion of assets under management. Mr. Bercoon earned his B.S. in Accountancy with high honors from the University of Illinois (Urbana, IL) and his J.D. from the UCLA School of Law. Mr. Bercoon passed the Illinois CPA exam in 1982.

**Will Goldstein,** *Chairman*

Will Goldstein will be Chairman of the Company. Mr. Goldstein is an investor/entrepreneur who has been involved in the formation and development of many businesses. Mr. Goldstein began his professional career as an entrepreneur in 1987 by acquiring a locksmith and security store with one location in Norfolk, Virginia. Mr. Goldstein grew this business to four locations and in excess of 20 mobile units. In 1992, Mr. Goldstein sold the firm to the largest security company in Virginia. In the same year, Mr. Goldstein founded Nationwide Medical Services, Inc., a physician staffing company. Under Mr. Goldstein's leadership, Nationwide Medical grew at a rate of in excess of 200% per year for its first six years, achieving $18 million in sales by 1998. Mr. Goldstein successfully negotiated and managed Nationwide through a series of transactions, including the 1998 merger between Nationwide and Jackson & Coker, in which the surviving entity became JC Nationwide. With Mr. Goldstein as Chairman and CEO, JC Nationwide grew to approximately $70 million in revenue. In January 2005, JC Nationwide was acquired by World Health Alternatives, a publicly traded health care staffing company. Mr. Goldstein has been partners with Marc Bercoon since October 2001 in

29

Exhibit _____7_____ Page_____126_____

various ventures, including JC Nationwide, Inc. In August 2003, Marc Bercoon, Will Goldstein and another partner (who has since been bought out) purchased LA Digital. Mr. Goldstein earned his Bachelor's Degree in Business Administration from Old Dominion University.

## Employees

The Company had 97 full-time employees as of September 30, 2007 as summarized below:

| Employees by Department | | | | |
|---|---|---|---|---|
| | | | Annual Compensation | |
| | Employees | | Average | Total |
| Technicians | 32 | $ | 65,738 | $ 2,103,615 |
| Administrative | 17 | | 48,569 | 825,674 |
| General | 15 | | 64,685 | 970,280 |
| Finance | 11 | | 51,049 | 561,535 |
| Sales | 9 | | 97,471 | 877,236 |
| Warehouse | 8 | | 34,186 | 273,485 |
| Executives | 5 | | 338,000 | 1,690,000 |
| | 97 | $ | 75,277 | $ 7,301,825 |

30

Exhibit ___7___   Page___128___

## Terms of the Offering

**Offering procedures**

A maximum of 10,000,000 Shares are being offered by us at a price of $1.00 per Share (a maximum of $10,000,000). There is no minimum number of Shares which must be sold for completion of this Offering. The Offering shall terminate after the sale of such number of Shares as we, in our sole and absolute discretion, determine or with the sale of the maximum of 10,000 Shares. Our affiliates and members of our Management may purchase Shares for their own accounts.

The Offering shall terminate on November 26, 2009, subject to one or more extensions, in our sole and absolute discretion with no restrictions upon either the number of extensions or upon the length of time for said extensions. This Offering may be so extended without amending this Memorandum and without notice to either the investors who have submitted their subscription documents to us or to prospective investors.

The Initial Closing will be held when we first accept subscriptions for one or more Shares, as determined by our management, in its sole and absolute discretion. Subsequent subscriptions shall be accepted as determined by us in our sole and absolute discretion.

We reserve the right, in our sole and absolute discretion, to withdraw or modify this Offering and to reject any subscription for Shares in whole or in part. In the event of a complete rejection, we shall return to the prospective Investor all of his or her subscription documents and subscription funds, without interest. In the event of a partial rejection, we shall return to the applicable Investor the appropriate portion of his or her subscription funds without interest, and the applicable Investor shall be required to deliver to us promptly such other documents as we may request, including, but not limited to, a newly executed Subscription Agreement.

**Subscription Price of Shares**

The Subscription Price is $1.00 per Share. We, in our sole and absolute discretion, may sell fractional Shares to an Investor, provided, however, that no fractional shares of common stock may be issued. The investment is payable by each Investor upon delivery of a duly completed Subscription Agreement and the other required documents as hereinafter described.

**Plan of Distribution**

Subscriptions for Shares shall be solicited on a "best efforts" basis by us on our own behalf and/or through registered broker-dealers and finders. We shall pay a selling commission of twelve and a half (12.5%) percent of the Subscription Price per Share and a non-accountable expense allowance of three (3%) percent, if such payments are permitted under applicable federal and state securities laws. All commissions shall be paid by us promptly after (i) acceptance of the subscription for Shares, (ii) receipt of all necessary documentation and (iii) the

Exhibit _____ 7 ____ Page ____ 129

applicable Closing.  To the extent the aforesaid commissions are not payable, the amount which shall be available for expansion of our business shall be increased.  See "USE OF PROCEEDS."

Persons who assist in the sale of Shares may be deemed "Underwriters" as that term is defined in the 1933 Act, and the compensation received may be deemed to be "underwriting compensation."  We may indemnify certain broker-dealers and finders against certain liabilities, including liabilities under the 1933 Act.

**Method of Purchasing Shares**

Offers to purchase Shares should be made by completing, signing and returning to the company, LADP Corp, 5 Concourse Parkway, Atlanta, Georgia 30328.

(1) the Purchaser Questionnaire, substantially in the form of Exhibit "A" which is contained in the Subscription Package;

(2) the Purchaser Representative Questionnaire, substantially in the form of Exhibit "B" which in contained in the Subscription Package, if an Investor utilizes the services of a Purchaser Representative;

(3) the Subscription Agreement, substantially in the form of Exhibit "C" which is contained in the Subscription Package; and

(4) a check in an amount equal to the number of Shares subscribed for multiplied by $10.00 payable to "_____; " or wire funds in an amount equal to the number of Shares subscribed for multiplied by $10.00 plus a wiring fee of $20 to _____, to the following account:

_____

_____

Attn: _____,
Tel: (###) ###-####
Fax: (###) ###-####

ABA/Routing No.: #########
Account No.: _____
Account of: _____
ACCOUNT
Subscriber: [INSERT INVESTOR NAME]
Reference:    LADP Corp

Exhibit ____7____ Page____130

## Risk Factors

An investment in our securities involves a high degree of risk. If any of the following risks actually occur, our business, financial conditions and operations will be materially affected.

**Technological advances will require additional spending.** Customer acceptance of and demand for newly introduced editing technology may require the Company to upgrade its existing equipment inventory or purchase new equipment. In general, Management purchases equipment in response to customer demand. The cost of purchasing equipment is generally recovered within 36 weeks of rental (not including costs of providing technical support services). On average, customers rent the Company's editing system for a period of 30 weeks. Therefore, on average, the cost of the purchasing an editing systems has been nearly repaid by the end of the first rental period. The relatively rapid break-even period mitigates the risk from technological obsolescence as the equipment has essentially already been "paid for". Management has projected that the Company will purchase 361 editing systems, 15 finishing systems, and additional storage and peripherals over the next five years at a cost of $11.0 million.

**Decreasing cost of equipment may induce customers to purchase.** Over the past ten years, the cost to purchase Avid editing systems and storage has decreased and may continue to decrease in the future. Lower equipment costs may induce some of the Company's customers to purchase equipment rather than rent it from the Company. Management believes the initial equipment cost is only one aspect of the total cost, which also includes on-going technical support and servicing. In addition, customers are generally unable to match the high utilization rates that equipment rental companies are able to achieve. Management also believes that customers are unwilling to be "long" on technology, and are unwilling to manage an equipment inventory. Instead, customers are looking to outsource technology risk, technical support staffing, and equipment management, to focus instead on the artistic and creative processes.

**Customer concentration.** The Company's primary customers are major film studios, television networks, cable networks, and independent production companies. The Company's three largest customers compose approximately 20% of total revenue. The loss of one or more of these customers could adversely affect the business.

**Industry is highly competitive.** The post-production industry is a highly competitive, service-oriented business. The Company competes with a variety of post-production firms some of which have a national presence and, to a lesser extent, the in-house post-production operations of its major motion picture studio customers. In addition, the Company does not have any long-term or exclusive rental agreements with its customers. Business is acquired on a purchase order basis and is based primarily on customer satisfaction with reliability, timeliness, quality and price.

**Protracted writer's strike will negatively affect revenues.** The Company derives

48

Exhibit _____ 7 _____ Page 131

substantially all of its revenue from clients in the entertainment industry. Management believes the current Writer's Guild of America (WGA) strike could have a negative impact on the Company if it continued beyond 12 months. An extended writer's strike would decrease the production (and related post-production) of film and television programming. The impact on the Company would be somewhat mitigated because (1) reality television shows, which composed a significant portion
of the Company's revenues, are expected to take the place of shows that were written by WGA writers, and (2) feature films, for which studios have stockpiled enough scripts to continue film production through 2008 and 2009, will continue to be produced in the near future.

**Operating costs are relatively fixed in the short-run.** The Company's largest expenses are salaries and rent, which were approximately $8.7 million and $2.8 million, respectively in LTM 9/30/07. These costs are largely fixed
in the short-run, and can not be quickly reduced if revenues decrease.

**Loss of key personnel would adversely affect business.** The Company is dependent on the efforts and abilities of certain senior management, particularly those of David Pincus, Josh Kandal, and Gary Migdal. In addition, the Company's success depends upon its ability to attract and retain qualified sales, operations, and technical personnel. The competition for qualified personnel is intense and the loss of any such persons, and as well as the failure to recruit additional key personnel in a timely manner, could have a material adverse effect on the Company.

**We may need additional financing to fund our ongoing operational needs and to meet our loan obligations.**

It is possible, even if the maximum number of Shares offered pursuant to this Memorandum are purchased, that we shall require additional financing to meet our capital requirements and loan obligations.  This would be more likely if fewer than the maximum number of Shares are purchased.  If we require additional financing, we shall be dependent upon sources such as:

- future earnings;

- the availability of funds from private sources, including, but not limited to, our shareholders, loans and additional private placements; and

- the availability of funds from public sources including, but not limited, an initial public offering of our securities which we intend at some point to proceed with.

Market conditions for private and public offerings are subject to uncertainty and there can be no assurance when or whether a private and/or public offering shall be successfully completed or that other funds shall be made available to us.  Our ability to obtain additional funds is limited.  Such financing may only be available, if at all, upon terms which may not be advantageous to us. If adequate funds are not available from operations or additional sources of financing, our business shall be materially adversely affected.

Exhibit ___7___ Page 1.32

We contemplate utilizing the net proceeds of this Offering to repay some of our outstanding debt and fund our intended expansion of the business.

**We do not currently pay dividends on our Common Stock**

We do not currently pay dividends on our Common Stock and do not anticipate paying any in the foreseeable future. There can be no assurance that we will have sufficient earnings to earnings to pay any dividends with respect to our Common Stock. Moreover, even if we had sufficient earnings, we are not obligated to declare dividends with respect to our Common Stock. Presently, we intend to retain earnings, if any, for our business. It is also possible that the terms of any future debt financing may restrict the payment of dividends.

**Control**

Upon completion of this Offering, assuming the sale of the maximum number of Shares issued in this Offering, Subscribers will own 10 % of our issued and outstanding Common Stock and will not be in a position to exercise any control over any part of our operations.

**There can be no assurance of a public market for our securities**

There is no current market for our securities. There can be no assurance that a market will exist in the future. We are contemplating conducting an Initial Public Offering ("IPO") in the future. However, there can be no assurance that we will attempt an IPO, or that any such attempt would be successful. There can be no assurance that, if a trading market does develop as a result of a future IPO, our Common Stock can be resold either at or near its original offering prices.

**The Shares being offered by this Memorandum are not registered with the Securities and Exchange Commission and are therefore restricted from transferability**

None of our securities has been registered under the Act or under the securities laws of any state. The Shares of Preferred Stock and the Common Stock issuable upon conversion of the Preferred Stock (collectively, the "Securities") may not be sold, pledged, hypothecated, donated or otherwise transferred, whether or not for consideration, except upon registration or the issuance to us of a legal opinion, acceptable to our counsel, that the transfer of the Securities does not violate the Act, as then in effect, and applicable state securities laws. In addition, each investor will be required to agree not to sell the Securities acquired pursuant to this Offering for a Lock-Up Period after the closing of an IPO which we intend to proceed with at some point in the near future as may be required by the underwriters of the IPO or the NASD.

**Conflicts of Interest**

The Offering which is described in this memorandum involves or may involve conflicts of interest among the persons who are associated with this Offering including, but not limited to,

Exhibit _____7_____   Page__133

engaging in other businesses similar or dissimilar to ours and allocating their time and services between us and any such other entities.

**The Shares being offered by this Memorandum are not a liquid investment of funds.**

There is presently no market for the Shares of Common Stock and, in the absence of an IPO, it is foreseeable that no public market will develop. None of the Securities have been registered under the Act or any Blue Sky Law, and, therefore, cannot be resold until subsequently so registered or unless an exemption therefrom is available. It is anticipated that Rule 144 under the Act will not be available to investors in connection with such sales unless and until an IPO occurs.

The lack of liquidity of, and significant risks associated with, an investment in us, makes the purchase of Shares suitable only for an investor who has substantial net worth, who has no need for liquidity with respect to this investment, who understands the risks involved and has reviewed these risks with his or her legal and investment advisors, and who has adequate means of providing for his or her current and foreseeable needs and contingencies.

**Our Board of Directors has the authority to issue shares of Stock without shareholder approval.**

Our Board of Directors, within the limitations and restrictions contained in our Certificate of Incorporation and without further action by our shareholders, has the authority to issue additional shares of stock from time to time in one or more series and to fix the number of shares and the relative rights, conversion rights, voting rights, and terms of redemption, liquidation preferences and any other preferences, special rights and qualifications of any such series. Any issuance of stock could adversely affect the rights of holders of our Common Stock.

**Litigation and related matters**

Aspects of our current and future business activities involve risks of liability. We may be exposed to liability under federal and state securities laws, other federal and state laws and court decisions.

If the plaintiffs in any suits against us were to successfully prosecute their claims, or if we were to settle such suits by making significant payments to the plaintiffs, our operating results and financial condition would be materially and adversely affected. We do not carry insurance which would cover any such payments. Our certificate of incorporation provides that none of our directors shall be personally liable to us or our shareholders for damages for any breach of duty in such capacity, except as otherwise provided by applicable law. In addition, our by-laws provide for the indemnification of our officers, directors and agents to the maximum extent permitted under Delaware law. We may in the future be the subject of indemnification claims by our officers, directors or agents who are or may become defendants in litigation.

Exhibit _____ 7 _____ Page _134_

In addition, the defense of litigation may in the future, to a certain extent, divert the efforts and attention of our management and staff. The amount of time that management and other employees are required to devote in connection with the defense of litigation could be substantial and might materially divert their attention from their other responsibilities within the Company.

In the normal course of business, we may be defendant in various civil actions and arbitrations arising out of our activities as an employer and as a result of other business activities. There can be no assurance that substantial payments in connection with the resolution of disputed claims will not occur in the future.

**The price of the Shares in this Offering has been arbitrarily determined.**

The Offering price of the Shares has been arbitrarily determined by us and should not be construed as indicative of the value of the Shares. There can be no assurance that any of the Shares, if transferable, could be sold for the Subscription Price or for any other amount.

## Forward Looking Statements

Statements in this Memorandum discuss future expectations and plans, which are considered forward-looking statements as defined by section 27A of the 1933 Act and section 21E of the 1934 Act. Sentences which incorporate words such as "believes," "intends," "expects," "predicts," "may," "will," "should," "contemplates," "anticipates," or similar statements are based on our beliefs and expectations using the most current information available to us. This Memorandum should be read in conjunction with the financial statements and the notes to those statements which appear elsewhere in this Memorandum. In view of the fact that our discussions in this Memorandum are based upon our estimates and beliefs concerning circumstances and events which have not yet occurred, the anticipated results are subject to changes and variations as future operations and events actually occur and could differ materially from those discussed in the forward-looking statements. Moreover, although we reasonably expect, to the best of our knowledge and belief, that the results to be achieved by us will be as set forth in the following discussion, the following discussion is not a guarantee and there can be no assurance that any of the potential results which are described will occur. Furthermore, there will usually be differences between the forecasted and actual results because events and circumstances frequently do not occur as expected, and the differences may be material.

Exhibit _____ 7 _____ Page _135_

### Dilution

The purchasers of the Shares being offered hereby will incur an immediate and substantial dilution.

### Capitalization

The following table sets forth our capitalization as of _____.

Exhibit ____7____ Page____136____

## PRINCIPAL SHAREHOLDERS

The following table sets forth certain information, as of the date of this memorandum, with respect to the ownership of our Common Stock by (i) each officer and director, (ii) each person (including any "group" as such term is defined in Section 13(d)(3) of the 1934 Act) known by us to be the beneficial owner of more than five (5%) percent of any class of our Common Stock and (iii) directors and officers as a group

| Name | Amount of Beneficial Ownership | Prior to Offering(1) | After this Offering: Assuming Maximum Sold (2) |
|---|---|---|---|
| _____ | _____ Common Stock | 100% | 90% |

54

Exhibit _____ 7 _____ Page_____ 137

## DESCRIPTION OF THE SECURITIES

**Common Stock**

We are authorized to issue one hundred million (100,000,000) shares of Common Stock (the "Common Stock"), par value $0.01. The holders of our Common Stock are entitled to one vote per each Share held and have the sole right and power to vote upon all matters upon which a vote of shareholders is taken. The holders are not permitted to vote their shares cumulatively. Upon our liquidation, dissolution, or winding up, the holders of the Common Stock shall be entitled to receive our net assets in proportion to the respective number of shares held by them. The holders of Common Stock shall not have any preemptive right to subscribe for or purchase any Shares of any class of stock. The outstanding shares of Common Stock and the Shares offered hereby shall not be subject to further call or redemption and shall be fully paid and non-assessable.

40,000,000 shares of our authorized 100,000,000 shares of Common Stock are issued and outstanding prior to this Offering.

Our subsidiaries have never paid any dividends on our Common Stock. There can be no assurance that we shall have sufficient earnings to pay any dividends with respect to the Common Stock. Moreover, even if we have sufficient earnings, we are not obligated to declare dividends with respect to the Common Stock. The future declaration of any cash or stock dividends shall be in the sole and absolute discretion of the Board of Directors and shall depend upon the earnings, capital requirements, our financial position, general economic conditions and other pertinent factors. It is also possible that the terms of any future debt financing may restrict the payment of dividends. To date, no dividends have been paid on our Common Stock and we presently intend to retain earnings, if any, for the development and expansion of our business.

## REPORTS TO SHAREHOLDERS

We intend to issue an annual report, including certified financial statements, to holders of our Common and Preferred shares. We shall provide such other reports as our Management, in its sole and absolute discretion, may deem necessary or appropriate.

55

Exhibit ___7___  Page___138___

Name of Offeree: _____

Document No. _____

# LADP ACQUISITION, INC.

### CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

By reading this information contained within this document, the recipient agrees with LADP Acquisition, Inc,. a Delaware corporation (referred to herein as the "**Company**", "**we**", "**us**", "**our**", "**LADP Acquisition**") to maintain in confidence such information , together with any other non-public information regarding the Company obtained form the Company and its agents during the course of the proposed financing.

The information contained in this confidential Private Placement Memorandum, including all exhibits and supplements hereto (this "**Memorandum**"), has been provided by the Company. No representation or warranty (express or implied) is made or is to be relied upon as a promise or representation as to the Company's future performance.

**June 22, 2009**

1

Exhibit _____ 7 Page _____ 139

# PRIVATE PLACEMENT MEMORANDUM
# LADP ACQUISITION, INC.

## 10,000,000 Shares Common Stock

LADP Acquisition, Inc. ("LADP Acquisition") is a Delaware corporation formed for the purpose of acquiring 100% of the outstanding stock of LA Digital Post, Inc. & Affiliate ("LA Digital"), which has been in the post production equipment rental industry since its inception in 1995. In this private placement memorandum (this "Memorandum"), the "Company," "us," "our," and "we" refer to LADP Acquisition. We rent post production editing equipment and provide technical support to major film, television and other entertainment content producing clients.

The Offering (the "Offering") consists of Ten Million Shares of Common Shares ("Common Stock") offered at a price of $1.00 per Share. Each Share has a par value $0.01 per share. No public offering of our Common Stock is contemplated in the foreseeable future, but management will continue to evaluate the opportunities in the public markets and will pursue a public offering if management deems a public offering to be a viable and advantageous avenue to maximize value and/or liquidity. There is no current market for our Common Stock. We have arbitrarily determined the Subscription Price (hereinafter defined). The maximum amount which shall be raised pursuant to this Offering is Ten Million Dollars $10,000,000. The minimum amount which shall be raised shall be determined by us in our sole and absolute discretion. This Offering shall close after the sale of such minimum number of Shares as we in our sole and absolute discretion determine or with the sale of the maximum of Ten Million (10,000,000) Shares.

|  | Subscription Price | Selling Commissions (1) | Proceeds to Company (2) |
|---|---|---|---|
| Per Share | $1.00 | $0.125 | $0.875 |
| 10,000,000 Shares (Maximum Offering) | $10,000,000 | $1,250,000 | $8,750,000 |

(1)    We shall pay a selling commission to registered broker-dealers, "finders", individuals and entities legally authorized to receive such commissions (the "Selling Agents") of twelve and a half (12.5%) percent of the Subscription Price per Share sold, provided that such payments are permitted under federal and applicable state securities laws. We shall also pay a non-accountable expense allowance of three (3%) percent of the Subscription Price per Share sold which is not reflected in the above table, provided that such payments are permitted under federal and applicable state securities laws.

(2)    Legal, printing and other expenses of the Offering, which are estimated to be approximately $100,000 if the maximum number of Shares is sold, are not reflected in the above table.

This Offering shall close after the sale of such minimum number of Shares as we in our sole and absolute discretion determine or with the sale of the maximum of 10,000,000 Shares. The total amount to be raised pursuant to this Offering is a maximum of $10,000,000. The Offering will terminate on or prior to March 31, 2010, subject to one or more extensions, in our sole and absolute discretion, with no restrictions upon either the number of extensions or upon the length of time for each of said extensions. The Offering may be so extended without amending this Memorandum and without notice to prospective and/or existing Investors.

June 22, 2009

2

Exhibit _____ 7 ___ Page ___ 140

THE SECURITIES OFFERED PURSUANT TO THIS PRIVATE PLACEMENT MEMORANDUM AND THE EXHIBITS ANNEXED HERETO AND THE SUBSCRIPTION PACKAGE (COLLECTIVELY, THE "OFFERING MATERIALS") HAVE NEITHER BEEN FILED OR REGISTERED WITH NOR APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"). THE SEC HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THE OFFERING MATERIALS. NO STATE SECURITIES LAW ADMINISTRATOR HAS PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR THE ADEQUACY OF THE OFFERING MATERIALS, ANY REPRESENTATION TO THE CONTRARY OF WHAT IS STATED IN THIS PARAGRAPH IS UNLAWFUL.

THE INVESTMENT WHICH IS DESCRIBED IN THIS MEMORANDUM INVOLVES A HIGH DEGREE OF RISK AND THE PURCHASE OF THE SECURITIES SHOULD BE CONSIDERED ONLY BY PERSONS WHO: (1) CAN AFFORD TO SUSTAIN A LOSS OF THEIR ENTIRE INVESTMENT; (2) HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT; AND (3) HAVE ADEQUATE MEANS TO PROVIDE FOR THEIR CURRENT AND FUTURE NEEDS, INCLUDING CONTINGENCIES.

INVESTORS SHALL BE REQUIRED TO REPRESENT THAT THEY ARE FAMILIAR WITH, AND UNDERSTAND, THE TERMS OF THIS OFFERING.

THIS OFFERING IS BEING MADE PURSUANT TO AN EXEMPTION FROM THE REGISTRATION PROVISIONS OF THE SECURITIES ACT OF 1933 (THE "ACT" OR THE "1933 ACT"), AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS ("BLUE SKY" LAWS) FOR NON-PUBLIC OFFERINGS AND IN RELIANCE UPON INTENDED COMPLIANCE WITH THE PROVISIONS OF SECTIONS 4(2) OF THE ACT AND RULE 506 OF REGULATION D PROMULGATED UNDER THE ACT. THE SECURITIES WHICH WILL BE ISSUED WILL BE RESTRICTED AND CANNOT BE FREELY TRADED. ACCORDINGLY, THE SECURITIES MAY NOT BE SOLD, PLEDGED, HYPOTHECATED, DONATED OR OTHERWISE TRANSFERRED, WHETHER OR NOT FOR CONSIDERATION, UNLESS THE SECURITIES ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION APPLIES. IN ADDITION TO RESTRICTIONS UNDER FEDERAL LAWS, THE SECURITIES PURCHASED IN ONE STATE CANNOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED IN THAT STATE OR ANOTHER STATE UNTIL WE HAVE REGISTERED THE SECURITIES OR UNLESS AN EXEMPTION UNDER STATE SECURITIES LAW APPLIES.

IN VIEW OF THE FACT THAT THIS OFFERING IS LIMITED SOLELY TO ACCREDITED INVESTORS, WE ARE NOT REQUIRED TO PROVIDE PROSPECTIVE INVESTORS WITH DISCLOSURE WITH RESPECT TO OUR COMPANY. THIS DOCUMENT IS NOT INTENDED TO BE A FULL DISCLOSURE DOCUMENT; IT IS ONLY INTENDED TO PROVIDE PROSPECTIVE INVESTORS WITH A BRIEF OVERVIEW OF OUR COMPANY AND OUR MANAGEMENT.

THIS MEMORANDUM CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE DOCUMENTS WHICH RELATE TO THIS OFFERING, AS WELL AS SUMMARIES OF VARIOUS PROVISIONS OF RELEVANT STATUTES AND THE APPLICABLE REGULATIONS THEREUNDER. ALTHOUGH WE BELIEVE THAT THESE SUMMARIES ARE ACCURATE, THESE SUMMARIES DO NOT PURPORT TO BE COMPLETE AND ARE

Exhibit ____7____ Page ____141____

QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE TEXTS OF SUCH DOCUMENTS, STATUTES AND REGULATIONS.

NO SECURITIES MAY BE RESOLD OR OTHERWISE DISPOSED OF BY AN INVESTOR UNLESS, IN THE OPINION OF OUR COUNSEL, REGISTRATION UNDER THE APPLICABLE FEDERAL OR STATE SECURITIES LAWS IS NOT REQUIRED OR COMPLIANCE IS MADE WITH SUCH REGISTRATION REQUIREMENTS. THE SALE, TRANSFER OR OTHER DISPOSITION OF ANY SECURITIES PURCHASED PURSUANT HERETO MAY BE SUBSTANTIALLY RESTRICTED BY UNITED STATES AND APPLICABLE STATE SECURITIES LAWS. ACCORDINGLY, THE SECURITIES SHOULD NOT BE PURCHASED BY INVESTORS WHO NEED LIQUIDITY IN THEIR INVESTMENTS. AN INVESTOR MAY HAVE TO CONTINUE TO BEAR THE ECONOMIC RISK OF HIS INVESTMENT FOR AN INDEFINITE PERIOD, UNLESS A MARKET FOR THE SECURITIES IS ESTABLISHED. THERE CAN BE NO ASSURANCE THAT A MARKET SHALL DEVELOP IN THE FUTURE.

THE OFFERING PRICE OF THE SECURITIES WAS DETERMINED BY US AND THERE CAN BE NO ASSURANCE THAT SUCH PRICE BEARS A RELATIONSHIP TO OUR FINANCIAL POSITION, BOOK VALUE OR ANY OTHER GENERALLY ACCEPTED CRITERIA OF VALUE.

THE OFFEREE, BY ACCEPTING DELIVERY OF THE OFFERING MATERIALS, AGREES TO RETURN THE OFFERING MATERIALS AND ALL ACCOMPANYING AND RELATED DOCUMENTS TO US UPON REQUEST IF THE OFFEREE DOES NOT AGREE TO PURCHASE ANY OF THE SECURITIES OFFERED HEREBY.

THIS OFFERING DOES NOT CONSTITUTE AN OFFER OR SOLICITATION BY ANYONE IN ANY JURISDICTION IN WHICH SUCH AN OFFERING OR SOLICITATION IS NOT AUTHORIZED. IN ADDITION, THE OFFERING MATERIALS CONSTITUTE AN OFFER ONLY IF A NAME AND IDENTIFICATION NUMBER APPEAR IN THE APPROPRIATE SPACES PROVIDED ON THE COVER PAGE HEREOF AND ONLY TO THE PERSON WHOSE NAME APPEARS ON THE COVER PAGE.

IF WE AND OUR AFFILIATES ARE INCORRECT IN OUR ASSUMPTIONS AS TO THE CIRCUMSTANCES OF ANY PROSPECTIVE INVESTOR, THEN THE DELIVERY OF THIS MEMORANDUM TO SUCH PROSPECTIVE INVESTOR DOES NOT CONSTITUTE AN OFFER AND THIS MEMORANDUM MUST BE RETURNED TO US IMMEDIATELY. WE RESERVE THE RIGHT, IN OUR SOLE AND ABSOLUTE DISCRETION, TO REJECT ANY SUBSCRIPTION FOR SECURITIES IN WHOLE OR IN PART.

THIS MEMORANDUM IS STRICTLY CONFIDENTIAL AND MAY NOT BE DISTRIBUTED OR REPRODUCED. ITS CONTENTS MAY NOT BE DIVULGED, IN WHOLE OR IN PART. ANY DISTRIBUTION OR REPRODUCTION OF THIS MEMORANDUM IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, OTHER THAN AS SPECIFICALLY SET FORTH HEREIN, IS UNAUTHORIZED AND FORBIDDEN AND MAY BE A VIOLATION OF FEDERAL AND/OR STATE SECURITIES LAWS.

Exhibit _____ 7 _____ Page _____ 172_____

NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATION OR GIVE ANY INFORMATION WITH RESPECT TO THIS OFFERING WHICH IS INCONSISTENT WITH THE INFORMATION WHICH IS SET FORTH HEREIN. NO OFFERING LITERATURE OR ADVERTISING IN ANY FORM SHALL BE EMPLOYED IN THE OFFERING OF THE SECURITIES UNLESS SUCH OFFERING LITERATURE IS DATED WITH THE SAME DATE OF THIS MEMORANDUM OR LATER AND THE INFORMATION WHICH IS SET FORTH THEREIN IS CONSISTENT WITH THE INFORMATION WHICH IS SET FORTH HEREIN. IF THERE IS ANY INCONSISTENCY BETWEEN SUCH OFFERING LITERATURE OR ADVERTISING AND ANY INFORMATION WHICH IS SET FORTH HEREIN, OR IF SUCH OFFERING LITERATURE IS DATED PRIOR TO THE DATE OF THIS MEMORANDUM, SUCH OFFERING LITERATURE IS UNAUTHORIZED. NO PROSPECTIVE INVESTOR MAY RELY UPON ANY INFORMATION OR REPRESENTATION WHICH MAY BE MADE OR GIVEN IN VIOLATION OF THIS PARAGRAPH.

5

Exhibit ____7____ Page___143___

## CERTAIN NOTICES UNDER STATE SECURITIES LAWS

### NASAA UNIFORM LEGEND

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY UPON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSIONS OR REGULATORY AUTHORITY. THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT"), AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE ("BLUE SKY" LAWS) AND ARE BEING OFFERED AND SOLD IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

### CONNECTICUT RESIDENTS

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE BANKING COMMISSIONER OF THE STATE OF CONNECTICUT. THE COMMISSIONER HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

### FOR FLORIDA RESIDENTS

THE SECURITIES REFERRED TO HEREIN HAVE NOT BEEN REGISTERED UNDER THE FLORIDA SECURITIES ACT.

EACH FLORIDA RESIDENT WHO SUBSCRIBES FOR THE PURCHASE HEREIN SHALL HAVE THE RIGHT, PURSUANT TO SECTION 517.061(12)(A)(5) OF THE FLORIDA SECURITIES ACT, TO WITHDRAW HIS SUBSCRIPTION AND RECEIVE A FULL REFUND OF ALL MONIES PAID WITHIN THREE (3) BUSINESS DAYS AFTER THE EXECUTION OF THIS SUBSCRIPTION AGREEMENT OR PAYMENT FOR HIS INVESTMENT HAS BEEN MADE, WHICHEVER IS LATER. WITHDRAWAL WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, A SUBSCRIBER NEED ONLY SEND A LETTER OR TELEGRAM TO US AT THE ADDRESS SET FORTH IN THE OFFERING DOCUMENTS, INDICATING HIS OR HER INTENTION TO WITHDRAW. SUCH LETTER OR TELEGRAM SHOULD BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED THIRD BUSINESS DAY. IT IS PRUDENT TO SEND SUCH LETTER BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME WHEN IT WAS MAILED.

Exhibit ____7____ Page __144__

## FOR PENNSYLVANIA RESIDENTS

UNDER THE PROVISIONS OF SECTION 207(M) OF THE PENNSYLVANIA SECURITIES ACT OF 1972, A PENNSYLVANIA RESIDENT WHO ACCEPTS AN OFFER TO PURCHASE SECURITIES EXEMPTED FROM REGISTRATION BY SECTION 203(D) DIRECTLY FROM AN ISSUER OR AN AFFILIATE OF AN ISSUER SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE WITHOUT INCURRING ANY LIABILITY TO THE SELLER OR ANY OTHER PERSON WITHIN TWO (2) BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE ISSUER OF HIS WRITTEN BINDING CONTRACT OF PURCHASE OR IN THE CASE OF A TRANSACTION IN WHICH THERE IS NO WRITTEN BINDING CONTRACT OF PURCHASE, WITHIN TWO (2) BUSINESS DAYS AFTER MAKING THE INITIAL PAYMENT FOR THE SECURITIES BEING OFFERED.

EACH PERSON ENTITLED TO EXERCISE THE RIGHT TO WITHDRAW GRANTED BY SECTION 207(M) AND WHO WISHES TO EXERCISE SUCH RIGHT, MUST WITHIN THE AFOREMENTIONED TWO (2) BUSINESS DAYS CAUSE A WRITTEN NOTICE OR TELEGRAM TO BE SENT TO THE COMPANY AT THE ADDRESS PROVIDED IN THE OFFERING MATERIALS INDICATING HIS INTENTION TO WITHDRAW. SUCH LETTER OR TELEGRAM MUST BE SENT AND POSTMARKED ON OR PRIOR TO THE END OF THE AFOREMENTIONED SECOND BUSINESS DAY. IF YOU ARE SENDING A LETTER IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME WHEN IT WAS MAILED. SHOULD YOU MAKE THIS REQUEST ORALLY, YOU MUST ASK FOR WRITTEN CONFIRMATION THAT YOUR REQUEST HAS BEEN RECEIVED. AN INVESTOR RESIDING IN PENNSYLVANIA MAY NOT SELL HIS SECURITIES WITHIN TWELVE (12) MONTHS AFTER THE DATE OF HIS PURCHASE.

## FOR NEW YORK RESIDENTS

THESE OFFERING MATERIALS HAVE NOT BEEN REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW YORK BECAUSE OF OUR REPRESENTATION THAT THIS IS INTENDED TO BE A NON PUBLIC OFFERING PURSUANT TO SEC REGULATION D AND THAT IF ALL OF THE CONDITIONS AND LIMITATIONS OF REGULATION D ARE NOT COMPLIED WITH, THE OFFERING WILL BE RESUBMITTED TO THE ATTORNEY GENERAL FOR AMENDED EXEMPTION.   THE OFFERING LITERATURE USED IN CONNECTION WITH THIS OFFERING HAS NOT BEEN PRE-FILED WITH THE ATTORNEY GENERAL AND HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL.   THE PURCHASER WILL BE REQUIRED TO REPRESENT THAT IT HAS ADEQUATE MEANS OF PROVIDING FOR ITS CURRENT NEEDS AND POSSIBLE PERSONAL CONTINGENCIES, AND THAT IT HAS NO NEED FOR LIQUIDITY OF THIS INVESTMENT.

THESE SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING.

Exhibit ___7___ Page 145

## TABLE OF CONTENTS

CERTAIN NOTICES UNDER STATE SECURITIES LAWS..................................6
SCHEDULE OF EXHIBITS.................................................................................9
WHO MAY INVEST..........................................................................................10
SUMMARY OF THE OFFERING......................................................................12
THE OFFERING..................................................................................................12
EXECUTIVE SUMMARY..................................................................................16
TERMS OF THE OFFERING............................................................................32
RISK FACTORS..................................................................................................35
FORWARD LOOKING STATEMENTS............................................................39
DESCRIPTION OF THE SECURITIES............................................................40
REPORTS TO SHAREHOLDERS....................................................................40

8

Exhibit ___7___ Page _146_

## Schedule of Exhibits

A.    Confidential Prospective Purchaser Questionnaire.*

B.    Purchaser Representative Questionnaire.*

C.    Subscription Agreement.*

D.    Un-Audited Financial Statements for the fiscal years ended March 31, 2008 and 2009.

E.    Pro Forma Financial Statements – (Un-Audited)

*    These documents are not annexed as exhibits to this Memorandum; however, copies of these documents are contained in a separate subscription package which shall be distributed to each potential investor (the "Subscription Package"). The Subscription Package is an integral part of this Memorandum, and each potential investor should carefully review the Subscription Package.

Exhibit _____7_____ Page____147

## Who May Invest

Many state securities commissioners have established investor suitability standards within their respective jurisdictions for the marketing of private placement securities offerings. These standards appear to have been imposed, among other reasons, because of the relative lack of liquidity of securities of such private placement offerings as compared with other securities investments. Investment in the Shares involves a high degree of risk and is suitable only for persons of substantial financial means who have no need for liquidity in their investments.

Shares shall be sold only to those investors who meet the suitability requirements which are set forth in this Section. Assuming that the applicable suitability requirements are satisfied, the Shares may be sold to individuals, corporations, pension, profit sharing or Keogh plans, or individual retirement accounts.

In reliance upon an exemption from the registration provisions of the 1933 Act, and by reason of intended compliance with the provisions of Sections 4(2) of the 1933 Act and Rule 506 of Regulation D promulgated under the 1933 Act, the Shares have not been registered under the 1933 Act. Accordingly, prior to the investors purchasing Shares, we shall take all actions which are reasonably necessary (including requiring each prospective investor to complete and return the Subscription Agreement and the Purchaser Questionnaire and, in certain instances, requiring that a Purchaser Representative be used) in order to be satisfied that the prerequisites of applicable state regulatory exemptions have been met. Each Purchaser Representative, if any, must also complete and return the Purchaser Representative Questionnaire.

This offering is limited solely to accredited investors. We shall accept subscriptions from an unlimited number of accredited investors as such term is defined in Rule 501 pursuant to the 1933 Act. Pursuant to Rule 501, an accredited investor includes (i) a natural person who (with spouse, if any) has a net worth which exceeds $1,000,000 at the time of the purchase; (ii) a natural person who has had an individual income in excess of $200,000 for the prior two years (or joint income with such spouse which exceeds $300,000 in each such year) and have a reasonable expectation of reaching the same income level (or joint income level) in the current year; (iii) an organization as described in section 501 (c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000; (iv) a trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506 (b)(2)(ii); or (v) an entity in which all of the equity owners are accredited investors.

Offers shall be made and subscriptions shall be accepted only from investors residing within jurisdictions in which the offering has been registered or licensed, unless in the opinion of counsel either: (i) such registration or licensing is not required; or (ii) an exemption from such registration and licensing is available and has been obtained, or can be obtained by a filing subsequent to such sale. This investment is available to those investors who as of the date of the execution of the Subscription Agreement have a net worth (exclusive of home, furnishings and automobiles) in excess of four times the Subscription Price for the Shares which are purchased by such investor. We reserve the right, in our sole and absolute discretion, to accept subscriptions

Exhibit ___7___ Page __148__

from investors who do not satisfy the foregoing suitability standards. The foregoing suitability standards are minimum requirements for prospective investors and the satisfaction of these standards does not necessarily mean that the purchase of Shares is a suitable investment for the prospective investor.

A prospective investor may also have to meet other suitability standards established by the laws or regulations ("Blue Sky" Laws) of the state of such investor's residence. See "CERTAIN NOTICES UNDER STATE SECURITIES LAWS."

To assist us in determining a person's qualifications, each investor must provide us with a completed Purchaser Questionnaire, which shall be substantially in the form of Exhibit "A", which is contained in the Subscription Package. All Purchaser Questionnaires shall be reviewed by us to assure that there is compliance with the suitability standards, and subscriptions shall not be accepted from any individual who does not represent in the Purchaser Questionnaire that such standards are met.

Each person requiring the assistance of a Purchaser Representative shall be so notified by us. We shall supply each prospective investor requiring a Purchaser Representative with a Purchaser Representative Questionnaire and require that the same be completed by such Purchaser Representative.

A Purchaser Representative must have sufficient knowledge and experience in financial and business matters, either alone or together with other Purchaser Representatives for the prospective investor or together with the prospective investor, to evaluate the merits and risks of an investment by the investor in us. Each Purchaser Representative shall have to first satisfy us as to such qualifications by submitting to us a Purchaser Representative Questionnaire, which shall be substantially in the form of Exhibit "B" which is contained in the Subscription Package. In addition, a Purchaser Representative must also satisfy (or we must reasonably believe that such Purchaser Representative satisfies) all of the following conditions: (i) he is not an Affiliate of us (unless he is a close relative of the investor or a company, a trust or estate in which the investor or his relative has a 50% or greater interest); (ii) designation by the investor as the investor's Purchaser Representative; and (iii) disclosure to the investor, before such designation, of any material relationship between such Representative and his Affiliates and us and its Affiliates and any compensation which such Representative shall receive.

Each investor shall be required to make certain representations and warranties to us and to agree to indemnify, hold harmless and pay all judgments and claims against us and our Counsel for any liability which is incurred as a result of any misrepresentation made or breach of any warranty of such investor.

The attention of each prospective investor is directed to the Subscription Agreement for a complete description of those warranties and representations which each investor shall be required to make. The following are of particular importance: each investor must (i) warrant that such investor meets the suitability standards which are set forth in the fifth paragraph of this section "Who may invest" and acknowledge that such investor has received a copy of this Memorandum and read same and (ii) represent that such investor is aware that (a) there are United States and

11

Exhibit ___7___    Page _149_

state restrictions upon the transfer of his or her investment in Shares which shall make their sale or other disposition difficult or impossible, (b) there is no guarantee of profit, or against loss, as a result of purchasing Shares, and (c) that only those investors who can afford a total loss of their investment should consider purchasing Shares.

## SUMMARY OF THE OFFERING

The following is a summary of certain material contained in this Memorandum. This summary is qualified in its entirety by the detailed information and financial statements (including notes thereto) appearing elsewhere herein and should be read in conjunction with such material.

## THE OFFERING

Securities Offered:
Maximum Offering:

10,000,000 Shares. Each share is common stock, par value $0.01 at a price of $1.00 per Share. No public offering of our Common Stock is contemplated in the foreseeable future. There is no market for the Shares. We do not currently pay dividends on our Common Stock and do not anticipate paying any dividends in the foreseeable future.

Common Stock Outstanding:

40,000,000 Shares

Common Stock Outstanding assuming the maximum number of Shares is sold pursuant to this Offering:

50,000,000 Shares

Purchase Price:

$1.00 per Share.

Terms of the Offering:

The Offering will terminate on, or prior to, March 31, 2010, subject to one or more extensions, in our sole and absolute discretion, with no restriction upon either the number of extensions or upon the length of time for each of said extensions. This Offering may be so extended without amending this Private Placement Memorandum and without notice to either the investors who have submitted their

12

Exhibit _____ 7 _____ Page _____ 150

subscription documents to us or to prospective investors. We are offering the Shares on a "best efforts" basis with no minimum number of Shares required to be sold. We may in our discretion accept subscriptions for fractional Shares; provided however, that no fractional shares of Common Stock may be issued.

**Use of Proceeds:**

Assuming the sale of the maximum of 10,000,000 Shares offered herein, our net proceeds are expected to be approximately $8,350,000, after deducting commissions, legal, printing and other expenses of the Offering. We contemplate utilizing the net proceeds of this Offering for (i) expansion of the LA Digital business including, but not limited to, financing the purchases of new equipment for rental in the ordinary course of LA Digital's business, (ii) to repay or restructure existing debt; (iii) for expenses related to this offering; (iv) recapitalizing the Company, and/or (v) acquisitions.

**Risk Factors:**

An investment in the Shares offered hereby is speculative and involves a high degree of risk. There can be no guarantees of profit, or against loss, as a result of purchasing Shares. Only those investors who can afford immediate and substantial dilution and a total loss of their investment should consider purchasing Shares. See "RISK FACTORS" and "DILUTION."

**Registration Rights/Transferability/Liquidity:**

The Shares being offered hereby have not been registered under the 1933 Act or under the securities laws of any state. The Shares are offered pursuant to an exemption from registration under the 1933 Act in reliance upon intended compliance with the provisions of Sections 4(2) of the Act and Rule 506 of Regulation D promulgated under the Act. Accordingly, the Shares may not be sold, pledged, hypothecated, donated or otherwise transferred, whether or not for consideration, until we register the Shares or an exemption

13

Exhibit ___7___ Page___151__

from registration applies. Although the Shares shall not be registered in various states, we shall comply with the registration or other qualification requirement concerning the offering of securities in each state in which the Shares shall be offered. In addition to restrictions under federal laws, the Shares purchased in one state cannot be sold, transferred, pledged or hypothecated in that state or in another state until we have registered the Shares or an exemption under state securities law applies. We are not presently a reporting company pursuant to either Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "1934 Act"), and therefore, do not presently file any reports with the Securities and Exchange Commission (the "SEC"). No public offering of our Common Stock is contemplated in the foreseeable future. There is no certainty with respect to if, and when, a public market shall develop. Investors should understand that the Shares are not liquid and may have little or no value if an Investor desires to liquidate his or her investment in the Shares. Accordingly, the Shares should not be purchased by anyone who requires liquidity or who cannot afford a complete loss of his investment. The lack of liquidity of, and significant risks associated with, an investment in us makes the purchase of Shares suitable only for an Investor who has substantial net worth, who has no need for liquidity with respect to this investment, who understands the risks involved and has reviewed these risks with his or her legal and investment advisors, and who has adequate means of providing for his or her current and foreseeable needs and contingencies. See "RISK FACTORS"-"Registration Rights/ Transferability/ Liquidity".

14

Exhibit ___7___ Page___1.52

**Closing:**

The Offering shall terminate on or before March 31, 2010, subject to one or more extensions, in our sole and absolute discretion with no restrictions upon either the number of extensions or upon the length of time for said extensions. This Offering may be so extended without amending this Memorandum and without notice to either the investors who have submitted their subscription documents to us or to prospective investors. The Initial Closing will be held when we first accept subscriptions for one or more Share, as determined by our management, in its sole and absolute discretion. Subsequent subscriptions shall be accepted as determined by us in our sole and absolute discretion.

15

Exhibit _____7_____ Page_____153

## EXECUTIVE SUMMARY

LA Digital rents post-production editing systems and provides technical support to major film and television clients. LA Digital owns approximately 200 non-linear digital editing systems. LA Digital rents editing systems to its customers on a short-term basis, typically six to 50 weeks, for use at the client's site or at one of the 99 editing rooms located at LA Digital's four facilities in Los Angeles and New York.

As part of editing system rentals, LA Digital provides custom configuration, full-service installation, and 24/7 technical support. LA Digital clients include major film studios (e.g. 20th Century Fox, Warner Brothers, New Line Cinema, Marvel Films), major television networks (e.g. ABC, NBC, CBS), cable television networks (e.g. HBO, E! Entertainment, Lifetime), and independent production companies (e.g. Mark Burnett Productions).

**Reputation for Quality and Customer Service.** In its fourteen years of operations, LA Digital, has established a reputation for high quality products and customer service and has created valuable brand name recognition within the entertainment industry. Because of its reputation, LA Digital caters to higher end clients who demand superior service and support. This level of service that LA Digital provides also allows it to maintain a strong pricing model which tends to be at the higher end of the range for the industry. Generally, the industry does not provide for long-term or exclusive agreements with its customers, and therefore business is won based on customer satisfaction with reliability, timeliness, quality and price. LA Digital has secured a two year exclusive with Viacom/MTV in New York for certain services and LA Digital has a de facto exclusive relationship with many clients, but generally client relationships are a function of providing the level of service that the clients demand and expect.

**Strong Customer Relationships.** Management has formed strong strategic relationships with a significant number of major motion picture studios, such as 20th Century Fox, Paramount Pictures, Warner Brothers, New Line Cinema and Marvel Films, and cable and television networks, such as ABC, NBC, CBS, HBO, MTV, E! Entertainment and Lifetime. These networks and studios rely on LA Digital to deliver high-quality equipment and technical support. Frequently, Management will be invited to project planning meetings to assist and consult on post-production matters. The Company also maintains strong relationships with directors, editors, and various other decision makers who are involved in selecting equipment rental providers. These customer relationships act as an effective barrier to entry to potential new competitors.

**Niche Market in Large and Stable Industry.** LA Digital provides a niche service within the larger post-production services market, which according to Fortis Bank is a $4 billion industry. LA Digital rents post-production editing equipment to its customers, who are looking to outsource the equipment management, technical support staffing, and technology risk related to the owning post-production equipment. According to First Research, the demand for post-production editing equipment and related services is dependent upon the overall $46 billion film and television production industry which is projected to grow at a 4.1% annual rate through 2012. The industry lends itself to being an out source solution as it is critical to the production process but it is a small expense item in the scope of entertainment content production budgets.

16

Exhibit ___7___ Page__154__

Therefore, the risk in bringing the service in house does not justify the relatively small cost of using an out source solution such as LA Digital.

**Experienced Management Team**

LA Digital has an experienced management team with virtually all of the senior managers having been with LA Digital for in excess of 6 years. The management is committed to a growth plan to expand profitability and market share. Gary Migdal, currently CEO and President of LA Digital, joined the firm in 1995 and has over 24 years of post-production management experience and has extensive industry relationships. Mr. Migdal owns in excess of 10% of the Company which aligns his interests with shareholders.

**Products**

The Company primarily rents post-production editing equipment consisting of non-linear digital editing systems, data storage devices, video tape recorders and other peripherals. The Company also provides technical support services, rents editing rooms (in conjunction with renting editing systems), and on occasion sells equipment

**Pricing**

Pricing for the Company's products and services is generally customized on a project by project basis. However in general, the Company is considered to be a higher-cost provider amongst its competitors. Despite this, the Company has been able to maintain its blue chip customer base by offering the latest in digital editing technologies and providing unequaled customer support.

**Rent Versus Own Rationale**

While certain editors and post-production companies purchase editing equipment for in-house use, a sizable portion rent editing equipment for economic and practical reasons: (1) initial capital costs to purchase post-production editing equipment are relatively high, (2) multiple non-standard video formats necessitate a large inventory of editing systems, video tape recorders, and components to accommodate the demands of different projects, (3) project-by-project nature of the entertainment industry results in relatively low utilization rates on equipment owned in-house versus equipment owned by third-party rental companies, (4) deadline-sensitive nature of projects requires the highest level of technical support, with dedicated personnel on-call 24/7 – an expensive proposition for most service providers in the entertainment industry, and (5) on-going costs to manage, maintain and store editing equipment are significant. For these reasons, customers outsource to companies, such as LA Digital, the equipment management, technical support staffing, and technology risk associated with owning post-production editing equipment. This also allows clients to focus on the artistic and creative processes.

**Equipment Rentals**

LA Digital rents complete editing and finishing systems, data storage devices, video tape recorders, and other components. Equipment is delivered for use at the client's site or at one of

17

Exhibit ___7___   Page___155

the Company's facilities in Los Angeles and New York. The equipment is typically rented between six and 50 weeks with billing on a weekly basis. Historically, LA Digital equipment is rented for an average period of 30 weeks for television shows and 40-50 weeks for feature films.

LA Digital differentiates itself within the market by offering its clients the very latest in existing and emerging digital editing technologies, and providing them with technical expertise and support infrastructure. Editing systems are custom configured for every client to meet the specific needs and demands of each individual project. All systems undergo vigorous testing and diagnostics prior to the start of any editing project deployment. Systems are fully integrated to help eliminate potential problems, increase reliability and create a more user-friendly interface. A key selling point for customers is access to LA Digital's highly skilled technical support staff, which can be available on-site at the client's site or via a 24/7 call center. The Company also makes service and maintenance contracts available to customers that purchase systems or otherwise own their own systems.

An editing system consists primarily of (1) editing software (e.g. Avid or Apple) that operates on a high-powered computer (e.g. Mac or PC), and (2) input/output device for video and audio, also known as a break-out box. A typical editing system will also include data storage devices, video tape recorders, monitors, speakers and other components. A picture of a typical editing system is shown below.

The Company currently owns approximately 210 systems that can be used for editing and finishing.

<u>Editing Systems</u>

*Avid Media Composer.* Avid is the manufacturer of the software that has become the de facto standard in the industry. Final Cut Pro, an Apple product is used, but for LA Digital's clients, Avid is 90% of the demand. Accordingly, the Avid Media Composer is the worldwide standard for non-linear digital editing software. Media Composer converts video and audio from video tape to digital media, stores the digital media on a range of data storage devices, then allows the user to preview, play back and edit the digital media. Avid has three versions of Media Composers: Meridien, Adrenaline, and DX Nitris. All of these versions are still in use and the decision as to which to use is based on the type of job, editor preference, and cost. Meridiens were released in the late 1990's and have performed well. Although the industry is technology driven, the number of years that Meridiens have been used shows that the useful life of the products is long. Adrenalines were released in 2003 and are still in use and the DX model is the newest Avid version with a release date in late 2008. LA Digital will only purchase DX's going forward.

18

Exhibit ___7___ Page_156_






Avid Meridien Media Composer                              Avid Adrenaline Media Composer

The Company has 50 Meridien systems and 85 Adrenaline systems and approximately 50 DX systems, which are typically rented on a weekly basis for $650 and $1,100, respectively.

*Apple Final Cut Pro.* Final Cut Pro is a competing editing software program developed by Apple. The Apple Final Cut Pro has the ability to process many formats including DV, HDV, DVCProHD, XDCAM, 2K, and IMAX. The software logs and captures video onto the computer's hard drive, where it can be manipulated and edited. The Company has 10 Apple Final Cut Pro systems, which are typically rented on a weekly basis for $650.



<u>Editing Systems, Finishing</u>

*Avid Symphony.* Avid Symphony is a digital, non-linear video editing system that is used for finishing. Finishing refers to final touch-up enhancements that include color correction, transition effects, and shot stabilization. Avid Symphony differentiates itself from Avid Media Composer with the addition of secondary color correction, uncompressed high definition support, higher real-time performance, and other advanced features. Avid Symphony can be combined with a Meridien or a Nitris hardware accelerator.

19

Exhibit _____7_____ Page___151





Avid Symphony Meridien                                  Avid Symphony Nitris

The Company has 5 Avid Symphony Meridien systems for standard definition finishing and two Avid Symphony Nitris systems for high definition finishing. The Company rents the Symphony Meridien and Symphony Nitris on a weekly basis for $1,400 and $2,000, respectively. The new DX system can work on high definition projects as well.

<u>Data Storage</u>

Digital video editing creates an immense amount of data which must be stored and accessed either through local storage or networked storage devices. The Company offers a certain amount of data storage as part of its editing system rental packages, but also provides additional storage if requested for additional charge.

*Local storage.* The Company rents local storage devices (i.e. hard drives) that range from 36 gigabytes (1 gigabyte = $10^9$ bytes) to 8 terabytes (1 terabyte = $10^{12}$ bytes). The Company has a variety of Avid hard drives that can store 36-146 gigabytes and rent for $20-$50 per week. For greater storage capacity and data redundancy, the Company also offers Avid disk arrays that can hold 1-8 terabytes of data and rent for $300-$600 per week.

*Networked storage.* The Company rents networked storage solutions which allow multiple editors to share data and work collaboratively. The Company offers Avid Unity LANshare which can store 2,880-8,000 gigabytes of data and can be accessed simultaneously by up to 20 editors. The Company rents the Avid Unity LANshare, which cost up to $50,000 depending on the storage option, for $1,000 per week approximately.

<u>Peripherals</u>

LA Digital intends to begin renting peripherals and other miscellaneous equipment for rent to its customers in addition to complete systems. These peripherals range from monitors and speakers to additional computers.



Exhibit ____7____ Page____158

**Technical Support**

LA Digital is one of only a few Avid Authorized Level 3 Support Providers worldwide. As an authorized provider, LA Digital can offer Avid Assurance maintenance contracts. Avid Assurance contracts provide total customer support including unlimited telephone support, access to system software maintenance releases, discounts on spare parts and advanced parts exchange. Avid Assurance is offered to customers who purchase equipment from LA Digital. LA Digital is also an Authorized Apple Service & Support Agent.

LA Digital employs a highly qualified staff of Avid Certified Service Representatives who provide expertise for Avid editing systems, various SCSI and fibre channel storage devices, and editing system peripherals on both the Macintosh and Windows NT platforms. The Company has a substantial inventory of editing systems and spare parts readily available at all times. The Company's technicians are responsible for ensuring that the editing systems are well-maintained and are available for use on short notice.

The Company has annual service contracts with Warner Brothers, E! Entertainment and NBC Studios. For its other customers, the Company offers technical support services a la carte. The Company provides custom configuration, full-service installation and 24/7 technical support, which is typically priced at $125-$175 per hour.



**Editing Room Rentals**

For those customers that do not have their own editing facilities or require overflow space, the Company provides 99 in-house editing rooms at three locations in Los Angeles and one in New York. The rooms are turnkey editing environments that feature valet parking, a private security entrance, kitchenette, office/reception area, basic janitorial services, onsite security and 24-hour technical support along with the actual editing system. Each facility offers LA Digital's full line of editing products and services and can be custom configured to the specifications of each client.

The editing rooms are priced $200 to $600 per week, and are generally rented in conjunction with an editing system.

**Equipment Sales**

Although its principal business is rental of editing equipment, the Company also occasionally sells equipment to its clients usually in connection with an installation or service agreement.

Exhibit _____7_____ Page___159

## Capital Expenditures

According to Management, the post-production editing systems and peripherals generally have a 5-10 year useful life depending upon the specific item. This useful life easily allows LA Digital time to recover its investment and a strong return on all equipment. While editing technology is continually being improved by Avid, Apple, and other developers, adoption of new technology by the motion picture and television production industry occurs more slowly. The post-production industry tends to adopt the next generation of editing products only after it has undergone a field-testing period of at least one year. For example, Avid introduced Media Composer Adrenaline in 2003 as a replacement for Media Composer Meridien and discontinued production of Meridien as of December 31, 2006. Early adopters of Media Composer Adrenaline faced significant software and hardware problems with inadequate technical support from Avid. As such, a significant portion of the post-production community continues to utilize the familiar and proven Meridien systems. The new DX Nitris Avid system seems to have few performance issues so LA Digital expects it to become adopted more quickly than the Adrenaline, but even as technology may shift over a period of years, no capital expenditures on equipment are made until LA Digital has a client ready to take delivery of the equipment for rental so the revenue stream starts almost simultaneously with the capital expenditure.

Management typically purchases equipment in response to customer demand. Break-even on the cost of purchasing post-production editing equipment generally occurs within 36-50 weeks of being on rental (excluding costs of providing technical services) depending upon the particular piece of equipment.

Management will evaluate the cost-benefit of purchasing additional editing equipment on a system by system basis. For the twelve months ending December 31, 2009, LA Digital would expect to purchase $2.0-$3.0 million worth of equipment which if rented as expected will generate incremental operating cash flow of approximately $200,000 per month.

## Customers

The Company's customers include major film studios (e.g. 20th Century Fox, Paramount Pictures, Warner Brothers, New Line Cinema, and Marvel Films), major television networks (e.g. ABC, NBC, and CBS), cable television networks (e.g. HBO, MTV, E! Entertainment, Lifetime), and independent production and post-production companies (e.g. Mark Burnett Productions).

Because of the project-by-project nature of the entertainment industry, the Company has few long-term or exclusive service agreements. Customers typically rent post-production editing equipment for a duration of time that is dependent upon the type of project. On average, customers rent the Company's editing systems for a period of 30 weeks.

- Feature Film, Studio – 26 to 50 weeks
- Television Program – 6 to 12 weeks
- Feature Film, Independent – 12 to 40 weeks
- TV Series (episodic and reality) – 30 to 40 weeks

22

Exhibit ____7____  Page____160

## Industry Overview

The Company rents post-production editing equipment and provides technical support to major film and television clients. The Company provides a niche service within the larger post-production services market, which according to Fortis Bank is a $4 billion industry. The demand for post-production editing equipment and related services is dependent upon the overall $46 billion film and television production industry.

The entertainment industry creates motion pictures, television programming, and interactive multimedia content for distribution through theatrical exhibition, home video, pay and basic cable television, direct-to-home, private cable, broadcast television, on-line services and video games. Content is released into a "first-run" distribution channel, and later into one or more additional channels or media. Entertainment content produced in the United States is often exported and is in increasingly high demand internationally. In addition to newly-produced content, film and television libraries may be released repeatedly into distribution.

## Post-Production

As summarized in the chart below, the steps in creating a film or television show can be categorized into four broad areas: (1) Development, (2) Pre-Production, (3) Production, and (4) Post-production. Post-production refers to the final stage whereby video and audio recorded in the production phase is edited and manipulated. In addition to the editing of video and audio, post-production also includes the creation of soundtracks and special effects.

| Development | Pre-Production | Production | Post-Production |
|---|---|---|---|
| • Write screenplay<br>• Schedule production<br>• Create budget<br>• Obtain financing | • Create storyboards<br>• Hire cast<br>• Hire crew | • Prepare sets<br>• Rehearse scenes<br>• Film video & audio | • Edit video & audio<br>• Compose soundtrack<br>• Add special effects |

Exhibit _____ 7 _____ Page _____ 161

## Non-Linear Editing

Non-linear editing for film and television postproduction is a modern editing method which involves being able to access any frame in a video clip with the same ease as any other. This method is similar in concept to the "cut and paste" technique used in film editing. However, when working with film, the editing process is destructive as the actual film negative must be cut. The introduction of digital video technology enabled a non-linear and non- destructive editing process. With digital editing systems, the original source files are not lost or modified. The editor works on low-resolution copies of the original video. This makes it possible to edit both standard-definition broadcast quality and high definition broadcast quality very quickly on normal computers which do not have the power to do the full processing of the huge full-quality original data in real-time. The editing system records the decisions of the editor in an edit decision list. The editing system makes it easy to change cuts and undo previous decisions simply by editing the edit decision list.

## Motion Picture Industry

According to First Research, U.S. motion picture production and distribution is a $33 billion industry. The industry is highly concentrated with the largest 50 companies accounting for almost 80 percent of revenue. Major companies include Disney, Sony Pictures, MGM, Paramount, Fox, Universal, and Warner Brothers. Production companies create movies that are released first in movie theatres and later through television, DVD, and other distribution channels. The industry is forecasted to grow at an annual rate of 4.1% between 2007 and 2012.

*Theaters.* In 2008, 610 films were released which generated box office receipts of $9.5 billion. Box office receipts have remained relatively consistent since 2004, despite an increase in the number of films released. According to PricewaterhouseCoopers, box office receipts will grow to $11.7 billion in 2011. According to Variety.com, there were 607 films in some stage of post-production as of June 2009.



24

Exhibit ___7___   Page___162___

*Home Video.* The biggest market for motion pictures is the home video market, which consists of both movie rentals and movie sales. In 2006, the U.S. home video market was approximately $26.3 billion, the majority of which came from DVD sales. According to Veronis Suhler Stevenson, the U.S. home video market will grow to approximately $31.2 billion by 2011, a 3.5% annual growth rate. In terms of number of titles available, according to Digital Entertainment Group, there were 68,000 DVD titles available in 2006 up from 20,000 titles in 2002.



25

Exhibit ____7____ Page ____16.3

## Television Industry

According to First Research, U.S. television program production and distribution is a $13 billion industry and is forecasted to grow at an annual growth rate of 4.1% between 2007 and 2012. The industry is highly concentrated with the largest 50 companies accounting for almost 80 percent of revenue. The major companies include NBC Universal, CBS Paramount, Disney/ABC, Fox Television Studios, Warner Brothers, and Sony Pictures Television. Production companies create television movies, dramas, situational comedies (sitcoms), reality, game, talk shows, documentaries, children's, art, sports and news programs. Shows are aired initially on a "first-run" basis, then may be re-released in syndication and on other media like DVDs. The industry has been impacted by the following trends:

*Reality Television.* The demand for equipment rentals has increased significantly since reality television became popular. The majority of the creation process for a reality television series is completed in post-production. Reality television requires more cameras, more footage, and therefore more editing equipment than traditional television programs. According to tvtracker.com, there will be 56 network reality series airing in 2008, up from 51 the prior year. Entire cable networks, including MTV and Bravo, build their original lineups almost exclusively with this genre.

*High Definition.* In the U.S., legislation has mandated a full transition of television broadcasts from analog to digital high definition signals by June, 2009. As a result, more media is being filmed and edited for distribution in high definition. Management is seeing greater demand from its customers for editing systems capable of editing and finishing high definition media, as well as greater demand for data storage.

*Existing Media Libraries.* There is a significant amount of post-production work related to the re-distribution of original programming in syndication, DVD and other media. As "first run" television programming moves from prime time to syndication, the content is edited to make room for more commercials. In addition, as existing media libraries of older television programs and films are converted for distribution on new media channels, the content is typically re-mastered, edited, restored, re-colored, converted and reformatted.

*Other Media.* The growth of content made for internet distribution will create opportunities for the Company. The content developed for YouTube.com and other "amateur" websites would not be the Company's target market, but rather the burgeoning number of internet-only broadcast channels that are producing first rate content.

## Vertical Growth Opportunities

Management is evaluating several opportunities to expand its product offerings vertically and provide existing customers a "one stop shop" for their other production and post-

Exhibit _____7_____  Page____164____

production needs. Management is evaluating production equipment rental such as lighting and equipment storage. In addition, the Company is evaluating partnering with another company to market digital asset management technology for safeguarding content transmitted over the internet or via satellite. The Company has also identified several acquisition targets that would expand the client base and create operating efficiencies.

## Competition

The Company is one of the largest providers of post-production editing equipment rentals with approximately 210 editing systems and 99 editing rooms. The post-production editing equipment rental market is a highly competitive industry centered in Los Angeles and New York, where most of the domestic motion picture and television production is located. A large number of companies offer post-production services with no single provider having a dominant market share. In addition, the major film studios and television networks often have the capability to perform in-house some or all of the services the Company offers. The Company competes for customers based on reliability, timeliness, quality and price. Management considers companies in Los Angeles and New York with inventories of 50 or more editing systems to be the Company's most direct competitors. A list of such competitors is shown below followed by brief descriptions.

*Wexler Video.* Wexler Video rents production (e.g. cameras) and post-production equipment. Wexler Video is generally considered to be a low cost provider with a lower level of customer service. Wexler is located in Los Angeles and has been in business for more than 20 years. Management estimates the company has 350 editing systems and does not offer editing rooms.

*Postworks Orbit.* Postworks Orbit provides digital equipment rentals to the motion picture and television production industry. The company also offers rentable editing rooms. Postworks Orbit has offices in Los Angeles and New York and Management estimates that the company has approximately 300 editing systems and 50 editing rooms for rent. The company was formed by the merger of Postworks and Orbit Digital in October 2006.

*Pivotal Post.* Pivotal Post provides digital equipment rentals to the motion picture and television production industry. The company is headquartered in Los Angeles with additional offices in New York and the United Kingdom. Management estimates that the company has 150 editing systems and 20 editing rooms.

*EPS/Global Entertainment Partners.* EPS and Global Entertainment Partners were each formed in approximately 1994 and merged in 2008. They are an Avid Rental company serving the feature film industry. Since then, the service offering has expanded to include post-production film transfers including high definition and standard definition Telecine of feature film dailies as well digital mastering. The company also offers technical support and customer service. The company has two locations in Los Angeles and Management estimates that the company has 280 editing systems and 40 editing rooms.

Exhibit _____7_____ Page_____165_____

*Atlas Digital.* Atlas Digital provides digital equipment rentals to the motion picture and television production industry. Atlas Digital has one office in Los Angeles. Management estimates that the company has 75 to 80 editing systems.

*Runway Editorial.* Runway Editorial provides digital equipment rentals such as Avid and Final Cut Pro and rents editing rooms to the motion picture and television industry. The company also provides customer service and technical support to their customers.
Runway has four offices in the Los Angeles area. Management estimates that the company has 50 to 60 editing systems and 18 editing rooms. Runway Editorial is owned by The New Post Group which is a full-service production company.

*Catalyst Digital.* Catalyst Digital provides digital equipment rentals to the motion picture and television production industry. Management estimates that the company has approximately 50 editing systems for rent.

*Go Edit.* Go Edit provides digital equipment rentals to the motion picture and television production industry. The company also offers rentable editing rooms and customer support. Go Edit is located in Los Angeles and management estimates that the company has 25 to 50 editing systems.

*Hula Post.* Hula Post has traditionally focused on renting solely peripherals. They have expanded to complete systems and own an estimated 75 systems. They are based in Los Angeles and have approximately 10 editing suites.

## Vendors

The Company purchases new post-production editing systems and components primarily from Avid Technology, Inc. (NASDAQ: AVID). The Company also purchases used and refurbished equipment from various other sources.

Avid is considered the industry standard, with the majority of major feature films, television programs, and commercials created with its systems. Avid estimates that approximately 90% of primetime television shows, 85% of feature films, and 80% of commercials are made using one or more Avid products.

The Company typically secures commitments from customers before new inventory is purchased and made available for rent. Equipment is sourced from multiple locations. At times, the Company may identify used or refurbished equipment from bankrupt businesses, competitors, customers, resellers or other third parties and realize a savings on equipment purchases. The Company typically updates its equipment to keep up with industry improvements but primarily in response to customer demand.

Exhibit _____7_____   Page___166

## Sales & Marketing

The Company markets its services through industry referrals, regular contact with the existing client base, a direct sales force, trade show participation, and trade publication advertising. The Company relies primarily upon its strong brand reputation in the industry and certain strategic business relationships to bring in referral business.

The Company maintains a direct sales force that regularly calls upon existing customers and customers who have rented from the Company in the past, as well as reaching out to potential new customers. The sales force also stays abreast of production schedules and contacts the various producers of content.

In addition, the Company regularly advertises in trade publications for editors including the *ACE Guild* and the *Motion Picture Editors Guild*. The Company also advertises in the *Blubook, LA 411,* and *Creative Handbook*, which are service provider listings frequently utilized by the entertainment industry. The Company also maintains an internet presence through its websites: ladigital.com.

## Company History

*LA Digital.* LA Digital was founded in 1995. In August 2003, Marc Bercoon, Will Goldstein and another partner (who has since been bought out) purchased LA Digital. Gary Migdal has been the President of LA Digital for over 13 years. Collectively, Mr. Migdal, Mr. Bercoon and Mr. Goldstein control over 80% of the fully-diluted membership interests in LA Digital. LA Digital currently employs 43 people at four offices.

## Corporate Structure

The Company owns 100% of LADP, LLC which owns 100% of the outstanding stock of LA Digital Post, Inc. which owns 100% of the membership units of LADP New York, LLC a Delaware limited liability company with operations in New York.

## Management

The Company's management team is comprised of individuals who have diverse and complementary skills and substantial collective experience in the media and technology industries. Management and the directors on the Board of Directors are summarized below.

### Gary Migdal, *President & CEO*

Gary Migdal is the President & CEO of LA Digital. Mr. Migdal has been with the LA Digital since one year after its inception in 1995. Mr. Migdal has over 24 years of post-production management experience and has extensive industry relationships. Mr. Migdal is responsible for the Company's sales effort and strategic direction. Prior to joining LA Digital, Mr. Migdal held senior management positions at three other leading post-production companies in the Los Angeles area.

Exhibit ___7___ Page __167__

**Don Schiada,** *Controller)*

Don Schiada is the Controller of LA Digital. Mr. Schiada has 20 years of accounting experience, including eight years with LA Digital. Previously, Mr. Schiada served three years as General Accounting Manager at the California Power Exchange, and prior to that, served eight years as Assistant Controller at the insurance division of Countrywide Funding. Mr. Schiada is a CPA.

**Marc Bercoon,** *Vice Chairman & Chief Financial Officer*

Marc Bercoon is Vice Chairman of the Company and Chief Financial Officer of the Company. He has been on the Board of LA Digital since August 2003. Mr. Bercoon began his career as an attorney with a Chicago-based national law firm currently known as Katten, Muchin, & Rosenman, followed by various senior positions with the Equity Group, a private investment company owned and controlled by Chicago investor, Sam Zell. Mr. Bercoon has been a private investor since 2002 and has been involved in many investments with partner Will Goldstein. Ventures have included JC Nationwide, Inc. a physician staffing company founded by Mr. Goldstein in 1992. Mr. Bercoon was Vice Chairman and Chief Financial Officer for JC Nationwide, Inc., until it was sold in January 2005. Mr. Bercoon also was a Vice President of the Trump Group, a private investment company based in South Florida with over $1 billion of assets under management. Mr. Bercoon earned his B.S. in Accountancy with high honors from the University of Illinois (Urbana, IL) and his J.D. from the UCLA School of Law. Mr. Bercoon passed the Illinois CPA exam in 1982 and the Illinois BAR exam in 1985.

**Will Goldstein,** *Chairman*

Will Goldstein is Chairman of the Company. Mr. Goldstein is an investor/entrepreneur who has been involved in the formation and development of many businesses. Mr. Goldstein began his professional career as an entrepreneur in 1987 by acquiring a locksmith and security store with one location in Norfolk, Virginia. Mr. Goldstein grew this business to four locations and in excess of 20 mobile units. In 1992, Mr. Goldstein sold the firm to the largest security company in Virginia. In the same year, Mr. Goldstein founded Nationwide Medical Services, Inc., a physician staffing company. Under Mr. Goldstein's leadership, Nationwide Medical grew at a rate of in excess of 200% per year for its first six years, achieving $18 million in sales by 1998. Mr. Goldstein successfully negotiated and managed Nationwide through a series of transactions, including the 1998 merger between Nationwide and Jackson & Coker, in which the surviving entity became JC Nationwide. With Mr. Goldstein as Chairman and CEO, JC Nationwide grew to approximately $70 million in revenue. In January 2005, JC Nationwide was acquired by World Health Alternatives, a publicly traded health care staffing company. Mr. Goldstein has been partners with Marc Bercoon since October 2001 in various ventures, including JC Nationwide, Inc. In August 2003, Marc Bercoon, Will Goldstein and another partner (who has since been bought out) purchased LA Digital. Mr. Goldstein earned his Bachelor's Degree in Business Administration from Old Dominion University.

Exhibit _____ 7 _____ Page _____ 168

## Employees

The Company had approximately 45 full-time employees as of June 1, 2009.

## Financial Highlights

LA Digital's revenues for fiscal year end were $13.375 million. The EBITDA or income from operations was $1.72 million. The EBITDA has been negatively impacted by $2.5 million because LA Digital does not own all of the equipment it rents to third parties. Therefore, LA Digital rents certain equipment from third parties for $2.5 million per year (approx.) in order to deliver complete editing systems to its clients. Through the Offering, LA Digital will be able purchase the equipment it needs so that the amount of equipment it needs to rent from third parties is minimized. Management believes that purchasing $2.5-$3.0 million will increase EBITDA by approximately $2.5-$3.0 million over the course of twelve months. The useful life of the equipment is in most cases 5-10 years so the benefits of buying the equipment should be realized over a long duration.

There are also several acquisition targets that management has identified. Some of these targets are direct competitors that will increase profitability and allow LA Digital to better leverage its infrastructure. Management believes that it can absorb additional revenue without a proportionate increase in SG&A expenses. Accordingly, acquisitions should create substantial profitability if they are integrated properly.

Other acquisition targets include ancillary products such as technology companies that provide services to the LA Digital's client base. These types of acquisitions should give LA Digital a competitive advantage in marketing its services to clients in that it will have an exclusive or favorable pricing on the acquired technologies.

L.A. Digital Post, Inc. - Consolidated P&L for Twelve Months ending Mach 31,
Un-Audited – Includes Pro Forma Information

|  | 2009 w/ Equip. Purchases | 2010 Pro Forma | 2010 Pro Forma w/Acquisition |
|---|---|---|---|
| Revenues: | $13,374,547 | $14,512,879 | $22,985,565 |
| Cost of Goods Sold | (1,257,183) | (1,019,873) | (2,309,876) |
| Gross Profit | $12,117,364 | $13,493,006 | $20,675,689 |
| SG&A | (7,787,153) | (8,245,700) | (11,987,590) |
| Income From Operations (EBITDA) | $4,330,211 | $ 5,247,306 | $8,688,099 |
| Depreciation/Amortization | (2,452,885) | (2,452,885) | (4,087,633) |
| Interest Expense | (821,829) | (800,000) | (1,500,000) |
| Net Income | $1,055,497 | $ 1,994,421 | $3,100,466 |

The above shows the effect of purchasing equipment that LA Digital currently subrents from third parties. Actual EBITDA was $1.72 million, while EBITDA would have been $4.33 million (see column 1 above) in the same time period if it purchased $2.5 million (approx.) of equipment. Based on management's estimates for the current fiscal year, the Company would have $5.24 million of EBITDA ("2010 Pro Forma") if it owned this equipment. The "2010 Pro Forma with Acquisition" column shows the effect of an acquisition that is a direct competitor.

Exhibit _____ 7 _____ Page___169